UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELERS PERSONAL INSURANCE COMPANY, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, ST. PAUL MERCURY INSURANCE COMPANY, THE CHARTER OAK FIRE INSURANCE COMPANY, THE PHOENIX INSURANCE COMPANY, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY, THE TRAVELERS INDEMNITY COMPANY OF AMERICA, THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, TRAVELERS CASUALTY AND SURETY COMPANY, TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, TRAVELERS PERSONAL SECURITY INSURANCE COMPANY, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, THE STANDARD FIRE INSURANCE COMPANY, THE AUTOMOBILE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, AND UNITED STATES FIDELITY AND GUARANTY COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> ELECTROSTIM MEDICAL SERVICES, INC., MARIO GARCIA, JR., DEAN MULEY, GRETCHEN DACEY-ZAVALIANOS, YORLAN ALFONSO, AND ROSSANA CIELO, <br><br> Defendants. | C.A. No. |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

The plaintiffs, Travelers Personal Insurance Company, St. Paul Fire and Marine Insurance

Company, St. Paul Mercury Insurance Company, The Charter Oak Fire Insurance Company, The

Phoenix Insurance Company, The Travelers Home and Marine Insurance Company, The Travelers

Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity

Company of Connecticut, Travelers Casualty and Surety Company, Travelers Casualty Insurance

1

Company of America, Travelers Personal Security Insurance Company, Travelers Property Casualty Company of America, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, and United States Fidelity and Guaranty Company, (collectively, "Travelers" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.    <u>INTRODUCTION</u>

1.    This is a case about a fraudulent durable medical equipment ("DME") company, Electrostim Medical Services, Inc. ("EMSI") and its owner, Mario Garcia, Jr. ("Garcia"), and operators, Dean Muley ("Muley"), Gretchen Dacey-Zavalianos ("Dacey-Zavalianos"), Yorlan Alfonso ("Alfonso"), and Rossana Cielo ("Cielo") who conspired to submit fraudulent insurance charges for the provision of unlicensed, unnecessary, medically worthless, and fraudulently charged DME.

2.    EMSI is a Florida company that manufacturers interferential stimulation and transcutaneous electrical nerve stimulation ("TENS") devices and neuromuscular electrical stimulation ("NMES") devices (collectively, "TENS/NMES Devices") and provides these devices and related supplies and services to patients throughout numerous states, including New York.

3.    At all relevant times, EMSI did not possess a New York City Department of Consumer and Worker Protection ("DCWP") license.

4.    Despite being unlicensed, EMSI allegedly dispensed TENS/NMES Devices in New York (including New York City and its boroughs).

5.    The Defendants submitted fraudulent billing to Travelers for DME that was (1) unlicensed; (2) unnecessary; (3) medically worthless; (4) billed pursuant to a pre-determined treatment protocol; and (5) fraudulently billed.

6.      This is corroborated by EMSI itself, which recently paid "$20 million to resolve allegations that they violated the False Claims Act by billing federal healthcare programs for excessive and medically unnecessary supplies associated with [TENS] and related devices." Press Release, E.D. Penn., *EMSI and Garcia Agreement to Pay $20 Million to Resolve Allegations* (Sept. 27, 2024), *available at* https://www.justice.gov/usao-edpa/pr/electrostim-medical-services-inc-and-mario-garcia-jr-pay-20-million-resolve.

7.      A true and accurate copy of the press release for the United States Attorney's Office, Eastern District of Pennsylvania is depicted below:

**PRESS RELEASE**

# Electrostim Medical Services, Inc. and Mario Garcia, Jr. to Pay $20 Million to Resolve Allegations of Billing for Excessive and Unnecessary Supplies

Friday, September 27, 2024

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Pennsylvania

PHILADELPHIA – United States Attorney Jacqueline C. Romero announced today that Florida-based durable medical equipment supplier Electrostim Medical Services, Inc. (EMSI) and its Founder and Chairman Mario Garcia, Jr. have together agreed to pay, based on their limited ability to do so, $20 million to resolve allegations that they violated the False Claims Act by billing federal healthcare programs for excessive and medically unnecessary supplies associated with Transcutaneous Electrical Nerve Stimulation (TENS) and related devices.

TENS units provide short-term pain relief for many patients by delivering a low-voltage electrical current to the skin around an affected body part. Among the supplies necessary for TENS use are electrodes, which transmit the current, and rechargeable batteries, which power the device. In limited circumstances, healthcare providers may prescribe a wearable garment containing electrodes, such as a specialized glove or sock, to be used instead of traditional electrodes for appropriate patients. For extended use, electrodes and rechargeable batteries require occasional replacement.

When a physician prescribes a TENS or related device for home use, a durable medical equipment supplier, such as EMSI, receives a referral; provides the patient with a device kit, containing the device and all supplies necessary for approximately one month of use; and submits a single claim for reimbursement under a billing code for the kit. Garments are separately reimbursable under a different code. Federal healthcare programs vary in how they reimburse for replacement supplies. Some programs, such as Medicare, permit monthly billing for all medically necessary supplies at a fixed rate under a "bundled" supply code. Other programs — including TRICARE, the federal healthcare program for military members, retirees, and their families — permit itemized billing for all medically necessary supplies using "unbundled" supply codes.

The government alleges that, from at least 2018 through 2019, EMSI and Garcia profited by marketing its TENS and related electrical stimulation devices to beneficiaries of federal healthcare programs that reimbursed for unbundled supply codes — primarily TRICARE. EMSI typically billed TRICARE for replacement supplies on a monthly basis, including improperly billing for supplies during the first month despite knowing that patients received kits that contained all initial supplies. EMSI's improper billing practices also included submitting claims for a monthly resupply of traditional electrodes for the same beneficiaries to whom it billed for a garment, despite knowing that patients with a garment did not need traditional electrodes.

According to the government, EMSI and Garcia knowingly executed this scheme without regard to medical necessity, resulting in false claims to federal programs. The result was that many TRICARE beneficiaries were forced to pay co-pays for excessive amounts of supplies they did not need or want.

"Durable medical equipment suppliers play a vital role in providing safe and effective medical devices to patients in need, and especially to our brave service members and their families," said U.S. Attorney Romero. "EMSI and Garcia served their own financial interests over and above the medical needs of patients. This conduct will not be tolerated by my office. We will work tirelessly to hold businesses like this to account."

Acting Special Agent in Charge Brian J. Solecki, with the Defense Criminal Investigative Service (DCIS) Northeast Field Office, echoed the U.S. Attorney's remarks. "Protecting the integrity of TRICARE is a top priority of DCIS, the law enforcement arm of the Department of Defense Office of Inspector General," he stated. "Medically unnecessary services and fraudulent expenses place a tremendous burden on the TRICARE program. We will continue to work with the U.S. Attorney's Office and our law enforcement partners to ensure that individuals who engage in fraudulent activity, at the expense of the U.S. military, are held accountable for their actions."

"The U.S. Department of Labor, Office of Inspector General remains committed to working with the U.S. Attorney's Office and our law enforcement partners to investigate allegations involving medical provider billing schemes that target programs administered by the U.S. Department of

Labor," said Syreeta Scott, Special Agent in Charge, Mid-Atlantic Region, U.S. Department of Labor, Office of Inspector General.

This resolution concludes a years-long investigation by agents from DCIS, DOL-OIG, the Office of Personnel Management, Office of Inspector General (OPM-OIG), United States Postal Service, Office of Inspector General (USPS-OIG), and Department of Veterans Affairs, Office of Inspector General (VA-OIG).

Assistant United States Attorneys Charlene Keller Fullmer, Bryan C. Hughes, and former Assistant United States Attorney John T. Crutchlow handled the civil investigation and settlement, assisted by Auditor George Niedzwicki.

*The claims asserted by the United States are allegations only. There has been no determination of liability.*

8.      In legitimate scenarios, TENS/NMES Devices are prescribed by providers to patients for pain relief or to treat muscle weakness through the application of electrical currents through electrodes attached to the patient's skin.

9.      However, the Defendants exploited TENS/NMES Devices for their personal financial gain by purporting to dispense medically unnecessary TENS/NMES Devices and related supplies to patients that did not need, or even want, the devices and by submitting excessive and improper charges for the TENS/NMES Devices and related supplies to take advantage of the patients' available No-Fault and workers' compensation benefits under New York law.

10.      The  Defendants did so intentionally to inflate billing.

11.      In fact, a complaint was submitted to the New York Office of the Inspector General alleging that EMSI was involved in durable medical billing fraud by sending supplies to claimants and receiving supplies from other vendors.

12.      A true and accurate copy of the complaint from the New York Office of the Inspector General is depicted below:

Form: IG1 rev 9/2009

**Office of the Inspector General**
**Complaint Intake Form**

| Office | Source of Complaint | Date Complaint Received: Wed 9/21/2016 | File Number: 3046-325-2016 |
|---|---|---|---|
| Albany | Hotline | Time Complaint Received: <None> | |

Received By: mshufelt - SHUFELT, MARY

To Intake/Date: Wed 9/21/2016    Intake Person: smulhall - MULHALL, SHARON    Page  1  of  1

Additional Source Information:

| Location of Occurrence | County: | City: | Town: | Village: |
|---|---|---|---|---|

Allegation: Anonymous complaint that ▮▮▮▮▮ a licensed Physical Therapist is prescribing TENS machines to her WC patients. Her friend, ▮▮▮▮▮ works for EMSI who sells the TENS machines. Caller states that ▮▮▮▮▮ s always taking ▮▮▮▮ o dinner and for drinks to pay her back.

Number of Subjects:                    Witnesses: No ☐  Yes ☐

13.     The Defendants intentionally caused providers to issue, or purport to issue, prescriptions for TENS/NMES Devices even though there was no documented medical rationale for the repeated use of the TENS/NMES Devices.

14.     The Defendants intentionally caused providers to issue, or purport to issue, prescriptions for TENS/NMES Devices for an indefinite duration, which permitted EMSI to sell the TENS/NMES Devices at an inflated rate and continuously purport to send the patient medically unnecessary and excessive supplies on an automatic basis in perpetuity without regard for whether the supplies were needed or would ever be used.

15.     True and accurate copies of consumer complaints regarding EMSI mailing unnecessary and unwanted DME are depicted below:

6

| Record # 1 / | (b)(6) | | Consumer Sentinel Network Complaint |
|---|---|---|---|
| Subject Information: | Name: | | Electrostim Medical Services Inc. |
| Reference Number: | (b)(6) | | |
| Product or Service / Theft Subtype: | Misc. Medical; Unsolicited Email | | |
| Created Date: | 10/19/2023 08:16 AM | | |
| Comments: | Electrostim Medical Services is continuing to email invoices for payment for a service I never signed up for. I called them to stop the invoices but they continue to send | | |
| Amount Paid: | | | |

| Record # 5 / | (b)(6) | / Consumer Sentinel Network Complaint | |
|---|---|---|---|
| Subject Information: | Name: | Electrostim Medical Services Inc | |
| Reference Number: | (b)(6) | | |
| Product or Service / Theft Subtype: | Misc. Medical | | |
| Created Date: | 08/20/2021 12:24 AM | | |
| Comments: | Two Unresolved incidents:The company sent unordered medical devices to our home to addressed to our adult daughter after she had already moved away from college and billed our insurance for their part. The insurance paid them. They kept sending the equipment. (They come in very small envelopes to be exact for your understanding of our being unaware). We (as sponsorsparents) get a bill from the company for the copay. We call and question them. We check her mail and find them. We call her....she had not requested them. It was fraud. They refused to take them back claiming medical equipment cannot be returned. They are now saying if we do not pay the $700ish of co-pays they will send the pill to collections. Second issue. The company had been sending me medical equipment. Once this happened I contacted them and told them to stop sending me their equipment. However, they wont stop sending me equipment, billing my insurance, then sending me the copay bill. I call the insurance and they say they cant do anything about it as long as they aare sending them a bill for equipment they have sent to me. So I called the insurance fraud department, but they dont seem interested to help me either. The insurance is Tri Care. No one wants to help so i am writing to you. | | |
| Amount Paid: | $25.00 | | |

16.     As explained below, there was no justification for the indefinite "lifetime" prescriptions for the EMSI TENS/NMES Devices and replenishment supplies.

17.     Further, as explained below, the Defendants were motivated to implement a predetermined protocol of TENS/NMES Devices and replenishment supplies through the inflated

and excessive charges that the Defendants billed the Plaintiffs in violation of the applicable fee schedules.

18.    Overall, the TENS/NMES Devices were prescribed and billed for in contravention of the applicable standard of care.

19.    The Defendants caused EMSI to submit false and fraudulent documentation in support of its claims for benefits under New York's No-Fault laws.

20.    The Defendants caused EMSI to submit false and fraudulent documentation in support of its claims for benefits under New York workers' compensation laws.

21.    EMSI was never eligible to receive payment for the TENS/NMES Devices and replenishment supplies under New York law.

22.    Overall, the Defendants engaged in a pattern of fraudulent business practices designed to create opportunities by mailing TENS/NMES Devices and replenishment supplies to the doorsteps of patients who did not want or need them.

23.    The Defendants' scheme relied on the U.S. Mail, which were used by the Defendants (and persons working under their direction and control) to transmit records, reports, bills, and other claim-related documents to Travelers in support of EMSI's No-Fault and workers' compensation claims.  The Defendants (or persons working under their direction or control) caused EMSI to submit hundreds of fraudulent bills to Travelers seeking No-Fault benefits and workers' compensation benefits under New York law.

24.    The Defendants knew that EMSI's claims were false because the bills and documents submitted to Travelers in support of the claims misrepresented or omitted material facts about EMSI's rights to be paid.

25.     The Defendants knew that EMSI was ineligible to collect No-Fault and workers' compensation payments, yet they still created statutory claim forms that falsely certified EMSI's eligibility to collect such benefits.

26.     Travelers reasonably relied on the facial validity of the records and bills mailed by EMSI—and the representations contained therein—when making payments on EMSI's claims. Travelers was damaged by the fraudulent claims submitted by EMSI.

27.     By this Complaint, Travelers brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; and (b) common-law fraud.

28.     This action seeks actual damages in excess of $340,000.00, which represent No-Fault and workers' compensation payments that Travelers was wrongfully induced to make to EMSI during the course of this scheme.

29.     Travelers also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to EMSI (or its agents) in connection with any No-Fault and workers' compensation claims submitted to Travelers.

30.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

31.     The Defendants' fraudulent scheme was designed to elicit payment of No-Fault and workers' compensation benefits from Travelers to EMSI for the benefit of the Defendants.

## II.     THE PARTIES

### A.     PLAINTIFFS

32.     Travelers Personal Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Mercury Insurance Company, The Charter Oak Fire Insurance Company, The

Phoenix Insurance Company, The Travelers Home and Marine Insurance Company, The Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Casualty and Surety Company, Travelers Casualty Insurance Company of America, Travelers Personal Security Insurance Company, Travelers Property Casualty Company of America, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, and United States Fidelity and Guaranty Company, are companies duly organized and exiting under the laws of the State of Connecticut with their principal place of business in Hartford, Connecticut.

33.     Travelers Personal Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Mercury Insurance Company, The Charter Oak Fire Insurance Company, The Phoenix Insurance Company, The Travelers Home and Marine Insurance Company, The Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Casualty and Surety Company, Travelers Casualty Insurance Company of America, Travelers Personal Security Insurance Company, Travelers Property Casualty Company of America, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, and United States Fidelity and Guaranty Company, are authorized to conduct business in the State of New York.

**B.**     **D**EFENDANTS

**1.**     **Mario Garcia, Jr.**

34.     Garcia resides in and is a citizen of the State of Florida.

35.     Garcia is the founder and chairman of EMSI.

36.     Garcia owns 100% of EMSI.

37.     Garcia is not a licensed healthcare provider.

38.     Garcia participated in the operation and management of the EMSI and the association-in-fact enterprises during the relevant period, and is therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

### 2.     **Dean Muley**

39.     Muley resides in and is a citizen of the State of Florida.

40.     Muley is the President of EMSI.

41.     Muley is not a licensed healthcare provider.

42.     Muley participated in the operation and management of the EMSI and the association-in-fact enterprises during the relevant period, and is therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

### 3.     **Gretchen Dacey-Zavalianos**

43.     Dacey-Zavalianos resides in and is a citizen of the State of Florida.

44.     Dacey-Zavalianos is EMSI's Executive Vice President of Operations.

45.     Dacey-Zavalianos is not a licensed healthcare provider.

46.     Dacey-Zavalianos participated in the operation and management of the EMSI and association-in-fact enterprises during the relevant period, and is therefore responsible for the fraudulent replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

### 4.     **Yorlan Alfonso**

47.     Alfonso resides in and is a citizen of the State of Florida.

48.     Alfonso is EMSI's Executive Vice President of Finance.

49.    Alfonso is not a licensed healthcare provider.

50.    Alfonso participated in the operation and management of the EMSI and the association-in-fact enterprises during the relevant period, and is therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

### 5.    Rossana Cielo

51.    Cielo resides in and is a citizen of the State of Florida.

52.    Cielo is EMSI's Executive Vice President of Business Development.

53.    Cielo is not a licensed healthcare provider.

54.    Cielo participated in the operation and management of the EMSI and the association-in-fact enterprises during the relevant period, and is therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

### 6.    Electrostim Medical Services, Inc.

55.    EMSI is organized as a corporation under Florida law.

56.    EMSI's principal place of business is 3504 Cragmont Drive, Suite #100, Tampa, FL 33619.

57.    EMSI is an enterprise whose activities affect interstate commerce.

58.    EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo participated in the operation and management of the association-in-fact enterprise during the relevant time period and is therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

59.     Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo participated in the operation and management of the EMSI enterprise during the relevant time period and are therefore responsible for the fraudulent DME, replenishment supplies, and services billed in connection with the claimants at issue in this Complaint.

60.     EMSI billed for DME, specifically, TENS/NMES Devices, and replenishment supplies and services in connection with Travelers claimants.

61.     EMSI's bills are fraudulent because the billed-for TENS/NMES Devices and replenishment supplies and services were (1) unlicensed; (2) unnecessary, (3) medically worthless; (4) billed pursuant to a pre-determined treatment protocol; and (5) fraudulently billed.

62.     Accordingly, EMSI was never eligible to collect payments pursuant to No-Fault and workers' compensation benefits from Travelers under New York law.

## III.    <u>JURISDICTION AND VENUE</u>

63.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

64.     Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

65.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Travelers alleged herein were carried out within the Eastern District of New York.

66.     At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault and workers' compensation laws for patients who lived in New York or who were covered by New

York automobile insurance or workers' compensation policies issued by Travelers, as detailed, *infra*.

67.    EMSI conducted business in the State of New York by operating as a DME provider and delivering, or purporting to deliver, DME to patients residing in the State of New York.

68.    On or about May 14, 2012, EMSI received authority to do business in the State of New York, and is currently an active foreign business corporation in the State of New York.

69.    Moreover, on or about March 25, 2022, EMSI became enrolled as a Medicaid Managed Care network provider in the New York State Medicaid Program.

70.    EMSI also employed sale representatives who marketed DME to healthcare providers and patients in the State of New York during the relevant period.

71.    EMSI specifically targeted New York as part of a nationwide market. Indeed, EMSI's logo includes a map of the entire United States, including New York.

72.    EMSI reported in its Medicare application that 35% of its business is derived from New York.

73.    A true and accurate copy of the EMSI Medicare application is depicted below:

> 18.    Estimate the percentage of services that are ordered by out of state providers.    _65%_

74.    EMSI's contacts with the State of New York are substantial and not isolated.

75.    The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York, and by seeking and collecting payments under New York's No-Fault and workers' compensation laws.

76.    The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York, and their purposeful availment of New York's No-Fault

and workers' compensation insurance systems, and therefore there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

77.    Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## IV.    APPLICABLE LAWS AND REGULATIONS

### A.    NEW YORK'S NO-FAULT LAWS AND REGULATIONS

78.    Travelers underwrites automobile insurance in the State of New York.

79.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including DME.

80.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide eligible persons with coverage for necessary accident-related expenses (hereinafter, "No-Fault benefits").

81.    Under New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

82.    "Basic economic loss" is defined to include "all necessary expenses" for medical services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

83.    No-Fault benefits include up to $50,000.00 per Travelers claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

84.    Claimants can assign their No-Fault benefits to DME providers.

85.     Under a duly executed assignment, a claimant's DME provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Financial Services formerly known as the New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

86.     Alternatively, DME providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

87.     The NF-3 and CMS-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent, subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

N.Y. Ins. Law § 403(d).

88.     A DME provider makes a material misrepresentation when it submits an NF-3 or CMS-1500 form that either omits or misrepresents material information about the billed-for DME and other services or the provider's eligibility to collect payments.

89.     It is a material misrepresentation to submit NF-3 or CMS-1500 forms for DME and other services that: (a) are never provided; (b) are not necessary; (c) are not legitimately prescribed; and/or (d) are billed at a greater monetary charge than is permitted by the applicable Fee Schedule.

90.     A DME provider is not eligible to collect payment under New York's No-Fault laws if the provider fails "to meet **any** applicable New York State or local licensing requirement necessary to perform such services in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

91.     Accordingly, if a DME provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

92.     As alleged herein, the Defendants failed to comply with several laws and regulations when dispensing or purporting to dispense DME to claimants during the course of this scheme; therefore, the Defendants are not—and never were—eligible to seek or collect No-Fault benefits from Travelers.

**B.**     **NEW YORK'S WORKERS' COMPENSATION LAWS AND REGULATIONS**

93.     New York requires employers to maintain workers' compensation insurance.

94.     Workers' compensation insurance provides coverage for, among other things, medical costs if an employee becomes injured or sick as a result of the employee's employment.

95.     Within 45 calendar days of receiving the claim, Travelers is obligated to pay claims submitted by a DME supplier under New York's workers' compensation laws or provide written notice explaining why the claim is not being paid. *See* 12 N.Y.C.R.R. § 325-1.25(c).

96.     However, under New York's workers' compensation scheme, EMSI's charges for TENS/NMES Devices and replenishment supplies were not compensable.

97.     New York's workers' compensation laws long sought to prevent the treatment and care rendered to injured claimants being a "mere commercialized venture" that "operate[s] in a way to exploit worker, employer and insurance carriers through prolonged treatment, padded bills,

and inferior professional service." *Szold v. Outlet Embroidery Supply Co.*, 8 N.E.2d 858, 859 (N.Y. 1937) (affirming constitutionality of amendments to New York's workers' compensation law further regulating medical treatment), *appeal dismissed* 303 U.S. 623 (1938).

98.    In 2007, New York's workers' compensation laws underwent a comprehensive reform that resulted in the New York Workers' Compensation Board's adoption of "Medical Treatment Guidelines" ("MTGs").

99.    "The Guidelines include the list of pre-authorized medical procedures and set forth limitations on the scope and duration of each procedure." *Matter of Kigin v. State of N.Y. Workers' Comp. Bd.*, 24 N.E.3d 1064, 1066 (N.Y. 2014) (holding that Workers' Compensation Board did not exceed its authority when promulgating the MTGs).

100.    Therefore, benefits sought for medically necessary DME supplied to an injured worker related to the injury must be in accordance with the applicable MTGs. 12 N.Y.C.R.R. § 324.2(a).

101.    Beginning on December 1, 2010, MTGs were implemented as the mandatory standard of care for the treatment of injuries involving the neck, back, shoulder, and knee. *See* 12 N.Y.C.R.R. § 324.2 (2010).

102.    Since 2010, the MTGs have been updated and supplemented to include guidance for additional injuries and disorders.

103.    "The operative [MTG] shall be the [MTG] in place on the date on which medical services are rendered." 12 N.Y.C.R.R. § 324.2(a).

104.    Within 45 calendar days of receiving the claim, Travelers is obligated to pay claims submitted by a DME supplier under New York's workers' compensation laws or provide written notice explaining why the claim is not being paid. *See* 12 N.Y.C.R.R. § 325-1.25(c).

C.    **APPLICABLE FEE SCHEDULES**

105.    Under New York's No-Fault laws, the maximum permissible charge for DME is calculated in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the Department of Financial Services f/k/a the Department of Insurance. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. § 68.1.

106.    In an opinion letter dated June 16, 2004, the Department of Insurance explained why strict adherence to the fee schedule for charges for DME is crucial to the No-Fault system:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

107.    The New York Workers' Compensation Board established a fee schedule for DME by adopting the New York State Medicaid fee schedule ("Medicaid DME Fee Schedule") for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliance effective July 11, 2007. *See* 12 N.Y.C.R.R. § 442.2(a) (effective until June 7, 2021).

108.    The New York Workers' Compensation Board's amended 12 N.Y.C.R.R. § 442.2 to transfer the DME fee schedule from the New York Medicaid rates to new state-specific workers' compensation rates ("WC DME Fee Schedule"). *See* 12 N.Y.C.R.R. § 442.2(a) (effective June 7, 2021) (the WC DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

109.    DME "dispensed on or after July 11, 2007, but prior to the most recent effective date of section 442.2…shall be reimbursed pursuant to the fee schedule in section 442.2…in effect on the date the [DME] was dispensed." *See* 12 N.Y.C.R.R. § 442.2(a).

110.    However, the Chair of the New York Workers' Compensation Board delayed the implementation of the amendments of 12 N.Y.C.R.R. § 442.2 from June 7, 2021 to April 4, 2022.

111.    Therefore, up to April 4, 2022, payment for DME under New York's workers compensation laws is governed by the fee schedule set forth by the New York State Medicaid program. *See* 12 N.Y.C.R.R. § 442.2(a)-(b) (2021) ("The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided[.]").

112.    Up to April 4, 2022, if there was no established fee payable for a specific item under the New York State Medicaid, "then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public." *See* 12 N.Y.C.R.R. § 442.2(a)(1)-(2) (2021).

113.    New York's workers' compensation laws specifically exclude "separate and/or additional payments for shipping, handling, and delivery" from these maximum permissible charges. *See* 12 N.Y.C.R.R. § 442.2(c) (2021).

114.    Effective on April 4, 2022, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with the New York State Workers' Compensation Durable Medical Equipment Fee Schedule. *See* 12

N.Y.C.R.R. § 442.2(a)(1)-(3) (2022) ("The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule[.]").

115.    Both the Medicaid DME Schedule and the WC DME Schedule list DME and orthotic devices by their corresponding Healthcare Common Procedure Coding System (HCPCS) Level II Codes.

116.    The use of HCPCS codes is mandatory for transactions involving healthcare information.

117.    Improper use of HCPCS codes constitutes fraudulent billing.

118.    Certain DME items are designated in the WC Fee Schedule as requiring prior authorization. *See* 12 N.Y.C.R.R. § 442.2(b)(1).

119.    The medical provider (e.g., physician, nurse practitioner, or chiropractor), absent a documented medical emergency, "must obtain prior authorization before such durable medical equipment may be supplied to the claimant." *See* 12 N.Y.C.R.R. § 442.4(a)(1)-(3).

120.    For DME that is not listed in the WC Fee Schedule, "prior authorization, including a proposed purchase price or rental price for such equipment, must be obtained and provided within the prior authorization request prior to prescribing or supplying such durable medical equipment." *See* 12 N.Y.C.R.R. § 442.2(b)(2).

121.    However, such prior authorization requirements are not applicable to No-Fault claims. 11 N.Y.C.R.R. § 68.1(b)(1).

122.    In response to these amendments to the WC Fee Schedule, the Superintendent of the New York State Department of Financial Services adopted an emergency amendment to 11

N.Y.C.R.R. § 68 "to cap the purchase and total accumulated rental of DME supplies for which either no price has been established in the DME fee schedule or for supplies not listed in the DME fee schedule."

123.    Therefore, a new Part E(c) of Appendix 17-C to was added to establish "[t]he maximum permissible purchase charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public."

124.    "Acquisition cost" is defined as "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." *Id.* at Part E(b).

### D.    NEW YORK CITY DME LICENSURE REQUIREMENTS

125.    Section 20-425 of the New York City Administrative Code requires licensure of any New York City healthcare providers that dispense DME.

126.    Subchapter 25 of Title 20 of the New York City Administrative Code specifically requires DME dealers (including any business that involves selling, renting, repairing or adjusting DME) to obtain a Dealer in Products for the Disabled License from the New York City Department of Consumer and Worker Protection (hereinafter referred to as a "DCWP License").

127.    A DCWP License is required for all New York City DME dealers to lawfully provide DME to the disabled.[1]

---

[1] ""Disabled" means a person who has a physical or mental impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." NYC Admin. Code §20-425.

128.    Section 20-426 of the New York City Administrative Code provides that it is "unlawful for any dealer to engage in the selling, renting, repairing, or servicing of, or making adjustments to, products for the disabled without a license."

129.    To obtain a DCWP license, a dealer must submit an application to the Commissioner of the Department of Consumer and Worker Protection that includes the identity of the applicant, the address of the DME dealer and other pertinent information concerning its officers and directors.

130.    At no time were the DME Entity Defendants licensed by the DCWP to distribute DME and were therefore ineligible for No-Fault reimbursement.

## V.    FACTUAL ALLEGATIONS

131.    EMSI took advantage of claimants eligible for benefits under New York's No-Fault and workers' compensation laws.

132.    EMSI billed for DME and supplies purportedly provided to patients, including, but not limited to, patients employed by employers insured by Travelers and patients eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

133.    The Plaintiffs paid bills submitted to them in reasonable reliance on the documents and information submitted by the Defendants in support of the claims.

134.    Travelers attempted to seek verification for EMSI in the form of requests for documents and an examination under oath of EMSI.

135.    EMSI refused to comply with lawful verification.

136.    As explained below, the Defendants intentionally engaged in a pattern of fraudulent billing for DME that was (1) unlicensed; (2) unlawful; (3) unnecessary; (4) medically worthless;

(5) billed pursuant to a pre-determined treatment protocol; and (6) fraudulently billed that resulted in EMSI receiving payments from the Plaintiffs to which it was not entitled.

> A.    **THE OPERATION AND MANAGEMENT OF THE EMSI AND THE ASSOCIATION-IN-FACT ENTERPRISES**

137.    The Defendants participated in the operation and management of the EMSI and association-in-fact enterprises for the purpose of obtaining reimbursement to which EMSI was not entitled under New York law for TENS/NMES Devices and replenishment supplies.

138.    Garcia founded EMSI in 1995.

139.    EMSI does business nationwide, as reflected by its logo overlayed on a map of the United States.

140.    A true and accurate representation of the logo for EMSI is depicted below:



141.    Specifically, EMSI sells small, battery-powered devices that use adhesive electrodes applied to the patient's skin and connected to the device through wires to deliver either low-frequency electrical currents (TENS) or medium-frequency electrical currents (interferential stimulation) to the affected area.

142.    EMSI also sells small, battery-powered devices that use adhesive electrodes applied to the patient's skin and connected to the device through wires to apply electrical currents over the muscles and nerves to create muscle contractions, which is referred to as NMES therapy.

143.    EMSI manufactures and sells TENS units called the Flex-TENS and the Flex-IT.

144.    A true and accurate representation of the Flex-TENS and Flex-IT are depicted below:

 

145.    The Flex-TENS is classified by the FDA under Section 510(k) pre-market clearance number K090717 as a transcutaneous electrical nerve stimulator.

146.    The Flex-IT is classified by the FDA under Section 510(k) pre-market clearance number K083030 as a transcutaneous electrical nerve stimulator.

147.    EMSI also manufactures and sells NMES units called the Flex-MT Plus and the Flex-MI.

148.    A true and accurate representation of the Flex-MT Plus and Flex-MI are depicted below:

 

149. The Flex-MT Plus is classifed by the FDA under Section 510(k) pre-market clearance number K140467 as a "powered muscle stimulator."

150. The Flex-MI is classified by the FDA under Section 510(k) pre-market clearance number K221958 as a "powered muscle stimulator."

151. EMSI also sells the IF-5000 Combo Stimulator, which may be used for both interferential current stimulation and electrical muscle stimulation.

152. A true and accurate representation of the IF-5000 Combo Stimulator is depicted below:



153.    The IF-5000 Combo is classified by the FDA under Section 510(k) pre-market clearance number K071869 as a transcutaneous electrical nerve stimulator.

154.    EMSI employs sales personnel, called "Territory Managers" and "Area Managers," to market these devices to potential prescribing providers and patients.

155.    Garcia personally performed one or more training attended by sales personnel.

156.    According to Muley, during at least one training attended by sales personnel, "the long term strategic game plan for EMSI was discussed in great detail by Mario Garcia, EMSI's President, as well as various members of the EMSI management team."

157.    Upon information and belief, at all relevant times, Garcia participated in the development and execution of EMSI's business and marketing strategy.

158.    Garcia also had sole control over EMSI's bank account during the relevant period.

159.    A true and accurate representation of Garcia having control over the EMSI bank account is depicted below:



Provide the names and social security numbers of all personnel authorized to sign Corporate checks against those accounts.

| Person(s) Authorized to Sign Checks | Social Security Number |
| --- | --- |
| Mario Garcia, Jr | ████████ |

160.    Garcia compiled a team of managers to participate in the operation and management of EMSI, including, but not limited to, Muley, Dacey-Zavalianos, Alfonso, and Cielo.

161.    In EMSI's 2022 NY Medicaid Provider Enrollment Application for managed care only, Muley, Dacey-Zavalianos, and Alfonso were identified as EMSI's "agents, managing employees, and those with a control interest."

162.    Dacey-Zavalianos was identified in EMSI's 2022 NY Medicaid Provider Enrollment Application as the primary contact to receive all checks.

163.    According to EMSI's website, Dacey-Zavalianos joined EMSI in May of 2007 and "is responsible for overseeing Operations which includes Billing, Patient Support Services, Customer Service, Medicare, and Accounts Receivables."

164.    Alfonso was identified in EMSI's 2022 NY Medicaid Provider Enrollment Application as the primary contact to receive annual tax documents.

165.    According to EMSI's website, Alfonso "is responsible for the development, interpretation, maintenance and implementation of Company financial policies and procedures" as well as "[f]inancial and business plan development and execution."

166.    Cielo was identified in EMSI's 2022 NY Medicaid Provider Enrollment Application as the primary contact to receive all correspondence.

167.    According to EMSI's website, Cielo joined EMSI in 2009 as Vice President of Business Development and "oversees contracting, payor relations, contracted revenue cycle management, and state compliance."

168.    Based on Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo's management roles at EMSI, each was personally and systematically engaged in the execution of the scheme to defraud through the development and execution of the association-in-fact's core business strategy: to repeatedly submit false and fraudulent bills for DME that were (1) unlicensed; (2) unlawful; (3) unnecessary; (4) medically worthless; (5) billed pursuant to a pre-determined treatment protocol; and (6) fraudulently billed and replenishment supplies to obtain reimbursement to which EMSI was not entitled for their own personal financial benefit, including such claims submitted to Travelers under New York's No-Fault and workers' compensation laws.

169.    Collectively, all of the Defendants associated in fact to form an enterprise that has an ascertainable structure beyond the pattern of mail fraud racketeering activity in which it engaged.

170.    The Defendants operated together as members of an ongoing organization (the association-in-fact enterprise) that functioned as a continuing unit with a hierarchical and consensual decision-making structure.

171.    The Defendants acted with a definite purpose—to bill Travelers for false and fraudulent DME and replenishment supplies.

172.    The Defendants are all related whereas they conspired with one another to corrupt a legitimate business.

173.    The Defendants have been connected for a sufficient amount of time to permit them to pursue the association-in-fact enterprise's purpose.

174.    Indeed, the Defendants banded together to commit the insurance fraud scheme detailed herein, which they were incapable of accomplishing on their own.

175.    The Defendants acted together as members of an ongoing organization that functioned as a continuing unit.

176.    Specifically, the Defendants intended to and did in fact defraud Travelers by submitting false and fraudulent insurance claims for DME and replenishment supplies.

**B.    U̲N̲L̲I̲C̲E̲N̲S̲E̲D̲ ̲P̲R̲O̲V̲I̲S̲I̲O̲N̲ ̲O̲F̲ ̲D̲M̲E̲**

177.    EMSI does not possess the necessary DME licensure required to bill insurers, including Travelers, for DME dispensed in New York City and its boroughs.

178.    New York City's Administrative Code requires that DME and orthotic device suppliers obtain DCWP licensure. *See* NYC Admin. Code § 20-425; 6 RCNY § 2-271.

179.    A DME supplier that does not possess the DCWP licensure is not lawfully permitted to provide supplies to patients located in New York City.

180.    The DCWP has specific penalties for misrepresentations made in the licensure application, including revocation of the license obtained by false pretenses.

181.    Travelers was induced to pay EMSI for unlicensed services in violation of New York law.

182.    EMSI is a Florida corporation registered with the Florida Division of Corporations.

183.    The New York City Department of Consumer and Worker Protection maintains a database of all businesses with a Dealer in Products License.

184.    EMSI does not possess the requisite DME licensure to distribute DME in New York City.

185.    A true and accurate copy of the New York City Department of Consumer and Worker Protection response to a freedom of information request regarding EMSI is depicted below:

The Department of Consumer and Worker Protection (DCWP) has **denied** your FOIL request FOIL-2024-866-00348 for the following reasons:

- A diligent search for records responsive to your request did not locate any such records. Accordingly, your request is denied.

186.    Accordingly, EMSI violated New York licensure laws by providing DME to New York City residents without first obtaining the DCWP license, which rendered them ineligible to seek New York No-Fault and workers' compensation benefits during the majority of the relevant time period.

187.    In addition to the provision of DME by unlicensed entities, the DME orders were motivated by financial gain, not patient need.

188.    It is clear that EMSI was unlawfully operating in New York (without the required licensure or authorization from the state) during the substantial portions of the relevant time-period in violation of New York licensure laws rendering them ineligible to collect from Travelers.

189.    Travelers was fraudulently induced into paying more than $340,000.00 for fraudulent DME by EMSI.

190.    Accordingly, EMSI unlawfully dispensed DME to patients in New York City and was not eligible to submit claims to Travelers whereas they were in violation of New York licensure laws.

191.    The bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unlawful DME devices and supplies dispensed in New York City are fraudulent. *See* Exhibit 1.

C.    <u>MEDICALLY UNNECESSARY TENS/NMES DEVICES AND SUPPLIES</u>

192.    In a legitimate setting, the purpose of the TENS electrotherapy is to relieve pain by blocking a patient's perception of pain.

193.    In a legitimate setting, the purpose of NMES electrotherapy is to treat muscle weakness.

194.    In a legitimate setting, patients are provided with the supplies necessary to operate the TENS/NMES Devices only when the supplies are actually needed and wanted by the particular patient—and not on an automatic or subscription basis.

195.    In a legitimate setting, patients are provided with replenishment items, such as chargers or lead wires, only when the equipment is damaged or worn out and there is a documented need for the replacement.

196.    However, as explained below, EMSI billed for TENS/NMES Devices and replenishment supplies (e.g., alcohol wipes, lead wires, electrodes, vitamin E lotion, and Bio-Ice) to claimants that were not needed or even wanted by the claimants—if actually provided at all.

197.    These devices—and the automatic provision of replenishment supplies—were not legitimately prescribed and merely used as vehicles for the Defendants to submit false and fraudulent claims to Travelers.

198.    In reliance on these false and fraudulent claim submissions, Travelers was caused to make payments to EMSI for the benefit of the Defendants to which EMSI was not entitled under applicable law.

1.    **Improper Billing for Unnecessary TENS/NMES Devices Without Justification**

    i.    *Billing in Violation of New York's Workers' Compensation Board's Medical Treatment Guidelines*

199.    Claims submitted for DME supplied under New York's workers' compensation laws must comport with the applicable MTGs, including claims submitted by out-of-state providers.

200.    According to the New York Workers' Compensation Board, the MTGs set the standard of care for workers' compensation claims and "are based on the best available medical evidence and the consensus of experienced medical professionals."

201.    At all relevant times, the applicable MTG only authorized the use of TENS devices in a narrow set of circumstances with the necessary documentation that the patient needed the device and it would be effective to treat their pain.

202.    The current MTG for knee injuries recommends the use of a TENS device only "in select patients as clinically indicated." *See* New York Workers' Compensation Board, Medical Treatment Guidelines, Knee Injury (eff. May 2, 2022).

203.    The current MTG for the neck and low and mid back injury recommends the use of a TENS device only "for select use in treatment of chronic low back pain [or chronic neck pain] or chronic radicular pain syndrome as a second line adjunct to other first line treatments." *See* New York Workers' Compensation Board, Medical Treatment Guidelines, Low and Mid Back Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Neck Injury (eff. May 2, 2022).

204.    Chronic pain is defined as pain that lasts longer than 3 months.

205.    At all relevant times, the indications for the use of a TENS unit to treat a knee injury, low and mid back injury, neck injury, and shoulder injury "[i]nclude muscle spasm [and] atrophy." *See* New York Workers' Compensation Board, Medical Treatment Guidelines, Knee Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Mid and Low Back Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Neck Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Shoulder Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Knee Injury (eff. Nov. 1, 2014); New York Workers' Compensation Board, Medical Treatment Guidelines, Mid and Low Back Injury (eff. Nov. 1, 2014); New York Workers' Compensation Board, Medical Treatment

33

Guidelines, Neck Injury (eff. Nov. 1., 2014); New York Workers' Compensation Board, Medical Treatment Guidelines, Shoulder Injury (eff. Nov. 1, 2014).

206.    At all relevant time, the MTGs for knee injury, neck injury, mid and low back injury, and shoulder injury all specifically provide that "[c]onsistent, measurable, functional improvement **must be documented** and determination of the likelihood of chronicity **prior to** provision of a home unit." *Id.* (emphasis added).

207.    At all relevant times, according to the MTGs for knee injury, neck injury, mid and low back injury, and shoulder injury, a home unit may be provided or purchased "**if effective**" after three sessions. *Id.* (emphasis added).

208.    Notably, at all relevant times, the MTG for mid and low back injury specifically states that interferential therapy is **not** recommended "for treatment of acute or non-acute back pain, nonacute radicular pain syndromes, or other back-related conditions." *See* New York Workers' Compensation Board, Medical Treatment Guidelines, Mid and Low Back Injury (eff. May 2, 2022); New York Workers' Compensation Board, Medical Treatment Guidelines, Mid and Low Back Injury (eff. Nov. 1, 2014).

209.    As explained further below, there was no documentation to support the orders for TENS Devices billed by EMSI, including no documentation of a successful trial of the device prior to provision of a home unit, no documentation of measurable improvement with the use of the device, and no documentation that the device would be effective to treat the patient's chronic pain.

210.    Even if justified in the first instance (they were not), EMSI routinely billed for TENS Devices far beyond the period of time for which TENS use is reasonable and necessary.

*ii.    Billing in Violation of the Applicable Standard of Care*

211.    Although the MTGs do not apply to No-Fault claims, the MTGs' directions for TENS device use in a narrow set of circumstances with the necessary documentation that the patient needed the device and it would be effective to treat their pain applies is consistent with the standard of care applicable to all claims.

212.    In a legitimate setting, the use of a TENS/NMES Device should start with a 30 day trial with documentation of efficacy justifying continued use.

213.    Indeed, any electrical stimulation modality is a second-line therapy following the failure of other conservative treatments.

214.    However, EMSI billed for TENS/NMES Devices and replenishment supplies that were prescribed indiscriminately without any documented indications that the device would be effective to treat the patients' pain.

215.    Moreover, the American Academy of Neurology deems the use of TENS devices for chronic low back pain to be ineffective.

216.    The American Academy of Neurology found that there were no significant differences in the outcomes for patients with chronic low back pain who used a TENS device compared with those who used a sham TENS device.

217.    Additionally, interferential currents also have been found to provide no additional clinical benefits over first-line conservative treatment for patients with low back or lower extremity pain.

218.    Therefore, devices providing TENS and interferential currents are not recommended for the treatment of chronic low back pain due to lack of proven efficacy.

219.    However, EMSI purported to dispense TENS Devices to patients reporting chronic low back pain even though the device—and all replenishment supplies—were ineffective to treat the patients' pain and were no more effective than a placebo.

220.    Additionally, in a legitimate setting, a TENS/NMES device should not be prescribed for use in perpetuity.

221.    An initial prescription for lifetime use of a TENS/NMES unit—with a lifetime of refills—is simply unnecessary, excessive, and woefully below the standard of care.

222.    Rather, the prescribing provider must provide regular supervision and identify the metrics to warrant ongoing use of the TENS/NMES unit.

223.    The continued use of a TENS/NMES unit should be based on objective documented efficacy and functional improvement.

224.    A TENS/NMES device should be employed as a dynamic modality that is not one-size fits all.

225.    Indeed, the treatment plan for a TENS/NMES device must be tailored to a patient's individual needs through a healthcare provider's continuous monitoring, including the adjustment of the placement of the electrodes and the settings used by the particular patient as their condition progresses.

226.    Over time, a patient may develop a tolerance to the TENS device and no longer experience any relief; in this instance, the patient should be instructed to discontinue use.

227.    Indeed, EMSI itself concedes that "[w]ith continued treatment over an extended period of time, a patient will accommodate to a TENS unit and the unit will not have the same results."

228.    However, as explained below, EMSI purported to dispense TENS/NMES Devices and replenishment supplies to patients without any documentation that the device would be effective to treat their pain.

229.    The TENS/NMES devices were billed to Travelers by EMSI without sufficient documentation of critical information regarding the efficacy, analgesic response, or functional improvement to substantiate ongoing use and ongoing refills of supplies.

      *iii.*    *Billing in Violation of EMSI's Own Manuals for the TENS/NMES Devices*

230.    EMSI's own manuals regarding the use of their TENS/NMES Devices are consistent with the standard of care and clinical guidelines.

231.    According to EMSI's user manuals ("Manuals"), the TENS Devices are intended to be used for (a) symptomatic relief of chronic intractable pain and (b) post-traumatic or post-surgical pain relief, which are the intended uses for which the FDA has cleared these TENS devices.

232.    According to EMSI's Manuals for the Flex-MI, Flex-MT, and IF-5000, the NMES Devices also are intended to be used for (a) relaxation of muscle spasm, (b) increasing local blood circulation, (c) muscle re-education, (d) prevention or retardation of disuse atrophy, (e) prevention of venous thrombosis of the calf muscles immediately after surgery, and (f) maintaining or increase range of motion.

233.    The Manuals acknowledge that proper "patient selection" by a qualified pain management provider is essential to the "effectiveness" of the TENS/NMES Devices.  In other words, only select patients with specific indications will benefit from the TENS/NMES Devices and thus the TENS/NMES Devices cannot be prescribed or dispensed indiscriminately.

234.    The Manuals also warn that the TENS/NMES Devices "should be used only under the **continued supervision** of a physician." (Emphasis added.). Indeed, the TENS/NMES Devices require the prescribing practitioner to select the appropriate electrode placement and stimulation settings.

235.    Moreover, the Manuals admit that the "long-term effects of chronic electrical stimulation are unknown."

236.    Therefore, the Defendants were well-aware of the indications for the TENS/NMES Devices and thus intentionally billed for TENS/NMES Devices and replenishment supplies for an indefinite duration that they knew were ineffective, unnecessary, and potentially dangerous for the claimants at issue in this Complaint.

237.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unnecessary TENS/NMES devices are fraudulent. *See* Exhibits 2-3.

## 2.    Improper Billing for Unnecessary TENS/NMES Supplies

238.    Replenishment supplies for a TENS/NMES Device also must be reasonable and necessary.

239.    Replenishment supplies are only reasonable and necessary when the TENS/NMES Device for which they are intended is also reasonable and necessary.

240.    The supplies billed by EMSI in connection with the TENS/NMES Devices routinely included electrodes, batteries, skin wipes, vitamin E lotion, lead wires and topical Bio-Ice. However, these supplies were either wholly unnecessary in the first instance or provided more frequently than necessary—or both.

241.    There was no documentation that EMSI regularly and consistently contacted patients to confirm that the items were needed and wanted before sending resupplies to the patient.

242.    Indeed, upon information and belief, patients received numerous shipments of TENS/NMES supplies from EMSI that they did not use or want and that ultimately went to waste.

243.    Lead wires come with each TENS/NMES Device.

244.    Replacement of lead wires more often than every 12 months would rarely be reasonable and necessary.

245.    Moreover, no analysis was done by EMSI to determine whether patients even used the DME device warranty replenishment supplies.

246.    Indeed, the Medicaid Fee Schedule contains frequency rules that limit the frequency with which DME items may be dispensed.

247.    During portions of the relevant time period, under these frequency rules, lead wires billed under A4557 could only be dispensed once per year. Prior approval with accompanying documentation must be obtained to exceed that limit.

248.    A true and accurate representation of the frequency rules for A4557 are depicted below:

| A4557[F6] | Lead wires (e.g., Apnea monitor), per pair (up to 2 pair, any type) TENs Replacement lead wires are covered for members with a diagnosis of knee pain due to osteoarthritis. Please refer to the coverage criteria listed under code E0730 |
|---|---|

**Frequency**

Durable Medical Equipment, Orthotics, Prosthetics and Supplies have limits on the frequency that items can be dispensed to an eligible member. If a member exceeds the limit on an item, prior approval must be requested with accompanying medical documentation as to why the limit needs to be exceeded. The frequency for each item is listed by a superscript notation next to the procedure code. The following table lists the meaning of each notation:

| F1=once/lifetime | F2=twice/lifetime | F3=once/5years | F4=once/3 years |
| F5=once/2 years | F6=once/year | F7=twice/year | F8=three/2 months |
| F9=once/month | F10=twice/month | F11=four/month | F12=once/day |
| F13=once/3 months | F14=four/lifetime | F15=six/lifetime | F16=once/6 months |
| F17=twelve/lifetime | F18=three/lifetime | F19=twice/3years | F20=two/2 years |
| F21=two/6 months | F22=four/year | F23=six/2 years | F24=eight/year |
| F25=eight/lifetime | F26=continuous monthly rental | | |

249.     However, EMSI routinely billed for replacement of lead wires every 6 months, which was excessive and unnecessary, without obtaining the required prior approval to exceed the once per year limit under the Medicaid Fee Schedule.

250.     The TENS/NMES Devices are battery operated. According to the Manual for the TENS/NMES Devices, the battery pack is rechargeable "using the supplied proprietary EMSI battery charger." According to the Manuals, replacement of the battery pack is only necessary "if/when battery becomes inefficient."

251.     However, EMSI routinely billed for 4 additional batteries even though these batteries were wholly unnecessary given that the TENS/NMES Devices were operated using the supplied rechargeable battery pack and charger.

252.     Even if the replacement batteries were medically necessary for use of the TENS/NMES Device (they were not), the Medicaid Fee Schedule limits the frequency of the dispensing of the replacement batteries to twice per year.

253.     Again, it was unknown by EMSI whether the patient even used the DME device for a sufficient period of time to warrant replacement batteries.

254.    EMSI routinely billed for unnecessary replacement batteries on a monthly basis without obtaining the required prior approval to exceed the twice per year limit under the Medicaid Fee Schedule.

255.    According to the Manuals, the electrode pads are reusable and should only be replaced if not in "good condition."

256.    Based on typical orders of three-times daily use of the TENS/NMES Device, two sets of electrode pads would be sufficient for a 30-day period.

257.    Again, EMSI did not know whether the patient used the DME device for a sufficient period of time to warrant electronic pad replenishment supplies.

258.    Indeed, the Medicaid Fee Schedule limits the amount and frequency of replacement electrodes under A4556 to 2 pairs once per month.

259.    EMSI states in correspondence to Travelers that the frequency of electrode replacement "varies due to skin condition, climate, care and use of the product," which is not consistent with the automatic provision of excessive electrodes without regard to actual patients' varying needs.

260.    However, EMSI routinely dispensed between 16 and 24 electrode pads at a time, without obtaining the required prior approval to exceed 2 pairs per month limit under the Medicaid Fee Schedule.

261.    For example, EMSI billed Travelers under New York's workers' compensation laws for a Flex TENS unit under E0730 purportedly dispensed to claimant A.T. (FRT2634) on February 18, 2021 along with 16 electrode pads under A4556 and 4 batteries under A4630.

262.    A true and accurate representation of EMSI billing A.T. is depicted below:



| MM | DD | YY | MM | DD | YY | SERVICE | EMG | CPT/HCPCS | MODIFIER | POINTER | $ CHARGES | UNITS | EPSDT | QUAL | PROVIDER ID. # |
|----|----|----|----|----|----|---------|-----|-----------|----------|---------|-----------|-------|-------|------|----------------|
| 1 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | | E0730 | NU | A | 495.00 | 1.00 | | NPI | 1629167028 |
| 2 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | | A4630 | | A | 36.00 | 4.00 | | NPI | 1629167028 |
| 3 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | | A9901 | | A | 30.00 | 1.00 | | NPI | 1629167028 |
| 4 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | | A4556 | | A | 130.08 | 16.00 | | NPI | 1629167028 |
| 5 | | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN EIN ☐ X  26. PATIENT'S ACCOUNT NO. 7271/485465-61182  27. ACCEPT ASSIGNMENT? X YES ☐ NO  28. TOTAL CHARGE $ 691.08  29. AMOUNT PAID $  30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
ELECTROSTIM MED SERVICES
54          02/26/2021
SIGNED          DATE

32. SERVICE FACILITY LOCATION INFORMATION
ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 336198300
a. 1629167028          b.

33. BILLING PROVIDER INFO & PH # ( 800 ) 588 8383
ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 336198300
a. 1629167028          b.

263.    The next month, on March 18, 2021, EMSI purported to deliver resupplies to A.T.,
including forty-eight (48) units of skin wipes (A4245), three (3) ounces of vitamin E lotion,
twenty-four (24) electrodes, and four (4) batteries.

264.    A true and accurate representation of EMSI billing A.T. is depicted below:

| 24. A. | | From | DATE(S) OF SERVICE | To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS    MODIFIER | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|--------|----|------|--------------------|----|----|--------------------|--------|--------------------------------------------------------------------------|--|--------------------|--------------|------------------|----------------------|------------|-----------------------------|
| | MM | DD | YY | MM | DD | YY | | | | | | | | | |
| 1 | 03 | 18 | 21 | 03 | 18 | 21 | 12 | SKIN WIPES A4245 | | A | 48.00 | 48 | | ZZ | ZZ332B00000X |
| | | | | | | | | | | | | | | NPI | 1629167028 |
| 2 | 03 | 18 | 21 | 03 | 18 | 21 | 12 | LOTION VITAMIN E - 1 OZ A4362 | | A | 28.53 | 3 | | ZZ | ZZ332B00000X |
| | | | | | | | | | | | | | | NPI | 1629167028 |
| 3 | 03 | 18 | 21 | 03 | 18 | 21 | 12 | ELECTRODES A4556 | | A | 195.12 | 24 | | ZZ | ZZ332B00000X |
| | | | | | | | | | | | | | | NPI | 1629167028 |
| 4 | 03 | 18 | 21 | 03 | 18 | 21 | 12 | BATTERIES 1.2V A4630 | | A | 36.00 | 4 | | NPI | 1629167028 |
| 5 | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN EIN X  26. PATIENT'S ACCOUNT NO. 485465  27. ACCEPT ASSIGNMENT? X YES ☐ NO  28. TOTAL CHARGE $ 307.65  29. AMOUNT PAID $ 0.00  30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
EMSI          5/18/2021
SIGNED          DATE

32. SERVICE FACILITY LOCATION INFORMATION

33. BILLING PROVIDER INFO & PH # ( 800 ) 588-8383
ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 33619-8300
a. 1629167028          b. ZZ332B00000X

265. EMSI proceeded to continue to bill under New York's workers' compensation laws for these unnecessary supplies purportedly provided to A.T. on a monthly basis for an additional 5 months:

| Date of Service | Billed-For Supplies (quantity) |
|---|---|
| 4/18/2021 | Box of Skin Wipes (48)<br>Vitamin E Lotion 1oz (3)<br>Electrodes (24)<br>Batteries (4) |
| 5/19/2021 | Box of Skin Wipes (48)<br>Vitamin E Lotion 1oz (3)<br>Electrodes (24)<br>Batteries (4)<br>Delivery |
| 6/19/2021 | Box of Skin Wipes (48)<br>Vitamin E Lotion 1oz (3)<br>Electrodes (24)<br>Batteries (4)<br>Bio-Ice (3)<br>Delivery |
| 7/19/2021 | Box of Skin Wipes (48)<br>Vitamin E Lotion 1oz (3)<br>Electrodes (24)<br>Batteries (4)<br>Lead Wires (2)<br>Delivery |
| 8/16/2021 | Box of Skin Wipes (48)<br>Vitamin E Lotion 1oz (3)<br>Electrodes (24)<br>Batteries (4)<br>Lead Wires (2)<br>Delivery |

266. The Manuals indicate that the electrodes should be placed on clean and dry skin, but do not specify how the skin is to be cleaned. However, EMSI routinely billed for numerous boxes of alcohol skin wipes under HCPCS code A4245 in the packages of resupplies purportedly delivered to patients.

267. However, the provider ordering the TENS/NMES Devices never recommended or ordered alcohol wipes.

268.    Each invoice typically included 48 units of A4245, which is defined as "Alcohol wipes, per box" and indicates that the code represents an entire box of alcohol wipes. Each box typically contains 100 alcohol wipes.

269.    Therefore, EMSI's bills reflect that 4,800 alcohol wipes were dispensed at a time, and in the case of A.T., on a monthly basis.

270.    If A.T. used three (3) alcohol wipes per day, a single box would suffice for one month and the remaining forty-seven (47) boxes were unnecessary and excessive.

271.    The Manuals warn that "some patients" may experience "possible" or "isolated" skin irritation at the site of the electrode placement.

272.    Although not all patients will experience skin irritation through use of the TENS/NMES Devices, EMSI routinely supplied all patients with vitamin E lotion, which is used to relieve minor skin irritations.

273.    However, the provider ordering the TENS/NMES Devices never recommended or ordered vitamin E lotion.

274.    Vitamin E lotion can be purchased over the counter for approximately $0.49 per ounce compared to the inflated amount of $9.51 per ounce charged by EMSI.

275.    EMSI billed for vitamin E lotion under HCPCS code A4362, which is described as "skin barrier; solid, 4 x 4 or equivalent; each" and falls under "Ostomy Supplies." Therefore, this code is properly reported for the use of a solid skin barrier of 4 by 4 inches or equivalent that connects the skin to an ostomy pouch. This code is wholly inappropriate to use with a TENS/NMES Device as billed by EMSI.

276.    EMSI routinely billed under A9900 for a product called "Bio-Ice" purportedly provided to patients in packages of supplies. *See* Exhibit 10.

277.    HCPCS code A9900 is a miscellaneous DME supply code.

278.    Bio-Ice is an over-the-counter topical gel with an active ingredient of 5.4% menthol acting as an analgesic (i.e., pain reliever) and 0.48% camphor acting as a counter irritant.

279.    EMSI is the manufacturer of Bio-Ice and thus included this product in its predetermined package of supplies to increase its profits.

280.    Indeed, the prescribing providers never recommended or ordered Bio-Ice for their patients.

281.    In many, if not all, instances, Bio-Ice was not indicated for the patient's condition.

282.    Bio-Ice is marketed for the temporary relief of arthritis, backache, strains, and sprains.

283.    Moreover, products similar to Bio-Ice are readily available over-the-counter at a fraction of the price charged by EMSI. Specifically, the similarly named product Bio-Freeze is available in the same roll-on application as Bio-Ice in a 4% menthol concentration. A 3oz container of Bio-Freeze is available for purchase at approximately $12.00 while EMSI routinely charged $99.00 for three 3oz units of Bio-Ice.

284.    EMSI improperly billed for Bio-Ice under HCPCS code A9900 because a topical gel is not a DME item.

285.    EMSI also improperly billed for delivery of replenishment supplies under HCPCS code A9901, which code represents the delivery and set up of DME. However, supplies such as batteries, skin wipes, electrodes, and lotion are not considered DME for the purposes of A9901.

286.    In certain instances, EMSI also billed for conductive garments purportedly for use in connection with the TENS/NMES Devices.

287.    Conductive garments are used in place of standard electrodes. Therefore, any electrodes billed for a patient also purportedly dispensed with a conductive garment were not necessary.

288.    However, the use of a conductive garment is rarely reasonable and necessary.

289.    A conductive garment only may be necessary where the area to be treated is large or inaccessible, where the use of conventional electrodes is not feasible due to frequency of treatment, where the patient has a documented medical condition (e.g., skin condition) that precludes conventional electrodes, or where the patient requires treatment beneath a cast.

290.    EMSI did not document any justification for billed-for conductive garments and these garments were not reasonable and necessary. *See* Exhibit 11.

291.    For example, claimant S.D. (VNM3063) purportedly was prescribed with an Flex TENS and a Flex Gar conductive garment for the neck on September 15, 2017.

292.    EMSI purportedly provided the neck garment billed under E0731, the Flex TENS, four (4) batteries, and sixteen (16) electrodes to S.D. on September 25, 2017.

293.    A true and accurate representation of EMSI billing for CPT code E0731 is depicted below:



294.     Overall, EMSI used the TENS/NMES Devices to justify monthly packages of unnecessary supplies that were provided more frequently and in greater quantities than were necessary or permitted under the applicable Fee Schedule as a means to further exploit New York's No-Fault and workers' compensation laws and unsuspecting claimants.

295.     All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unnecessary and/or worthless replenishment supplies are fraudulent. *See* Exhibits 4-12.

### 3.     Improper Automatic Provision of TENS/NMES Supplies

296.     Refills of TENS/NMES Supplies should not be automatically shipped on a predetermined basis.

297.     By confirming that the claimant actually needs a refill of supplies, the DME provider ensures that the supplies are reasonable and necessary and truly wanted.

298.     However, EMSI automatically shipped TENS/NMES supplies to claimants who did not want or need the supplies.

299.    Upon information and belief, the claimants send the billed-for supplies back to EMSI or they simply go unused and are discarded.

300.    Upon information and belief, EMSI did not confirm that the claimant needed, wanted, or even used the supplies before dispensing them to the claimant.

301.    Indeed, according to claimants who were purportedly dispensed TENS Devices and accompany supplies at issue in this Complaint, EMSI repeatedly sent them supplies that they did not use because they did not want or need the supplies.

302.    By automatically shipping packages of supplies to the claimants' homes without confirming whether they needed or wanted the supplies (or even used the previously dispensed supplies), the Defendants created billing opportunities at the expense of the claimants who were literally left holding the bag of unneeded and unwanted supplies.

303.    These claimants were then saddled with the responsibility to shoulder the cost and time to store, dispose, or send back the supplies while EMSI profited.

304.    Such experiences with EMSI are corroborated by numerous negative reviews from consumers around the country who also have been victims of EMSI's unscrupulous business practices.

305.    True and accurate copies of negative reviews of EMSI are depicted below:



**Jake P.**
Tampa Bay, Fl.
⌂ 0  ▣ 1

■□□□□ Dec 21, 2021

Dishonest Company. DO NOT BUY FROM THEM!!!

I was quoted $450 for a Tens unit. I was then put on some form of a subscription service which I did not agree too. Months later, I received a huge bill and reached out to the company looking for answers. I sent them all of the quotes and communications with their rep showing the total as $450. They said it was their mistake and that if I paid the original quoted amount of $450 my account would be settled and I would no longer be on their "subscription service". I paid it on the spot and thought it would be over.

Now 5 months later I was just sent another bill for over $1000. I guess they didn't actually stop my service and continued to send me items. I have reached out multiple times and they still wont help me. I offered to send the items back but, since my wife opens the packages while I travel for work, I would need an itemized list and shipping label. They never sent either.

That was 2 months ago. I reached out again and they said they cant help me unless I send back the items (They wont tell me what they need) or I need to pay the bill for the items they sent without my consent after I shut off the service.

DO NOT USE THIS DISHONEST COMPANY.

I am working with the Florida Department of Health and legal professionals to get my account cleared but more importantly that this dishonest practice doesn't happen to anyone else.

Please just don't use this company, I wish I didn't!!!

♡            ⚒            ♡            ☺
Helpful 1    Thanks 0    Love this 0    Oh no 0



**Robert C.**
Sarasota, FL
⌂ 36  ▣ 32

■□□□□ Dec 16, 2020

This is a scam company. They have been billing me for a returned device they say they never received. They sent me batteries, a charger, etc. both devices they sent never worked and the customer support people are rude and you can tell they have been trained to scam people everyday.
Stay away from this company

♡            ⚒            ♡            ☺
Helpful 0    Thanks 0    Love this 0    Oh no 0



**Medical A.**
Lakeland, FL
0   1

⭐ Nov 26, 2017

Terrible Service. The were paid to provide a patient a TENS unit as post operative for knee surgery. They delivered a unit that was inoperable. I spoke to manager of Tampa Area. She said EMSI would overnight me one. Never received. Avoided my calls. EMSI billed Florida Blue $155 for this unit. Im waiting for them to give me a way to ship back their broken unit and to see if they will try to fraud Florida Blue, and still bill $155 despite me advising it does not work. EMSI out of Tampa dose not belong in the business of supplying critical post-operative devices, critical to patient recovery.

Helpful **0**    Thanks **0**    Love this **0**    Oh no **0**



**DW L.**
Bartlett, IL
53   22   3

⭐ Jun 7, 2019

If possible, I would give zero or negative stars. This company scams customers and insurance providers. Two years ago, I had knee replacement surgery, and my doctor arranged for electro-stim supplies for my rehab and recovery. Unfortunately, they went with EMSI. The product I received was in good working order, and I used it for about a month. After that time, I no longer needed electro-stim, so I contacted EMSI and requested to end service. The next month, a package of supplies arrived along with a bill. I called to cancel again. The next month, another bill and more supplies. I called a third time, and finally product stopped arriving, but the bills continued for months. I called a fourth time informing them that they were now billing me for products not delivered. Their reply...a bill for $73.68 for two months on mythical supplies delivered...that I don't need in the first place. Frustrated, I paid their $73.68 extortion fee and contacted the BBB. Steer well clear of this company...let your insurance company and medical provider know that this is a scam.

Helpful **0**    Thanks **0**    Love this **0**    Oh no **0**



306.    These complaints detail recurring deliveries of supplies on essentially a subscription basis that the consumers did not request or authorize EMSI to make.

307.    Therefore, the TENS/NMES supplies billed to Travelers by EMSI that were dispensed on an automatic basis without regard to the claimant's actual needs were not necessary and are not compensable under New York's No-Fault and workers' compensation laws.

308.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unnecessary TENS/NMES devices and replenishment supplies are fraudulent. *See* Exhibits 2-12.

**4.    Unauthorized Prescriptions for TENS/NMES Devices**

309.    EMSI billed for the TENS/NMES devices pursuant to prescriptions purportedly provided by the providers using EMSI's pre-printed form styled as a "Letter of Medical Necessity" ("LOMN").

310.    EMSI provided prescribing providers with a checklist pre-populated with EMSI's devices to facilitate the prescription of one of the TENS/NMES Devices as illustrated by the representative example below for claimant J.V. (FMQ1228).

51

311.    A true and accurate representation of an EMSI LOMN is depicted below:



312.    Each LOMN served as the prescription for the TENS/NMES Device.

313.    The LOMNs were a crucial part of the Defendants' scheme to defraud because they were precluded from billing for the TENS/NMES Devices without a prescription.

314.    Indeed, EMSI's manuals for the TENS/NMES Devices cautions patients that "Federal law requires a prescription from your physician before use of this product." *See* 21 C.F.R. § 801.109(b)(1).

315.    A true and accurate representation of the EMSI manual for the TENS/NMES Devices is depicted below:

⚠ **CAUTION** Federal law requires a prescription from your physician before use of this product.

316.    However, these LOMNs were unreasonable and below the standard of care because they fail to adequately set forth a specific rationale to substantiate the necessity of the TENS/NMES Device.

317.    Moreover, upon information and belief, an EMSI employee—and not the treating physician—completed the form that served as the basis for EMSI's false and fraudulent charges.

318.    Upon information and belief, an EMSI "territory manager" or other employee would complete the LOMN form for each claimant rather than the physician who purportedly prescribed the device.

319.    Upon information and belief, the territory manager would induce the claimant to agree to accept the TENS/NMES Device with promises that the device was covered by their insurance.

320.    The EMSI employees created the LOMN to create billing opportunities at the expense of the claimants and Plaintiffs.

321.    As a result, the LOMNs do not comport with the actual treatment plan for each patient.

322.    For example, claimant J.V. purportedly was prescribed an EMSI Flex TENS by his orthopedist, Anthony Cappellino, M.D. ("Cappellino"), on February 4, 2020 following a right knee arthroscopy on January 20, 2020.

323.    However, the report of Cappellino's examination of J.V. on February 4, 2020 does not discuss or even reference the prescription of a Flex TENS device for J.V. Rather, Cappellino recommends that J.V. proceed with physical therapy. Likewise, the physical therapist's note dated February 5, 2020 also does not reference a prescription for a Flex TENS device.

324.    Indeed, none of Cappellino's records for J.V. or J.V.'s physical therapy notes reference a prescription for a Flex TENS device.

325.    There was no justification for a prescription for a Flex TENS device for J.V., particularly for an indefinite duration. There is no indication in J.V.'s medical records that Cappellino ever intended to incorporate the lifetime use of a Flex TENS device into J.V.'s treatment plan.

326.    The LOMN purporting to prescribe lifetime use of a Flex TENS device to J.V. following arthroscopic knee surgery, including to treat supposed chronic pain, disuse atrophy, and "muscle spasms," is a sham, and, upon information and belief, was not actually authorized by Cappellino for J.V. Indeed, the Flex TENS is not indicated for these uses, which are the intended uses of a NMES device, such as the Flex-MT Plus.

327.    Moreover, nowhere in Cappellino's February 4, 2020 report does he indicate that J.V. presented with muscle spasms.

328.    Additionally, the diagnosis identified in the LOMN for J.V., M25.561 (pain in right knee), likewise does not appear in Cappellino's February 3, 2020 report for J.V.; rather, he diagnosed J.V. with acute meniscal tear, (S83.289A-836.1), acute medial meniscus tear of right

knee (S83.241A-836.0), other internal derangements of right knee (M23.8X1-717.9), and chondromalacia of right knee (M94.261-717.7).

329.    Therefore, EMSI's charges for the Flex TENS device and replenishment supplies purportedly provided on February 28, 2020 by EMSI for claimant J.V., along with additional supplies purportedly provided by EMSI to J.V. on May 28, 2020, August 28, 2020, and November 28, 2020, were fraudulent because they were unnecessary, unwanted, and unauthorized.

330.    Indeed, each EMSI LOMN contains a boilerplate paragraph that each prescribing provider purportedly attests to, which states that "In accordance with accepted medical standards, it is my opinion that the above named patient requires the device and attendant supplies for the above diagnosis. Dispense as written, no substitute permitted. If the device is purchased, I prescribe the device and supplies for indefinite use."

331.    This paragraph does not, in fact, comport with so-called "accepted medical standards" whereas an initial prescription for lifetime use of a TENS unit, with lifetime refills, is simply unnecessary, excessive, and below the standard of care.

332.    Rather, the Defendants used this paragraph as manufactured justification for potentially endless charges for EMSI's own branded TENS devices and supplies, which as explained below, were billed in excess of the amounts permitted under the applicable Fee Schedule.

333.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unnecessary TENS/NMES devices and replenishment supplies based on false LOMNs are fraudulent. *See* Exhibits 2-12.

D.    **INFLATED CHARGES FOR TENS/NMES DEVICES AND SUPPLIES**

334.    The Defendants intentionally caused EMSI to submit charges for TENS/NMES Devices and replenishment supplies that inflated the amounts billed in excess of the applicable Fee Schedules.

335.    The Defendants engaged in fraudulent billing practices through EMSI to maximize the amounts charged to Travelers as part of their scheme to obtain amounts to which EMSI was not entitled under New York's No-Fault and workers' compensation laws.

336.    As explained below, as a result of these fraudulent billing practices, EMSI was not lawfully entitled to receive payment on the false and fraudulent bills submitted to Travelers.

1.    **Improper Charges for TENS/NMES Devices Under E1399**

337.    EMSI routinely submitted charges for the TENS/NMES Devices using improper codes intentionally selected to inflate EMSI's charges to Travelers.

338.    DME items are billed using the HCPCS codes.

339.    EMSI incorrectly billed for TENS/NMES Devices, including the Flex MT, Flex IT, and IF-5000 Combo, using HCPCS Code E1399.

340.    HCPCS Code E1399, which is found in the section of HCPCS that pertains to unlisted oxygen supply items, is described as "Durable medical equipment, miscellaneous."

341.    HCPCS Code E1399 is not appropriate for reporting other forms of DME especially when the DME item being supplied has a specific code.

342.    HCPCS Code E1399 is inappropriate for use in billing for Flex IT and IF-5000 Combo because such devices are appropriately reported using E0730.

343.    HCPCS Code E0730 is described as "Transcutaneous electrical nerve stimulation (tens) device, four or more leads, for multiple nerve stimulation."

344.    HCPCS Code E1399 is inappropriate for use in billing for Flex MT because such devices are appropriately reported using E0745.

345.    HCPCS Code E0745 is described as "Neuromuscular stim for shock."

346.    The chart below contains representative examples of EMSI's false and fraudulent charges for TENS/NMES Devices under E1399:

| Claimant | Date of Service | Billed-For Device | Code | Amount Billed |
|---|---|---|---|---|
| M.C. (E2W6151) | 5/21/2019 | Flex IT | E1399 | $1,495 |
| T.B. (E7M6093) | 9/6/2018 | Flex IT | E1399 | $1,495 |
| J.M. (EGG9953) | 11/2/2010 | IF 5000 | E1399 | $2,495 |
| J.C. (FAW9378) | 12/4/2018 | Flex MT | E1399 | $1,495 |

347.    The permissible charge under the current WC DME Fee Schedule for a TENS Device billed under E0730 is only $76.25.

348.    Likewise, the permissible charge under the Medicaid DME Fee Schedule for a TENS Device billed under E0730 also was only $76.25 during the relevant period.

349.    In certain instances, EMSI did use E0730 to bill for TENS Devices, thus demonstrating knowledge that TENS Devices should be billed under E0730—and not E1399.

350.    However, even when billing under E0730, EMSI routinely submitted inflated charges to Travelers for TENS Devices.  For example, for claimant M.C. (E7E1095), EMSI charged $495.00 for a Flex TENS device under E0730 in violation of the New York Workers' Compensation DME Fee Schedule. *See* Exhibit 3.

351.    A true and accurate copy of a representative sample of EMSI billing E0730 at excessive rates is depicted below:



352.    EMSI's bills for TENS/NMES Devices billed under E1399 and E0730 are not compensable under the applicable Fee Schedules.

353.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for HCPCS Codes E1399 and E0730 are fraudulent. *See* Exhibits 2-3.

## 2.    Improper Unbundling of Charges for TENS/NMES Supplies Included with Device

354.    Unbundling refers to a fraudulent billing tactic where a provider bills for components of a service separately when there is one code that describes the entire service.

355.    The proper codes for the TENS Devices (E0730) and NMES Devices (E0745) include the initial supplies associated with the unit.

356.    Indeed, EMSI's Manuals for the TENS/NMES Devices direct the user to use the "electrodes and leadwires that came with the unit."

357.    A true and accurate representative sample of the EMSI manual for Flex-TENS is depicted below:

The Flex-TENS® is compatible and recommended for use with EMSI electrodes. Always use electrodes and leadwires that came with the unit. Using other electrodes and leadwires may render the unit non-operable, ineffective, and void the warranty.

358.    Likewise, the rechargeable battery pack and battery charging device also were included with the TENS/NMES Device as they are necessary for the TENS/NMES Device to operate.

359.    When billing for the TENS/NMES Devices, however, EMSI improperly billed separately for included supplies, including electrodes, chargers, batteries, and lead wires on the same date of service.

360.    For example, EMSI billed for 16 electrodes (A4556) and 4 batteries (A4630) separately from the Flex TENS unit purportedly provided to claimant L.B. (FSR0425) on June 16, 2021 even though the electrodes and batteries were included in the charge for the underlying TENS Device:

361.    A true and accurate copy of a representative sample of EMSI unbundling is depicted below:

362.    Likewise, for claimant J.M. (CIS1860), EMSI improperly billed Travelers for the

Flex TENS unit along with unbundled charges for four (4) batteries (A4630), a charger (E1399),

sixteen (16) electrodes (A4556), and a pair of lead wires (A4557).

363.    A true and accurate copy of a representative sample of EMSI unbundling is depicted

below:

364.    EMSI's bills for initial TENS/NMES Supplies, including, but not necessarily limited to, those billed under A4556 (electrodes), A4557 (lead wires), E1399 (charger), and A4630 (batteries), are not compensable under the applicable fee schedules.

365.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for unbundled HCPCS Codes A4556 (electrodes), A4557 (lead wires), E1399 (charger), and A4630 (batteries) are fraudulent. *See* Exhibits 2, 7-9.

### 3.    Improper Unbundling of Charges for TENS/NMES Resupplies

366.    EMSI used the billed-for TENS/NMES Devices as a vehicle to generate additional charges for a laundry list of unnecessary supplies.

367.    EMSI also improperly billed for TENS/NMES resupplies to further maximize the amounts billed to Travelers.

368.    EMSI billed for TENS/NMES resupply items separately even though such supplies should be billed under one code (A4595), which allows reporting of all the TENS resupply items. By billing for these items separately, EMSI engaged in unbundling, which is a fraudulent billing practice.

369.    A TENS supply allowance under A4595 is an all-inclusive code and includes items such as electrodes, skin preparation materials, and batteries.

370.    However, in numerous instances, EMSI submitted bills containing separate charges for electrodes, skin wipes, vitamin E lotion, and batteries.

371.    For example, for claimant S.W. (E3R6693), EMSI billed separately for TENS supplies on 20 dates of service between September 21, 2015 and March 21, 2019, including skin wipes (A4245), vitamin E lotion (A4362), electrodes (A4556), and batteries (A4630), purportedly for use in connection with the TENS Device dispensed to the claimant on August 21, 2015.

372.    However, EMSI should have billed for these supplies in one charge under A4595.

373.    Below are true and accurate copies of representative examples of EMSI's bills for TENS resupplies purportedly dispensed to S.W. on September 21, 2015 and March 21, 2020.





374. Notably, although EMSI continued to bill for resupplies for claimant S.W. over the course of over four years, upon information and belief, S.W. last used the TENS Device for which the supplies were intended in 2016.

375. Therefore, these resupplies were not medically necessary and were not eligible for reimbursement because EMSI failed to confirm whether the patient needed or wanted the supplies—which S.W. did not for the dates of service between, at least, 2017 and 2020.

376. In certain instances, EMSI billed for TENS supplies under A4595, which illustrates both the Defendants' knowledge of A4595 and the differential in the charges between the bundled and unbundled charges.

377. For example, when EMSI billed for medically unnecessary TENS supplies under A4595, it charged a total of $120 for two units whereas EMSI's separate charges for batteries, vitamin E lotion, skin wipes, and 24 electrodes totaled over $300.00. Therefore, EMSI intentionally unbundled the charges for TENS supplies to maximize the charges submitted to Travelers.

378. Indeed, EMSI's unbundled charges also grossly exceeded the permissible amounts under the applicable fee schedules.

379. Additionally, as noted above, the unnecessary batteries and vitamin E lotion billed by EMSI required prior authorization, which was never sought, and thus these supplies were not compensable under New York's workers' compensation laws.

380. Likewise, under the WC DME Fee Schedule, monthly TENS supplies under A4595 are designed as "PAR," which means that prior authorization was required for these supplies before they could be supplied to the claimant.

381.    Thus, even if EMSI's charges under New York's workers' compensation law for resupplies were properly billed and medically necessary (they were not), EMSI's charges under A4595 also were noncompensable because no prior authorization was obtained.

382.    The medical provider (i.e., the prescribing provider) never obtained prior authorization in accordance New York's workers' compensation law before EMSI automatically shipped resupplies to workers' compensation claimants.

383.    EMSI's bills for unneeded, unwanted, and falsely charged TENS/NMES resupplies, including, but not necessarily limited to, those billed under A4595, A4245, A4362, A4556, and A4630, are not compensable under the applicable Fee Schedules.

384.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for HCPCS Codes A4595, A4245, A4362, A4556 and A4630 are fraudulent. *See* Exhibits 4-8.

### 4.    Improper Delivery Charges

385.    Notably, EMSI does not submit any proof of delivery in support of its charges for the TENS/NMES Devices, supplies, and resupplies.

386.    Such proof of delivery, including identification of the specific TENS/NMES Device and supplies delivered along with the signature of the patient acknowledging receipt of the TENS/NMES Device and/or supplies, is conspicuously absent from EMSI's claims submissions.

387.    Nonetheless, EMSI routinely tacked on an improper $30.00 delivery charge under code A9901 to its bills submitted to Travelers for TENS/NMES Devices, supplies, and resupplies purportedly dispensed by EMSI.

388.    Code A9901 is used for charges for "DME delivery, set up, and/or dispensing service component of another HCPCS code."

389.    In New York, delivery of DME cannot be separately paid and the "maximum permissible charge" represents payment in full. 12 N.Y.C.R.R. § 442.2 (setting forth the "maximum permissible charge" for DME under New York's Workers' Compensation law); 12 N.Y.C.R.R. § 442.2 (2020) ("The maximum permissible charge for the purchase [or rental] of durable medical equipment…are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery.").

390.    Under the WC DME Fee Schedule, A9901 requires preauthorization and thus cannot be billed as a matter of course. Prior authorization was never sought for EMSI's delivery charges under A9901 and these charges are not compensable.

391.    Indeed, according to CMS guidance, delivery costs for DME are considered to be part of a DME provider's costs of doing business and are not separately reimbursable absent rare and unusual circumstances. *See* Medicare Claims Processing Manual, IOM Pub 100-4, Chapter 20, Section 60.

392.    According to EMSI, the delivery charges under A9901 submitted for TENS/NMES Devices and supplies merely encompassed EMSI's packaging for shipping the unit or supplies shipped by DHL carrier service or United States Mail.

393.    Below is a true and accurate copy of a representative example of EMSI's explanation for the delivery charges revealing that the charge is noncompensable:

> Delivery - A9901. *Defined as "DME delivery, set up, and/or dispensing component of another HCPS Code". This code includes packing, handling, postage, envelopes or boxes and shipment of supplies to patient's who have been prescribed units and supplies. The packaging for shipping a unit and supplies weighs from 4 to 5 pounds. If the package is for supplies only that package weights approximately 2 to 4 pounds depending on items ordered for the patient.*
> *We ship the above items by DHL carrier service and also by US mail.*

394.    EMSI never documented any unusual circumstances outside of its normal business activity accompanying its shipping or mailing of TENS/NMES Devices and supplies to Travelers claimants.

395.    There is no setup required for the TENS/NMES Devices or related supplies.

396.    Therefore, EMSI did not provide any setup services to claimants in connection with the billed-for TENS/NMES Devices or supplies.

397.    Upon information and belief, Travelers claimants who were shipped or mailed a TENS/NMES Devices by EMSI were provided Manuals supplied by EMSI with directions on use of the device and no one showed them how to use the device upon delivery.

398.    Therefore, EMSI's pattern of billing for delivery services under A9901, and its misrepresentations of these charges as compensable, represented billing for services not rendered.

399.    EMSI's bills for delivery charges under A9901 are not compensable under the applicable Fee Schedules.

400.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Travelers for HCPCS Code A9901 are fraudulent. *See* Exhibit 12.

E.    **SPECIFIC EXAMPLES OF FALSE AND FRAUDULENT CHARGES FOR MEDICALLY UNNECESSARY TENS/NMES DEVICES AND RELATED SUPPLIES**

**Exemplar Claim—Claimant A.T. (FRT2634)**

401.    Claimant A.T. was injured at work on or about December 29, 2020 when he slipped and fell onto his right low back.

402.    A.T. was examined by Gaurav Jaswal, M.D. ("Jaswal") on December 31, 2020 for complaints of right low back pain.

403.    Jaswal diagnosed A.T. with acute right-sided low back pain with right-sided sciatica and referred A.T. to physical therapy.

404.    A.T. followed up with Jaswal on January 21, 2021. At this visit, A.T. reported that his pain had improved with PT, as well as through oral and topical NSAIDs.

405.    Despite A.T.'s reports of improvement of his pain through physical therapy and other measures, Jaswal prescribed A.T. with "a standard TENS unit" at this follow-up visit "for his low back pain."

406.    Jaswal did not document that A.T. had undergone any trial of TENS therapy at the time of the prescription of the TENS unit.

407.    At the outset, the TENS unit prescribed by Jaswal was not justified to treat A.T.'s low back pain before A.T. had undergone a sufficient course of conservative care, including a trial of a TENS unit demonstrating its efficacy.

408.    The MTG in effect at the time of the prescription of the TENS unit for A.T. specifically states that "[c]onsistent, measurable, functional improvement must be documented and a determination made of the likelihood of chronicity prior to the provision of a home unit."

409.    Jaswal did not document any improvement following a trial of a TENS unit for A.T.

410.    Jaswal did not make any determination of the likelihood that A.T.'s pain would be chronic.

411.    Moreover, the American Academy of Neurology deems TENS devices to be ineffective to relieve low back pain such as that complained of by A.T.

412.    Jaswal purportedly signed an "EMSI - Letter of Medical Necessity" regarding a Flex TENS unit and Flex-Gar conductive garment for the back.

413.    The territory manager handling this referral to A.T. was Ashley Harvey who, upon information and belief, is an EMSI territory manager serving central New York.

414.    This LOMN misrepresented the necessity of the TENS unit for A.T.

415.    The LOMN indicated that A.T. had a history of "chronic pain"; however, on February 12, 2021, only six (6) weeks had passed since the date of A.T.'s injury. "Chronic pain" is defined as pain that has lasted for at least three (3) months. At no time as of February 12, 2021 had Jawal diagnosed A.T. with "chronic pain"; rather, he diagnosed A.T. with "acute pain."

416.    The LOMN also identifies "other" history of "muscle spasm and atrophy" even though Jawal never documented either finding for A.T. as of February 12, 2021.

417.    The LOMN also prescribes the Flex TENS unit to A.T. for an excessive period encompassing A.T.'s "lifetime." Notably, Jaswal did not specify use of the TENS unit for such an indefinite period.

418.    A true and accurate representation of the prescribed plan for A.T. is depicted below:

**Plan**

Standard TENS unit is prescribed for his low back pain.

419.    Jaswal did not prescribe any particular supplies for A.T.'s use with this TENS unit.

420.    EMSI purportedly provided the Flex TENS unit to A.T. on February 18, 2021, along with 16 electrodes and 4 batteries with a $30 delivery charge for a total charge of $691.08.

421.    A true and accurate copy of EMSI's billing for A.T. on February 18, 2021 is depicted below:

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | E0730 | NU | A | 495.00 | 1.00 | NPI | 1629167028 |
| 2 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | A4630 | | A | 36.00 | 4.00 | NPI | 1629167028 |
| 3 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | A9901 | | A | 30.00 | 1.00 | NPI | 1629167028 |
| 4 | 02 | 18 | 21 | 02 | 18 | 21 | 12 | A4556 | | A | 130.08 | 16.00 | NPI | 1629167028 |
| 5 | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN ☐ EIN ☒
26. PATIENT'S ACCOUNT NO. 7271/485465-61182
27. ACCEPT ASSIGNMENT? (For govt. claims, see back) ☒ YES ☐ NO
28. TOTAL CHARGE $ 691.08
29. AMOUNT PAID $
30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
ELECTROSTIM MED SERVICES
54    02/26/2021
SIGNED        DATE

32. SERVICE FACILITY LOCATION INFORMATION
ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 336198300
a. 1629167028

33. BILLING PROVIDER INFO & PH # ( 800)5888383
ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 336198300
a. 1629167028

422.    EMSI's charge for the Flex TENS unit for A.T. was excessive and in violation of the applicable Fee Schedule.

423.    EMSI charged $495.00 for the Flex TENS for A.T. even though the Medicaid Fee Schedule in effect on February 18, 2021 set the permissible charge for the unit at only $76.25.

424.    EMSI also unbundled the electrodes and batteries from the Flex TENS unit and improperly billed for these included items separately.

425.    EMSI further submitted inflated charges for these items by billing for 16 electrodes under A4556 even though the applicable Medicaid Fee Schedule limits the amount and frequency of replacement electrodes under A4556 to 2 pairs once per month at a rate of $6.13.

426.    EMSI also billed Travelers for 4 batteries under A4630 even though applicable Medicaid Fee Schedule allows for a maximum of 1 unit of this code at a rate of $2.46.

427.    EMSI never sought authorization to bill for 16 electrodes and 4 batteries for A.T.

428.    EMSI continued to bill Travelers for excessive resupplies purportedly sent to A.T. on a monthly basis from March 2021 to August 2021.

429.    EMSI billed Travelers a total of $2,154.90 for these TENS resupplies even though there is no evidence that A.T. needed or wanted the supplies and DME resupplies should not be provided on an automatic, subscription basis.

430.    EMSI billed for 24 additional electrodes each month for A.T. for a total of 124 electrodes, which was grossly excessive given that, at most, 2 sets of electrodes should suffice each month for the use of a medically necessary TENS device.

431.    EMSI also billed for Vitamin E lotion, Bio-Ice, and skin wipes purportedly delivered—along with a noncompensable delivery charge—to A.T. even though the prescribing provider never indicated that A.T. needed these items in connection with the TENS unit.

432.    These items were excessively charged and unnecessary for use in connection with the Flex TENS device billed by EMSI because this device, and all related supplies, were no more effective than a sham device to treat A.T.'s lower back pain.

433.    Travelers is entitled to recover all payments made to EMSI in connection with these services.  To the extent that any of EMSI's charges for the Flex TENS and related supplies for A.T. remain unpaid, Travelers has no further obligation to make payment because EMSI's charges for A.T. are not compensable under New York's workers' compensation laws.

434.    EMSI mailed all of these false bills and related documentation through the U.S. Mail.

**Exemplar Claim—Claimant M.W. (A4N6468)**

435.    Claimant M.W. reportedly sustained a work-related injury to his right shoulder on December 22, 2015.

436.    M.W. underwent an initial medical examination of his right shoulder on January 7, 2016 and was diagnosed with right should strain and rotator cuff tendinitis.

437.    Following a right shoulder MRI, M.W. was diagnosed with partial rotator cuff tear and initiated treatment with an orthopedist on February 29, 2016.

438.    On June 3, 2016, M.W. was examined at the orthopedist's office by Brandon Weaver, PA ("Weaver"), under the supervision of Bradley Raphael, M.D. ("Raphael"). Weaver prescribed M.W. with a TENS unit.

439.    However, on July 5, 2016, non-party CPR Medical Supply supplied M.W. with a TENS unit and electrodes prescribed by Raphael.

440.    However, a few weeks later, on July 26, 2016, EMSI purported to supply M.W. with a second, and wholly unnecessary and redundant, TENS unit purportedly prescribed by Weaver along with 16 electrodes and 4 batteries and a $30 delivery charge.

441.    EMSI submitted excessive charges for the TENS unit and supplies totaling $691.08, including a $495.00 charge for the Flex TENS unit (E0730) alone.

442.    A true and accurate copy of EMSI's billing for M.W. on July 26, 2016 is depicted below:



443.    However, the Medicaid Fee Schedule in effect on July 26, 2016 set the permissible charge for the unit at only $76.25.

444.    EMSI also unbundled the electrodes and batteries from the Flex TENS unit and improperly billed for these included items separately.

445.    EMSI further submitted inflated charges for these items by billing for 16 electrodes under A4556 even though the applicable Medicaid Fee Schedule limits the amount and frequency of replacement electrodes under A4556 to 2 pairs once per month at a rate of $6.13.

446.    EMSI also billed Travelers for 4 batteries under A4630 even though applicable Medicaid Fee Schedule allows for a maximum of 1 unit of this code at a rate of $2.46.

447.    EMSI never sought authorization to bill for 16 electrodes and 4 batteries for A.T.

448.    According to the LOMN purportedly signed by Weaver on June 22, 2016, he prescribed the TENS unit for M.W. for "lifetime" use.

449.    The lifetime duration of the prescription for the TENS unit was wholly unnecessary and unjustified. Indeed, according to Weaver, M.W. presented with "0%" temporary impairment soon after on September 14, 2016 when M.W. was last examined by Weaver.

450.    According to M.W., the last time that he treated with the orthopedist was in 2016.

451.    Weaver's September 14, 2016 examination report does not reference M.W.'s use of a TENS unit or document any beneficial effect from the TENS unit.

452.    Even though M.W.'s purported TENS use was not under the supervision of a physician or physician assistant after September 14, 2016; and M.W. was not impaired as of this date; and the EMSI device was wholly redundant and unnecessary for M.W.'s care, EMSI inexplicably continued to purport deliver TENS resupplies to M.W. like clockwork every February 26, May 26, August 26, and November 26 for four years until August 26, 2020.

453.    Specifically, in each instance, EMSI billed for unnecessary and excessive supplies, including 48 units of skin wipes (A4245), 3oz of Vitamin E Lotion (A4362), 24 electrodes (A4556), and 4 batteries (A4630).

454.    EMSI also included unnecessary and excessive charges for topical Bio-Ice (A9900) with the May and November deliveries and an additional 2 lead wires (A4557) in the February and August deliveries.

455.    A true and accurate representation of EMSI's billing in connection with M.W. is depicted below:



73

| 24. A.   DATE(S) OF SERVICE | | | | | | B.<br>PLACE OF<br>SERVICE | C. | D. PROCEDURES, SERVICES, OR SUPPLIES | | E.<br>DIAGNOSIS<br>POINTER | F.<br>$ CHARGES | G.<br>DAYS<br>OR<br>UNITS | H.<br>EPSOT<br>Family<br>Plan | I.<br>ID.<br>QUAL | J.<br>RENDERING<br>PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | From | | | To | | | | | | | | | | | |
| | MM | DD | YY | MM | DD | YY | | | CPT/HCPCS | MODIFIER | | | | | | |
| | | | | | | | | | COTTON VITAMIN E - 1 OZ | | | | | | |
| 1 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A4362 | | A | 28.53 | 3 | | NPI<br>G2 | 1629167028 |
| | | | | | | | | | ELECTRODES | | | | | | |
| 2 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A4556 | | A | 195.12 | 24 | | NPI<br>G2 | 1629167028 |
| | | | | | | | | | BATTERIES 1.2V | | | | | | |
| 3 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A4630 | NU | A | 36.00 | 4 | | NPI<br>G2 | 1629167028 |
| | | | | | | | | | DELIVERY | | | | | | |
| 4 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A9901 | | A | 30.00 | 1 | | NPI<br>G2 | 1629167028 |
| | | | | | | | | | SKIN WIPES | | | | | | |
| 5 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A4245 | | A | 48.00 | 48 | | NPI<br>G2 | 1629167028 |
| | | | | | | | | | BIO ICE | | | | | | |
| 6 | 05 | 26 | 20 | 05 | 26 | 20 | 12 | | A9900 | | A | 99.00 | 3 | | NPI | 1629167028 |

| 25. FEDERAL TAX I.D. NUMBER | SSN | EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|---|---|
| | | | 267075 | ☒ YES ☐ NO | $ 436.65 | $ 0.00 | 800-588-8383 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # |
|---|---|---|
| EMSI          5/24/2021 | | ELECTROSTIM MED SERVICES INC<br>3504 CRAGMONT DRIVE STE 100<br>TAMPA FL 33619-8300 |
| SIGNED          DATE | a.          b. | a. 1629167028    b. G2 |

456.    There is no documentation or indication that M.W. needed or wanted these supplies and thus the regular charges for resupplies were improperly billed on an automatic basis.

457.    Indeed, upon information and belief, M.W. began sending the supplies back to EMSI in 2020.

458.    Overall, EMSI billed Travelers $6,937.05 for TENS resupplies that were unnecessary, excessive, and falsely charged.

459.    Travelers is entitled to recover all payments made to EMSI in connection with these services.  To the extent that any of EMSI's charges for the Flex TENS and related supplies for M.W. remain unpaid, Travelers has no further obligation to make payment because EMSI's charges for M.W. are not compensable under New York's workers' compensation laws.

460.    EMSI mailed all of these false bills and related documentation through the U.S. Mail.

**Exemplar Claim—R.C. (AHE8201)**

461.    Claimant R.C. reportedly injured his cervical spine in a work-related accident on December 18, 2011.

462.    As early as July 11, 2018, R.C.'s provider Billy Carstens, D.O. ("Carstens") reported that R.C. had previously attempted a TENS unit to treat his pain, apparently without any benefit as R.C. continued to experience consistent neck pain.

463.    Indeed, on December 19, 2018, R.C. continued to report ongoing neck pain from the work injury to Carstens.

464.    Carstens did not discuss any rationale for the provision of a TENS home unit to R.C. in his report of his December 19, 2018 exam of R.C. or even indicate that one was being prescribed.

465.    Nonetheless, Carstens purported to sign an EMSI LOMN for a Flex TENS unit for R.C. on January 3, 2019.

466.    This LOMN for R.C. fell below the standard of care because it did not provide a specific rationale to substantiate use of the TENS and was written for an excessive "lifetime" duration.

467.    A true and accurate representation of a portion of the Letter of Medical Necessity for R.C. is depicted below:

468.    The following day, January 4, 2019, EMSI purported to provide R.C. with a Flex TENS unit (E0730), 4 batteries (A4630), and 16 electrodes (A4556), along with a delivery charge (A9901).

469.    A true and accurate copy of EMSI's billing for R.C. on January 4, 2019 is depicted below:



470.    However, the Medicaid Fee Schedule in effect on January 4, 2019 set the permissible charge for the Flex TENS unit under E0730 at only $76.25.

471.    EMSI also unbundled the electrodes and batteries from the Flex TENS unit and improperly billed for these included items separately.

472.    EMSI further submitted inflated charges for these items by billing for 16 electrodes under A4556 even though the applicable Medicaid Fee Schedule limits the amount and frequency of replacement electrodes under A4556 to 2 pairs once per month at a rate of $6.13.

473.    EMSI also billed Travelers for 4 batteries under A4630 even though applicable Medicaid Fee Schedule allows for a maximum of 1 unit of this code at a rate of $2.46.

474.    EMSI never sought authorization to bill for 16 electrodes and 4 batteries for R.C.

475.    There was no objective documentation that the EMSI TENS unit was effective and provided R.C. with functional improvement. Rather, Carstens simply noted on January 30, 2019 that R.C. "feels the TENS unit helps."

476.    This subjective assessment lacks any specific objective findings regarding the efficacy and analgesic response to the TENS unit to substantiate ongoing use and ongoing refills of supplies.

477.    R.C. was examined on numerous occasions from January 2019 through August 2022 by several providers, including an orthopedic surgeon, a neurosurgeon, and his primary care provider. None of these providers even mentioned R.C.'s use of a TENS unit in their reports of their examination and treatment of R.C.

478.    In fact, these providers actually reported that R.C. was not using any modalities.

479.    Additionally, approximately six (6) months after Carstens purportedly prescribed R.C. with a lifetime prescription for the TENS unit, on July 12, 2019, he discharged R.C. from treatment.

480.    However, EMSI continued to bill for TENS resupplies purportedly delivered to R.C. from August 4, 2019 through February 4, 2022 without any supervision by the prescribing physician, which is contrary to the standard of care.

481.    On a regular, recurring basis, EMSI billed for packages of medically unnecessary and excessive TENS resupplies, including numerous batteries (A4630), electrodes (A4556), Vitamin E lotions (A4362), skin wipes (A4245), lead wires (A4557), and Bio-Ice (A9900).

482.    A true and accurate representation of EMSI billing in connection with R.C. is depicted below:

483. Upon information and belief, at no time did EMSI confirm that R.C. needed or wanted these supplies, but billed for them anyway.

484. Overall, EMSI billed Travelers approximately $5,401.53 for TENS resupplies for R.C. that were unnecessary, excessive, and falsely charged.

485. Travelers is entitled to recover all payments made to EMSI in connection with these services. To the extent that any of EMSI's charges for the Flex TENS and related supplies for R.C. remain unpaid, Travelers has no further obligation to make payment because EMSI's charges for R.C. are not compensable under New York's workers' compensation laws.

486. EMSI mailed all of these false bills and related documentation through the U.S. Mail.

**Exemplar Claim—T.C. (A7K7475)**

487.    Claimant T.C. reportedly injured his lower right back at work on July 21, 2011.

488.    T.C.'s physician, David Carlson, M.D. ("Carlson") purportedly prescribed an EMSI Flex TENS unit and a Flex-Gar garment for the lower back on July 25, 2012 using a preprinted EMSI LOMN form.

489.    T.C. continued to follow-up with Carlson on a semi-annual basis until at least September 2020.

490.    From November 2014 until at least May 2020, EMSI continued to bill for packages of TENS supplies purportedly delivered to T.C. without any documentation from Carlson that T.C. was even continuing to use the TENS unit prescribed years prior in July 2011.

491.    The reports of Carlson's follow-up examinations of T.C. conducted nearly every April and October of each year for 2017, 2018, 2019, and 2020 never even mention T.C.'s TENS device use, let alone provide assessments of the efficacy of the TENS device for treatment of T.C.'s lower back pain and objective justifications for its continued use.

492.    Rather, Carlson reported that pain medication and chiropractic treatments relieved T.C.'s pain.

493.    Moreover, as of October 2018, Carlson reported that T.C. had reached maximal medical improvement.

494.    Despite no documented justification from the prescribing for continued use of the TENS device and related supplies for T.C.—and no indication whatsoever that the T.C. even was using the device—EMSI persisted in billing Travelers for the unnecessary and excessive TENS resupplies, including Vitamin E lotion (A4362), electrodes (A4556), batteries (A4630), Bio-Ice (A9900), skin wipes (A4245), and lead wires (A4557).

495.    True and accurate copies of EMSI billing are depicted below:



| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|---|

DN: CARLSON, DAVID — 17b. NPI 1154478113

19. ADDITIONAL CLAIM INFORMATION

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E)   ICD Ind. 0

S33.5XXA

| | | D. PROCEDURES, SERVICES, OR SUPPLIES | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|
| | | SKIN WIPES | | | | G2 | |
| 1 | 02 15 16 02 15 16 12 | A4245 | A | 48.00 | 48 | NPI | 1629167028 |
| | | LOTION VITAMIN E - 1 OZ | | | | G2 | |
| 2 | 02 15 16 02 15 16 12 | A4362 | A | 28.53 | 3 | NPI | 1629167028 |
| | | ELECTRODES | | | | G2 | |
| 3 | 02 15 16 02 15 16 12 | A4556 | A | 195.12 | 24 | NPI | 1629167028 |
| | | BATTERIES 1.2V | | | | G2 | |
| 4 | 02 15 16 02 15 16 12 | A4630 NU | A | 36.00 | 4 | NPI | 1629167028 |
| | | DELIVERY | | | | G2 | |
| 5 | 02 15 16 02 15 16 12 | A9901 | A | 30.00 | 1 | NPI | 1629167028 |
| | | LEADWIRES - PAIR | | | | G2 | |
| 6 | 02 15 16 02 15 16 12 | A4557 | A | 45.00 | 2 | NPI | 1629167028 |

| 25. FEDERAL TAX I.D. NUMBER   SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| X | 101426 | X YES   NO | 382.65 | 141.18 | |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER

32. SERVICE FACILITY LOCATION INFORMATION

33. BILLING PROVIDER INFO & PH # 800-588-8383

ELECTROSTIM MED SERVICES INC
3504 CRAGMONT DRIVE STE 100
TAMPA FL 33619-8300

EMSI     2/27/2018

SIGNED     DATE

a.     b.     a. 1629167028  b. G2

496.    Upon information and belief, at no time did EMSI confirm that T.C. needed or wanted these supplies, but billed for them anyway.

497.    Overall, EMSI billed Travelers approximately $7,382.23 for TENS resupplies for T.C. between February 2016 and May 2020 that were unnecessary, excessive, and falsely charged.

498.    Travelers is entitled to recover all payments made to EMSI in connection with these services.  To the extent that any of EMSI's charges for the Flex TENS and related supplies for T.C. remain unpaid, Travelers has no further obligation to make payment because EMSI's charges for T.C. are not compensable under New York's workers' compensation laws.

499.    EMSI mailed all of these false bills and related documentation through the U.S. Mail.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

500.    The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault and workers' compensation claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud), to execute, or attempt, such fraudulent schemes.

501.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, appeals, delivery receipts, CMS-1500 forms, letters of medical necessity, other No-Fault and workers' compensation claim reimbursement documents, assignment of benefits forms, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

502.    Every workers' compensation claim detailed within this Complaint involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

503.    Every automobile insurance claim detailed within this Complaint involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

A.   **EMSI ENTERPRISE**

504.   EMSI represented in its Medicare Application that it only does business through the U.S. Mail.

505.   Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, assignment of benefits forms, letters of medical necessity, and/or invoices/bills from EMSI to be mailed to Travelers (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

506.   Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to falsely certify that it was eligible to be reimbursed under New York's No-Fault and workers' compensation laws each time that EMSI mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Travelers.

507.   Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo's participation in the operation and management of EMSI, which included, among other things, (a) owning, managing, and/or operating EMSI, (b) profiting from the operation of EMSI, (c) facilitating unlawful and illegitimate prescriptions and orders between EMSI and prescribers, (d) dispensing medically unnecessary TENS Devices and supplies to EMSI patients, and (e) causing EMSI to submit false and fraudulent New York No-Fault and workers' compensation claims to Travelers, rendered EMSI completely ineligible for both No-Fault and workers' compensation reimbursement under New York law.

508.    As a result of the above-described conduct, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo purposely caused EMSI to make a misrepresentation every time that EMSI mailed (or was caused to mail) a document to Travelers claiming eligibility for reimbursement.

509.    Moreover, because (a) Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of EMSI, (b) Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to seek reimbursement from Travelers (even though EMSI was not lawfully entitled to such reimbursement), and (c) EMSI used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo committed mail fraud.

510.    At all relevant times, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo knew that EMSI (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Travelers would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation submitted by (or on behalf of) EMSI.

511.    Travelers estimates that the unlawful operation of the EMSI enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 13 and incorporated herein by reference as if outlined in its entirety.

### B.    EMSI ASSOCIATION-IN-FACT ENTERPRISE

512.    EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, assignment of benefits forms, letters of medical

necessity, and/or invoices/bills from the EMSI association-in-fact enterprise to be mailed to Travelers (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

513.    EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to falsely certify that it was eligible to be reimbursed under New York's No-Fault and workers' compensation laws each time that the EMSI association-in-fact enterprise mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Travelers.

514.    EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo's participation in the operation and management of the EMSI association-in-fact enterprise, which included, among other things, (a) owning, managing, and/or operating EMSI, (b) profiting from the operation of EMSI, (c) facilitating unlawful and illegitimate prescriptions and orders between EMSI and prescribers, (d) dispensing medically unnecessary TENS Devices and supplies to EMSI patients, and (e) causing EMSI to submit false and fraudulent New York No-Fault and workers' compensation claims to Travelers, rendered EMSI completely ineligible for both No-Fault and workers' compensation reimbursement under New York law.

515.    As a result of the above-described conduct, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo purposely caused the EMSI association-in-fact enterprise to make a misrepresentation every time that EMSI mailed (or was caused to mail) a document to Travelers claiming eligibility for reimbursement.

516.    Moreover, because (a) EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of the EMSI association-in-fact enterprise, (b) EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to seek reimbursement from Travelers

(even though EMSI was not lawfully entitled to such reimbursement), and (c) EMSI used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo committed mail fraud.

517.    At all relevant times, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo knew that the EMSI association-in-fact enterprise (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Travelers would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation submitted by (or on behalf of) EMSI.

518.    Travelers estimates that the unlawful operation of the EMSI association-in-fact enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 13 and incorporated herein by reference as if outlined in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY TRAVELERS

### A.    EMSI ENTERPRISE

519.    At all relevant times during the operation of the EMSI enterprise, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo purposely caused EMSI to falsely certify that it was eligible to be reimbursed under New York's No-Fault and workers' compensation laws to induce Travelers to promptly pay charges related to TENS/NMES Devices and supplies purportedly provided to Travelers Claimants who were caused to be customers of EMSI.

520.    During the relevant period, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo directly participated in the operation and management of EMSI.

521. Because Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo were responsible for causing EMSI's (a) billing Travelers for TENS/NMES Devices and supplies that were not medically necessary and were completely unjustified to treat the Travelers Claimants' purported injuries, (b) falsely charging for TENS/NMES Devices and supplies with the knowledge that such devices and supplies were not lawfully reimbursable under New York's No-Fault and workers' compensation laws, (c) charging Travelers for TENS/NMES Devices and supplies at grossly excessive rates and in violation of applicable Fee Schedules, and (d) dispensing TENS/NMES Devices and supplies in violation of applicable regulatory requirements, EMSI was caused to falsely claim eligibility for No-Fault and workers' compensation reimbursement each and every time that EMSI sought No-Fault reimbursement from Travelers.

522. As alleged above, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to create and submit to Travelers No-Fault and workers' compensation reimbursement documents and demands for payment relative to TENS/NMES Devices and supplies that were (a) unlicensed, (b) unnecessary, (c) medically worthless, (d) billed pursuant to a pre-determined protocol, and/or (e) fraudulently billed.

523. Such conduct is unlawful, and rendered each such claim fraudulent under New York's No-Fault and workers' compensation laws.

524. Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Travelers by these Defendants and upon which Travelers relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

525. Thus, every time that Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused EMSI to submit No-Fault and workers' compensation reimbursement demands to Travelers,

Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo necessarily certified that EMSI was eligible to be reimbursed under New York's No-Fault and workers' compensation laws.

526.    The full extent of Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo's fraudulent and unlawful acts relative to their participation in the EMSI enterprise was not known to Travelers until shortly before it commenced this action.

### B.    EMSI ASSOCIATION-IN-FACT ENTERPRISE

527.    At all relevant times during the operation of the EMSI association-in-fact enterprise, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo purposely caused EMSI to falsely certify that it was eligible to be reimbursed under New York's No-Fault and workers' compensation laws to induce Travelers to promptly pay charges related to TENS/NMES Devices and supplies purportedly provided to Travelers Claimants who were caused to be customers of EMSI.

528.    During the relevant period, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo directly participated in the operation and management of the EMSI association-in-fact enterprise.

529.    Because EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo were responsible for causing EMSI's (a) billing Travelers for TENS/NMES Devices and supplies that were not medically necessary and were completely unjustified to treat the Travelers Claimants' purported injuries, (b) falsely charging for TENS/NMES Devices and supplies with the knowledge that such devices and supplies were not lawfully reimbursable under New York's No-Fault and workers' compensation laws, (c) charging Travelers for TENS/NMES Devices and supplies at grossly excessive rates and in violation of applicable Fee Schedules, and (d) dispensing TENS/NMES Devices and supplies in violation of applicable regulatory requirements, EMSI was

caused to falsely claim eligibility for No-Fault and workers' compensation reimbursement each and every time that EMSI sought No-Fault reimbursement from Travelers.

530.    As alleged above, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused the EMSI association-in-fact enterprise to create and submit to Travelers No-Fault and workers' compensation reimbursement documents and demands for payment relative to TENS/NMES Devices and supplies that were (a) unlicensed, (b) unnecessary, (c) medically worthless, (d) billed pursuant to a pre-determined protocol, and/or (e) fraudulently billed.

531.    Such conduct is unlawful, and rendered each such claim fraudulent under New York's No-Fault and workers' compensation laws.

532.    Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Travelers by these Defendants and upon which Travelers relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

533.    Thus, every time that EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo caused the EMSI association-in-fact enterprise to submit No-Fault and workers' compensation reimbursement demands to Travelers, EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo necessarily certified that EMSI was eligible to be reimbursed under New York's No-Fault and workers' compensation laws.

534.    The full extent of EMSI, Garcia, Muley, Dacey-Zavalianos, Alfonso, and Cielo's fraudulent and unlawful acts relative to their participation in the EMSI association-in-fact enterprise was not known to Travelers until shortly before it commenced this action.

## VIII.    TRAVELERS' JUSTIFIABLE RELIANCE

535.    Each claim submitted to Travelers by EMSI was verified according to Insurance Law § 403.

90

536.    To induce Travelers to promptly pay EMSI's invoices, the Defendants submitted (or caused to be submitted) to Travelers CMS-1500 bills certifying that EMSI was eligible to be reimbursed under New York's No-Fault and workers' compensation laws.

537.    Further, to induce Travelers to promptly pay the fraudulent charges for TENS/NMES Devices and supplies purportedly provided to Travelers Claimants, the Defendants hired attorneys to pursue collection of the fraudulent and/or non-compensable charges from Travelers. These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Travelers.

538.    Travelers is under statutory and contractual obligations to promptly and fairly process workers' compensation claims within 45 days.

539.    Travelers is under statutory and contractual obligations to promptly and fairly process No-Fault claims within 30 days.

540.    The facially valid documents submitted to Travelers by (or on behalf of) EMSI in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did, cause Travelers to justifiably rely on them.

541.    The Defendants concealed from Travelers the truth regarding EMSI's reimbursement eligibility under New York law.

542.    In reasonable reliance on these misrepresentations, Travelers paid money to EMSI to its detriment.

543.    Travelers would not have paid these monies had the Defendants provided true and accurate information about EMSI's reimbursement eligibility under New York law, including the fact and necessity of the services purportedly provided to those Travelers Claimants and customers

of EMSI eligible for insurance coverage under an automobile or workers' compensation insurance policy issued by Travelers.

544.    As a result, Travelers was caused to pay EMSI over $340,000.00 in reasonable reliance on EMSI's false claim reimbursement documentation.

## IX.    <u>DAMAGES</u>

545.    The Defendants' pattern of fraudulent conduct injured Travelers in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Travelers to calculate damages with specificity at this stage in the litigation (whereas Travelers' damages continue to accrue), Travelers' injury includes, but is not limited to, compensatory damages for payments to EMSI in connection with claims for No-Fault and workers' compensation benefits in excess of $340,000.00, the exact amount to be determined at trial. The chart annexed at Exhibit 14, and incorporated herein as if set forth in its entirety, identifies Travelers' payments to EMSI in connection with No-Fault and workers' compensation claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## X.    <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ELECTROSTIM MEDICAL SERVICES, INC. ENTERPRISE**
**(Against Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos,**
**Yorlan Alfonso, and Rossana Cielo)**

546.    Travelers re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 545 as if set forth fully herein.

547.    In furtherance of their operation and management of Electrostim Medical Services, Inc., Defendants Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo (collectively, "Count I Defendants") intentionally prepared and mailed (or caused

to be prepared and mailed) false claim reimbursement documentation in connection with Travelers insurance claims in furtherance of this scheme to defraud.

548.    The Count I Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

549.    Among other things, invoices, documents, notes, reports, invoices, prescription forms, letters of medical necessity, delivery receipts, CMS-1500 forms, assignment of benefits forms, other claim reimbursement documents, letters, and/or payment requests were routinely delivered to Travelers through the U.S. Mail.

550.    Policies of insurance were delivered to two or more Travelers Claimants through the U.S. Mail.

551.    Payments made by Travelers to Electrostim Medical Services, Inc. were delivered through the U.S. Mail.

552.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices and other claim-related documentation to Travelers related to TENS/NMES Devices and supplies dispensed and delivered by Electrostim Medical Services, Inc. to collect payment from Travelers under the Travelers policies and applicable New York No-Fault and workers' compensation laws.

553.    When the Count I Defendants mailed (or caused the submission of) CMS-1500 forms and other claim-related documents to Travelers seeking No-Fault and workers' compensation reimbursement, the Count I Defendants materially misrepresented Electrostim Medical Services, Inc.'s reimbursement eligibility under New York law.

554.    As a result of, and in reasonable reliance upon, the mailing of false documents and materially false representations, Travelers, by its agents and employees, issued drafts to Electrostim Medical Services, Inc. for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

555.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the submission of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Travelers from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

556.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

557.    The activities alleged in this case had the direct effect of causing funds to be transferred from Travelers to Electrostim Medical Services, Inc. for the benefit of the Count I Defendants.

558.    Travelers is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Travelers's overall financial well-being and adversely affect insurance rates.

559.    Electrostim Medical Services, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

560.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

561.    Travelers is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

562.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Travelers' injury.

563.    Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Travelers is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ELECTROSTIM MEDICAL SERVICES, INC. ENTERPRISE
### (Against Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo)

564.    Travelers re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 545 as if fully set forth herein.

565.    Through their participation in the operation and management of Electrostim Medical Services, Inc., Defendants Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

566.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Electrostim Medical Services, Inc. through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 13, and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Travelers.

567.    The purpose of the conspiracy was to obtain payments from Travelers on behalf of Electrostim Medical Services, Inc., even though Electrostim Medical Services, Inc., as a result of

the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault and workers' compensation payments.

568.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

569.    Travelers has been injured in its business and property because of this conspiratorial conduct whereas Travelers has been induced to make No-Fault and workers' compensation claim payments as a result of the defendants' unlawful conduct described herein.

570.    Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Travelers, and Travelers is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ELECTROSTIM MEDICAL SERVICES, INC. ASSOCIATION-IN-FACT ENTERPRISE**
**(Against Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo)**

571.    Travelers re-alleges, re-pleads and incorporates by reference all paragraphs set forth above in paragraphs 1-545 as if set forth fully herein.

572.    In furtherance of their operation and management of the Electrostim Medical Services, Inc. ("EMSI") association-in-fact Enterprise, Defendants, Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be

96

mailed) false medical documentation in connection with Travelers insurance claims in furtherance of their scheme to defraud.

573.    EMSI constitutes an association-in-fact "enterprise" ("the EMSI Association-in-Fact Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

574.    The members of the EMSI Association-in-Fact Enterprise are and have been associated through time, joined in purpose and organized in a manner amendable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.

575.    The EMSI Association-in-Fact Enterprise members associated for the common purpose of facilitating the submission of fraudulent billing to Travelers for DME that was: (a) unlicensed; (b) unnecessary; (c) medically worthless; (d) billed pursuant to a pre-determined protocol; and (e) fraudulently billed.

576.    There was a discernible structure amongst the Count III Defendants that was distinct from the EMSI Association-in-Fact Enterprise itself and the racketeering activity perpetrated by the Count III Defendants.

577.    The Count III Defendants employed two or more mailings to demand and/or receive payment from Travelers on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

578.    Among other things, prescriptions, delivery receipts, wholesale invoices, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Travelers through the U.S. Mail.

579.    Policies of insurance were delivered to insureds through the U.S. Mail.

580.    Payments made by Travelers to EMSI were delivered through the U.S. Mail.

581.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices to Travelers related to services that were purportedly performed by EMSI for the purpose of collecting payment from Travelers under Travelers' policies of insurance and applicable New York No-Fault and workers' compensation laws.

582.    When the Count III Defendants mailed (or caused the submission of) CMS-1500 forms and other claim-related documents to Travelers seeking No-Fault and workers' compensation reimbursement, the Count III Defendants materially misrepresented EMSI's reimbursement eligibility under New York law.

583.    As a result of, and in reasonable reliance upon, the mailing of false documents and materially false representations, Travelers, by its agents and employees, issued drafts to EMSI, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

584.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the submission of) these documents, each appearing legitimate on their face, also prevented Travelers from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

585.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

586.    By creating and then mailing to Travelers (or directing the creation and subsequent mailing to Travelers) of numerous fraudulent documents in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

587.    The activities alleged in this case had the direct effect of causing funds to be transferred from Travelers to EMSI for the benefit of the Count III Defendants.

588.    Travelers is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Travelers' overall financial well-being and adversely affect insurance rates.

589.    The EMSI Association-in-Fact Enterprise constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

590.    The Count III Defendants associated with the EMSI Association-in-Fact Enterprise, and participated—both directly and indirectly—in the conduct of the this enterprise through a pattern of racketeering activities.

591.    Travelers is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

592.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Travelers' injury.

593.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Travelers is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
### ELECTROSTIM MEDICAL SERVICES, INC. ASSOCIATION-IN-FACT ENTERPRISE
### (Against Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo)

594.    Travelers re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-545 as if set forth fully herein.

595.    Throughout their participation in the operation and management of the Electrostim Medical Services, Inc. ("EMSI") association-in-fact Enterprise, Defendants, Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

596.    The Defendants collectively constitute an association-in-fact "enterprise" ("the EMSI Association-in-Fact Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

597.    The members of the EMSI Association-in-Fact Enterprise are and have been associated through time, joined in purpose and organized in a manner amendable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.

598.    The EMSI Association-in-Fact Enterprise members associated for the common purpose of conspiring to submit fraudulent billing to Travelers for DME that was: (a) unlicensed; (b) unnecessary; (c) medically worthless; (d) billed pursuant to a pre-determined protocol; and (e) fraudulently billed.

599.    There was a discernible structure amongst the Count IV Defendants that was distinct from the EMSI Association-in-Fact Enterprise itself.

600.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of EMSI Association-in-Fact Enterprise by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent invoices and other claim-related documents to Travelers in connection with No-Fault and workers'

compensation claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 13.

601.    The purpose of the conspiracy was to obtain benefit payments from Travelers on behalf of EMSI, even though EMSI, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such benefit payments.

602.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including invoices, containing misrepresentations.

603.    Travelers has been injured in its business and property by reason of this conspiratorial conduct whereas Travelers has been induced to make No-Fault payments as a result of the Count IV Defendants' unlawful conduct described herein.

604.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Travelers, and Travelers is entitled to recover from each of the Count IV Defendants three times the damages sustained by reason of the claims submitted by EMSI, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## COMMON LAW FRAUD
### (Against All Defendants)

605.    Travelers re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 545 as if fully set forth herein.

606.    The Defendants schemed to defraud Travelers by, among other things (a) unlicensed and unlawful dispensing of DME, (b) billing Travelers for TENS/NMES Devices and supplies that were not medically necessary and were completely unjustified to treat the Travelers

Claimants' purported injuries, (c) falsely charging for TENS/NMES Devices and supplies with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault and workers' compensation laws, (d) charging Travelers for TENS/NMES Devices and supplies at grossly excessive rates and in violation of applicable Fee Schedules, and (e) dispensing TENS/NMES Devices and supplies in violation of applicable regulatory requirements.

607.    The Defendants' scheme to defraud Travelers was dependent upon a succession of material misrepresentations of fact related to Electrostim Medical Services, Inc.'s eligibility for and entitlement to No-Fault and workers' compensation reimbursement under New York law.

608.    The misrepresentations of fact by the Defendants included, but were not limited to, material misrepresentations of fact made in Electrostim Medical Services, Inc.'s invoices, prescription forms, patient treatment records, delivery receipts, letters of medical necessity, health insurance claim forms, other workers' compensation claim reimbursement documents, letters, and/or payment requests.

609.    The Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

610.    The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Travelers by submitting claims on behalf of Electrostim Medical Services, Inc. demanding payment of No-Fault and workers' compensation insurance benefits.

611.    The Defendants knew that the representations contained in the No-Fault and workers' compensation claim reimbursement documentation relating to Travelers' Claimants were false, and were made to induce Travelers to make payments for claims that were not legitimate or lawfully compensable.

612.    Travelers reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning Electrostim Medical Services, Inc.'s eligibility to receive No-Fault and workers' compensation reimbursement in paying numerous bills for the TENS/NMES Devices and supplies according to New York law.

613.    Travelers' damages include, but are not necessarily limited to, monies paid to Electrostim Medical Services, Inc.—totaling more than $340,000.00—for TENS/NMES Devices and other equipment and supplies purportedly dispensed to Travelers' Claimants, even though Electrostim Medical Services, Inc. was, at all relevant times, ineligible to receive No-Fault and workers' compensation reimbursement under New York law.

## COUNT VI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Electrostim Medical Services, Inc.)

614.    Travelers re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 545 as if set forth fully herein.

615.    To be eligible to receive assigned No-Fault and workers' compensation benefits, the provider of healthcare services, including providers of durable medical equipment, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

616.    In view of its (a) unlicensed and unlawful dispensing of DME, (b) billing Travelers for TENS/NMES Devices and supplies that were not medically necessary and were completely unjustified to treat the Travelers Claimants' purported injuries, (c) falsely charging for TENS/NMES Devices and supplies with the knowledge that they were not lawfully reimbursable under New York's No-Fault and workers' compensation laws, (d) charging Travelers for TENS/NMES Devices and supplies at grossly excessive rates and in violation of applicable Fee

Schedules, and (e) dispensing TENS/NMES Devices and supplies in violation of applicable regulatory requirements, Electrostim Medical Services, Inc. was, at all relevant times, completely ineligible for No-Fault and workers' compensation reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault and workers' compensation benefits.

617.    Electrostim Medical Services, Inc. continues to submit assigned No-Fault and workers' compensation claims to Travelers demanding payment, and other assigned No-Fault and workers' compensation claims remain pending with Travelers.

618.    Electrostim Medical Services, Inc. continues to challenge Travelers' prior claim denials.

619.    Electrostim Medical Services, Inc. continues to pursue collections against Travelers seeking payment of No-Fault and workers' compensation benefits allegedly due and owing.

620.    A justifiable controversy exists between Travelers and Electrostim Medical Services, Inc. because Electrostim Medical Services, Inc. rejects Travelers' ability to deny such claims.

621.    Travelers has no adequate remedy at law.

622.    Electrostim Medical Services, Inc. also will continue to bill Travelers for No-Fault and workers' compensation benefit payments absent a declaration by this Court that its activities are unlawful, and that Travelers has no obligation to pay the pending, previously denied, and/or future No-Fault and workers' compensation claims submitted by Electrostim Medical Services, Inc.

623.    Under New York law, the Defendants have no legal right to seek, collect, or retain No-Fault and workers' compensation benefit payments made by Travelers in connection with claims submitted by (or on behalf of) the Defendants because Electrostim Medical Services, Inc.

(a) billed for unlicensed and unlawful dispensing of DME, (b) billed Travelers for TENS/NMES Devices and supplies that were not medically necessary and were completely unjustified to treat the Travelers Claimants' purported injuries, (c) falsely charged for TENS/NMES Devices and supplies with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault and workers' compensation laws, (d) charged Travelers for TENS/NMES Devices and supplies at grossly excessive rates and in violation of applicable Fee Schedules, and (e) dispensed TENS/NMES Devices and supplies in violation of applicable regulatory requirements.

624.    Accordingly, Travelers requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that Electrostim Medical Services, Inc. has no standing to seek, collect, or retain any payments made by Travelers in connection with assigned No-Fault and workers' compensation benefits, and (b) that Travelers has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Travelers by, or on behalf of, Electrostim Medical Services, Inc.

## XI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Travelers Personal Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Mercury Insurance Company, The Charter Oak Fire Insurance Company, The Phoenix Insurance Company, The Travelers Home and Marine Insurance Company, The Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Casualty and Surety Company, Travelers Casualty Insurance Company of America, Travelers Personal Security Insurance Company, Travelers Property Casualty Company of America, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, and United States

Fidelity and Guaranty Company (collectively, "Travelers"), respectfully pray that judgment to enter in their favor, as follows:

<u>**COUNT I**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ELECTROSTIM MEDICAL SERVICES, INC. ENTERPRISE**
**(Against Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos,**
**Yorlan Alfonso, and Rossana Cielo)**

(a) AWARD Travelers' actual and consequential damages to be established at trial;

(b) AWARD Travelers' treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT II**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ELECTROSTIM MEDICAL SERVICES, INC. ENTERPRISE**
**(Against Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos,**
**Yorlan Alfonso, and Rossana Cielo)**

(a) AWARD Travelers' actual and consequential damages to be established at trial;

(b) AWARD Travelers' treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT III**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ELECTROSTIM MEDICAL SERVICES, INC. ASSOCIATION-IN-FACT ENTERPRISE**
**(Against Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen**
**Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo)**

(a) AWARD Travelers' actual and consequential damages to be established at trial;

(b) AWARD Travelers' treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ELECTROSTIM MEDICAL SERVICES, INC. ASSOCIATION-IN-FACT ENTERPRISE
**(Against Electrostim Medical Services, Inc., Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo)**

(a) AWARD Travelers' actual and consequential damages to be established at trial;

(b) AWARD Travelers' treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT V
### COMMON LAW FRAUD
**(Against All Defendants)**

(a) AWARD Travelers' actual damages in an amount to be determined at trial;

(b) AWARD Travelers its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c) GRANT any other relief this Court deems just.

## COUNT VI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Electrostim Medical Services, Inc.)**

(a) DECLARE that Electrostim Medical Services, Inc., at all relevant times, was caused to be submit charges in violation of New York No-Fault and workers' compensation laws, thus rendering Electrostim Medical Services, Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault and workers' compensation laws;

(b) DECLARE that Electrostim Medical Services, Inc.'s activities are unlawful;

(c) DECLARE that Travelers has no obligation to pay any pending, previously-denied, and/or future No-Fault and workers' compensation insurance claims submitted by Electrostim Medical Services, Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

## XII.    JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Shauna L. Sullivan*
_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
Ph:  617-770-2214
Fax: 617-774-1714

Attorneys for the Plaintiffs,
*Travelers Personal Insurance Company,*
*St. Paul Fire and Marine Insurance Company,*
*St. Paul Mercury Insurance Company,*
*The Charter Oak Fire Insurance Company,*
*The Phoenix Insurance Company,*
*The Travelers Home and Marine Insurance Company,*
*The Travelers Indemnity Company,*
*The Travelers Indemnity Company of America,*
*The Travelers Indemnity Company of Connecticut,*
*Travelers Casualty and Surety Company,*
*Travelers Casualty Insurance Company of America,*
*Travelers Personal Security Insurance Company,*
*Travelers Property Casualty Company of America,*
*The Standard Fire Insurance Company,*
*The Automobile Insurance Company of Hartford, Connecticut, and*
*United States Fidelity and Guaranty Company*

Dated:  November 22, 2024