UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

TRAVELERS PERSONAL INSURANCE
COMPANY, ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, ST. PAUL MERCURY
INSURANCE COMPANY, THE CHARTER OAK
FIRE INSURANCE COMPANY, THE PHOENIX
INSURANCE COMPANY, THE TRAVELERS
HOME AND MARINE INSURANCE COMPANY,
THE TRAVELERS INDEMNITY COMPANY,
THE TRAVELERS INDEMNITY COMPANY OF
AMERICA, THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, TRAVELERS
CASUALTY AND SURETY COMPANY,
TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA, TRAVELERS
PERSONAL SECURITY INSURANCE
COMPANY, TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA, THE
STANDARD FIRE INSURANCE COMPANY,
THE AUTOMOBILE INSURANCE COMPANY
OF HARTFORD, CONNECTICUT, and UNITED
STATES FIDELITY AND GUARANTY
COMPANY,

**MEMORANDUM & ORDER**
24-CV-8138 (MKB)

Plaintiffs,

v.

ELECTROSTIM MEDICAL SERVICES, INC.,
MARIO GARCIA, JR., DEAN MULEY,
GRETCHEN DACEY-ZAVALIANOS, YORLAN
ALFONSO, and ROSSANA CIELO,

Defendants.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Travelers Personal Insurance Company, St. Paul Fire and Marine Insurance

Company, St. Paul Mercury Insurance Company, The Charter Oak Fire Insurance Company, The

Phoenix Insurance Company, The Travelers Home and Marine Insurance Company, The

Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Casualty and Surety Company, Travelers Casualty Insurance Company of America, Travelers Personal Security Insurance Company, Travelers Property Casualty Company of America, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, and United States Fidelity and Guaranty Company (collectively, "Travelers"[1]) commenced the above-captioned action on November 22, 2024 against Defendants Electrostim Medical Services, Inc. ("EMSI") and Mario Garcia, Jr., Dean Muley, Gretchen Dacey-Zavalianos, Yorlan Alfonso, and Rossana Cielo ("Individual Defendants"). (Compl., Docket Entry No. 1.) Travelers alleges that Defendants wrongfully obtained New York State no-fault and workers' compensation insurance reimbursements for durable medical equipment ("DME") and related supplies and asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d) ("RICO"), and for common law fraud, (id. ¶¶ 1, 546–613), and also seeks declaratory and injunctive relief, (id. ¶¶ 614–24).

On February 3, 2025, Defendants moved to dismiss (1) the Complaint on the basis that Travelers' allegations that EMSI was not licensed to sell DME in New York City cannot support any cause of action and (2) the RICO claims against Defendants and the common law fraud claim against the Individual Defendants for failure to state a claim, all pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; Travelers opposed the motion.[2] For the reasons

---

[1] The Court adopts the parties' convention of referring to Plaintiffs collectively as Travelers because, according to Plaintiffs' corporate disclosure statement, the Plaintiff companies are all wholly-owned subsidiaries of the Travelers Companies, Inc. or one of its subsidiaries. (Corp. Disclosure Statement, Docket Entry No. 2.)

[2] (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 22; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 22-1; Decl. of John W. Leardi, Esq. in Supp. of

explained below, the Court grants Defendants' motion to dismiss the RICO claims against Defendants and the common law fraud claim against the Individual Defendants. Although the Court finds that the licensure allegations are insufficiently pleaded, the Court denies Defendants' motion to dismiss the Complaint in its entirety because of the deficiencies in the licensure allegations.

## I.    Background

The Court assumes the truth of the factual allegations in the Complaint for the purpose of deciding Defendants' motion. The Court also considers documents attached to and incorporated by reference in the Complaint and takes judicial notice of relevant state laws, state regulations, case law, and public documents that are not subject to dispute.[3]  *See* Fed. R. Evid. 201(b)

---

Defs.' Mot. ("Leardi Decl."), Docket Entry No. 22-2; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 30; Decl. of Nichole Soriano in Supp. of Pls.' Mot. ("Soriano Decl."), Docket Entry No. 30-1; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 32.)

[3]  In deciding a Rule 12(b)(6) motion, "the district court is normally required to look only to the allegations on the face of the complaint," but "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025) (first citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); and then quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016))). In addition, "[i]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Hudson Shore Assocs. LP v. New York*, 139 F.4th 99, 104 n.1 (2d Cir. 2025) (quoting *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012)); *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) (first citing *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959); and then quoting *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003)); *see also Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020) (quoting *Pani*, 152 F.3d at 75); *Owens v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 24-CV-1037, 2025 WL 1795063, at *7 (N.D.N.Y. June 30, 2025); *McConkey v. Churchill Sch. and Ctr.*, No. 24-CV-6091, 2025 WL 2062195, at *4 (S.D.N.Y. July 23, 2025) ("Though the [c]ourt may take judicial notice of "documents in the public record at the [m]otion [t]o [d]ismiss stage, it considers them only to establish their existence and legal effect, or to determine what statements they contained not for the truth of the matters asserted." (quoting *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015))). The Court

(permitting judicial notice of facts "not subject to reasonable dispute"); *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (stating that "relevant matters of public record" are susceptible to judicial notice).

### a. Regulatory scheme

#### i. New York's no-fault insurance scheme

Under New York's no-fault law, automobile insurers provide mandatory coverage for certain no-fault benefits, including necessary expenses for medical treatment up to $50,000. N.Y. Ins. Law §§ 5102(a)(1), 5102(b), 5103; *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med.*, 120 F.4th 59, 71 (2d Cir. 2024) ("The No-Fault Act provides compensation for 'basic economic loss,' which covers, . . . 'necessary' health expenses up to $50,000 per person." (quoting N.Y. Ins. Law § 5102(a))). "The Act's implementing regulations allow covered individuals to assign their statutory benefits to licensed health care providers in exchange for services, and the providers in turn can submit claims directly to the insurance company for medically necessary expenses." *See id.* (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11(a)); *United States v. Zemlyansky*, 908 F.3d 1, 7 (2d Cir. 2018) ("[I]ndividuals injured in car accidents assign their statutory benefits to licensed medical professionals, who submit claims for medically 'necessary' treatments directly to the injured party's insurance carriers." (first quoting N.Y. Ins. Law § 5102; and then citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11)). The regulation also states that "[i]n the event any person making a claim for first-party benefits and the [insurance] [c]ompany do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration."

---

may also take judicial notice of "documents retrieved from official government websites." *Warner v. Garland*, No. 20-2197, 2023 WL 3220459, at *1 n.2 (2d Cir. May 3, 2023) (quoting *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022)).

N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1(d); *see State Farm*, 120 F.4th at 87; *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 87 (2d Cir. 2014) (quoting N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1).

A medical professional corporation is prohibited from "directly or indirectly offering [or] giving . . . any fee or other consideration to or from a third party for the referral of a patient . . . in connection with the performance of professional services."  N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3); *see Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 410, 415 (2d Cir. 2024) (explaining that professional misconduct under the "implementing regulation" includes "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services" (first citing N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3); and then quoting N.Y. Educ. Law § 6530(18))), *certified question accepted*, 42 N.Y.3d 1044 (2024); *see also Gov't Emps. Ins. Co. v. Jacques*, No. 14-CV-5299, 2017 WL 9487191, at *2 (E.D.N.Y. Feb. 13, 2017) ("New York also prohibits paying kick-backs for patient referrals."  (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3))), *report and recommendation adopted*, 2017 WL 1214460 (E.D.N.Y. Mar. 31, 2017); *Arthur Ave. Med. Servs., PC v. GEICO Ins. Co.*, 148 N.Y.S.3d 356, 361 (Civ. Ct. 2021) ("[A medical] corporation may not share professional service fees with third parties, such as referral fees."  (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(B)(4))).  "If a medical professional corporation engages in . . . unprofessional conduct, it is rendered ineligible for a requested no-fault reimbursement by virtue of [N.Y. Comp. Codes R. & Regs., tit. 11] § 65-3.16(a)(12)]."  *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-CV-2802, 2018 WL 6031156, at *7 (E.D.N.Y. Nov. 16, 2018) (quoting *Gov't Emps. Ins. Co. v. Badia*, No. 13-CV-1720, 2015 WL 1258218, at *9 (E.D.N.Y. Mar. 18, 2015)).  Providers are also ineligible to receive reimbursement of No-Fault benefits "if they,

fail[ ] to meet any applicable New York State or local licensing requirement . . . or meet any applicable licensing requirement necessary . . . in any other state." *Tri-Borough NY Med.*, 120 F.4th at 71 (quoting N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16(a)(12)); *see also Jacques*, 2017 WL 9487191, at *2 ("To be eligible for reimbursement payments under the no-fault law, a provider of healthcare services must comply with applicable licensing requirements." (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16(a)(12))). "New York law [also] provides that defendants may be held liable for medically unnecessary services under New York's [no-fault] insurance laws." *Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab'y*, No. 20-CV-2391, 2020 WL 7042648, at *7 (E.D.N.Y. Dec. 1, 2020) (citing *Long Is. Radiology v. Allstate Ins. Co.*, 830 N.Y.S.2d 192, 194 (App. Div. 2007)).

### ii.    New York's workers' compensation system

The New York State workers' compensation system provides benefits, such as medical care and replacement of lost wages, to workers who are injured in the course of their employment, regardless of fault. WCL §§ 10(1), 13–14; *see also Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 641 (2d Cir. 2009); *Jensen v. S. Pac. Co.*, 215 N.Y. 514, 524 (1915), *rev'd on other grounds*, 244 U.S. 205 (1917). The WCL "is remedial in nature and should 'be construed liberally to accomplish [its] economic and humanitarian objects.'" *Anderson v. City of Yonkers*, 207 N.Y.S.3d 735, 740 (App. Div. 2024) (alteration in original) (quoting *Husted v. Seneca Steel Serv., Inc.*, 41 N.Y.2d 140, 145 (1976)); *see also Wolfe v. Sibley, Lindsay & Curr Co.*, 36 N.Y.2d 505, 508 (1975) ("In light of its beneficial and remedial character the Workmen's Compensation Law should be construed liberally in favor of the employee."). "Generally, a workers' compensation claimant who is injured in New York is entitled to treatment by a physician of his or her choice so long as the physician is licensed to practice in New York and has been authorized by the Board to provide care and treatment to claimants." *Gomez v. Bd. of Managers of Cipriani*, 184 N.Y.S.3d

428, 429 (App. Div. 2023) (quoting *Bowman v. J & J Log & Lumber Corp.*, 758 N.Y.S.2d 852, 853 (App. Div. 2003)).  After providing an injured employee with medical care, an authorized medical care provider must provide the insurance carrier with the bills for the medical care provided within 120 days, or, if the medical care was provided prior to January 1, 2020, on or before April 30, 2020, N.Y. Comp. Codes R. & Regs., tit. 12 § 325-1.25(b)(1), while hospitals must submit bills within 120 days from the last day of medical care, *id.* § 325-1.25(b)(2).  Within forty-five days after the bill has been provided to the insurance carrier, the insurance carrier "must pay the bill or notify the medical care provider . . . that the bill is not being paid and explain the reasons for non-payment."[4]  WCL § 13-g(1); 12 N.Y. Comp. Codes R. & Regs. § 325-1.25(c).

### b.  Factual background

#### i.  The parties

Travelers underwrites automobile insurance in the State of New York.  (Compl. ¶ 78.)
Each of the Plaintiff companies is duly organized and exists under the laws of the State of Connecticut, has its principal place of business in Hartford, Connecticut, and is authorized to conduct business in the State of New York.  (*Id.* ¶¶ 32–33.)  Travelers' allegations pertain to claims submitted for New York no-fault or workers compensation insurance benefits for its insureds who lived in New York or were covered by automobile or workers' compensation insurance policies that Travelers issued under New York law during the relevant period.  (*Id.* ¶ 66.)  EMSI is a registered Florida corporation with its principal place of business in Tampa, Florida, that received authorization to conduct business in the State of New York on or about

---

[4]  If the insurance carrier "objects to payment of all or part of the bill for [m]edical [c]are rendered for reasons concerning its legal liability for payment and/or the Medical Treatment Guidelines . . . , the objection will be reviewed by the Board."  12 N.Y. Comp. Codes R. & Regs. § 325-1.25(f)(1).  After review, the Board will render an "adjudication decision" determining the issues of "legal liability and/or the Medical Treatment Guidelines objections."  *Id.* § 325-1.25(f), (f)(1).

May 14, 2012 and remains active in New York as a foreign business corporation delivering DME to patients residing in the state, including the five boroughs of New York City. (*Id.* ¶¶ 2, 55–56, 67–68, 182, 191; *see id.* ¶¶ 65,141–53; Five Boroughs Chart, annexed to Compl. as Ex. 1, Docket Entry No. 1-3.) On or about March 25, 2022, EMSI enrolled as a Medicaid Managed Care network provider in New York State's Medicaid Program. (*Id.* ¶ 69.) EMSI specifically targeted New York as part of a nationwide market, (*id.* ¶¶ 70–71), and reported in its Medicare application that 35% of its business is derived from New York and that it only does business through the mail, (*id.* ¶¶ 77–73, 504). Garcia founded EMSI in 1995 and is the chairman and owner. (*Id.* ¶¶ 34–36, 138.) He "compiled a team of managers to participate in the operation and management of EMSI, including, but not limited to, Muley, Dacey-Zavalianos, Alfonso, and Cielo." (*Id.* ¶ 160.)

### ii.    Defendants' devices and recommended usage

EMSI manufacturers interferential stimulation and transcutaneous electrical nerve stimulation ("TENS") devices and neuromuscular electrical stimulation ("NMES") devices (collectively, "TENS/NMES Devices") and provides these devices and related supplies and services to patients throughout numerous states, including New York. (*Id.* ¶ 2; *see id.* ¶¶ 141–53.) EMSI's "small, battery-powered devices . . . use adhesive electrodes applied to the patient's skin and connected to the device through wires" to "deliver low-frequency electrical currents (TENS) or medium-frequency electrical currents (interferential stimulation)" and "apply electrical currents over the muscles and nerves to create muscle contractions." (*Id.* ¶¶ 141–42.)

EMSI's TENS/NMES Devices manuals caution patients that "[f]ederal law requires a prescription from [their] physician before use of th[e] product" and, consistent with this warning, the standard of care and clinical guidelines warn that the devices "should be used only under the continued supervision of a physician." (*Id.* ¶¶ 230–35, 314 (emphasis omitted).) Medical

8

providers prescribe TENS/NMES Devices "for pain relief or to treat muscle weakness." (*Id.* ¶ 8; *see id.* ¶¶ 192–93.)  Ordinarily, the use of a TENS/NMES Device starts with a thirty-day trial with documentation of efficacy justifying continued use.  (*Id.* ¶ 212.)  Similarly, New York's Workers' Compensation Board maintains Medical Treatment Guidelines that list "pre-authorized medical procedures and set forth limitations on the scope and duration of each procedure," and, for knee, neck, mid and low back, and shoulder injuries, set forth that a home unit may be provided or purchased "if effective" after three sessions.  (*Id.* ¶¶ 98–99, 207 (emphasis and citation omitted).)  All insurance claims submitted for DME supplied under New York's workers' compensation laws, including claims submitted by out-of-state providers, must comport with the applicable Medical Treatment Guidelines.  (*Id.* ¶ 199.)  At all relevant times, the applicable Medical Treatment Guidelines only authorized the use of TENS devices in a narrow set of circumstances with the necessary documentation that the patient needed the device, and it would be effective to treat the patient's pain.[5]  (*Id.* ¶¶ 201–07.)

Devices providing TENS and interferential currents are not recommended for the treatment of chronic low back pain due to lack of proven efficacy.  (*Id.* ¶ 218.)  For example, the American Academy of Neurology deems the use of TENS devices for chronic low back pain to be ineffective and has found no significant differences in the outcomes for patients with chronic low back pain who used a TENS device compared with those who used a sham TENS device. (*Id.* ¶¶ 215–16.)  The Medical Treatment Guidelines for mid and low back injury specifically states that interferential therapy is not recommended "for treatment of acute or non-acute back pain, nonacute radicular pain syndromes, or other back-related conditions."  (*Id.* ¶ 208 (citation omitted).)

---

[5]  Travelers does not allege the Medical Treatment Guidelines authorization for NMES devices.

Normally, after receiving an initial TENS/NMES device, patients are not provided additional supplies automatically or on a subscription basis; rather, patients are given supplies only when they need or want them.  (*Id.* ¶ 194.)  Patients are also "provided with replenishment items, such as chargers or lead wires, only when the equipment is damaged or worn out and there is a documented need for the replacement."  (*Id.* ¶ 195.)  The prescribing provider must provide regular supervision and "identify the metrics to warrant ongoing use of the TENS/NMES unit" and continued use "should be based on objective documented efficacy and functional improvement."  (*Id.* ¶¶ 222–23.)

### iii.  Alleged fraudulent scheme

Travelers alleges that EMSI through or in association with the Individual Defendants submitted hundreds of false and fraudulent claims to Travelers for "unlicensed, unnecessary, medically worthless, and fraudulently charged" TENS/NMES devices and replenishment supplies "purportedly provided to patients" whose employers were Travelers insured or who were eligible for coverage under automobile insurance policies.[6]  (*See id.* ¶¶ 1, 19–20, 132.) EMSI billed Travelers for TENS/NMES Devices and replenishment supplies, including alcohol wipes, lead wires, electrodes, vitamin E lotion, and Bio-Ice, that were dispensed to patients that neither needed nor wanted them, automatically replenished supplies that were not legitimately prescribed, and routinely billed for TENS Devices far beyond the period of reasonable and necessary use.  (*Id.* ¶¶ 196–97, 210.)  Under the scheme, Defendants sought reimbursement from

---

[6]  Travelers alleges in the Complaint that EMSI billed for DME and supplies dispensed to "patients eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate," (Compl. ¶ 132), and that "there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action," (*id.* ¶ 76). Neither party addresses these references to Allstate and the Court assumes these are typographical errors intended to refer to Travelers.

Travelers under New York's No-Fault and workers' compensation laws, (*id.* ¶¶ 19–21, 75, 131), knowingly and falsely certified their eligibility for reimbursement under New York law, (*id.* ¶¶ 21, 25), and mailed "records, reports, bills, and other claim-related documents" that "misrepresented or omitted material facts concerning EMSI's rights to be paid," (*id.* ¶¶ 23–25). Travelers attempted to verify EMSI's eligibility through document requests and an examination under oath, (*id.* ¶ 134), but EMSI refused to comply with Travelers' verification attempts, (*id.* ¶ 135).

Travelers contends that EMSI's bills were not eligible for reimbursement because (1) they were fraudulently prescribed; (2) improperly billed; and/or (3) EMSI was not properly licensed.

### 1.    Fraudulent prescriptions

EMSI employed sales representatives titled "Territory Managers" and "Area Managers" to market its TENS/DMES Devices to healthcare providers and patients, (*id.* ¶¶ 70, 154), and to "create opportunities by mailing TENS/NMES Devices and replenishment supplies to the doorsteps of patients who did not want or need them," (*id.* ¶ 22). Defendants caused medical providers to "to issue, or purport to issue, prescriptions" TENS/NMES Devices without any documented indications that the device would be effective to treat the patients' pain. (*Id.* ¶¶ 9, 214.) Defendants also caused providers to issue prescriptions for an indefinite duration without any documented medical rationale for repeated use and in contravention of the applicable standard of care. (*Id.* ¶¶ 13–14, 18.) The indeterminate prescriptions "permitted EMSI to sell the TENS/NMES Devices at an inflated rate and continuously purport to send the patient medically unnecessary and excessive supplies on an automatic basis in perpetuity without regard for" need or actual use. (*Id.* ¶¶ 14, 22.) An anonymous complaint filed with the New York Office of the Inspector General reported that a licensed physical therapist was "prescribing

TENS machines to her . . . patients" in exchange for a friend who works for EMSI and takes the physical therapist "to dinner and for drinks to pay her back." (*Id.* ¶¶ 11–12.) Other filed consumer complaints regarding EMSI reported the mailing of "unnecessary and unwanted" DME. (*Id.* ¶¶ 15–16.)

EMSI billed for the TENS/NMES devices using its pre-printed "Letter of Medical Necessity" form, and EMSI gave providers a checklist pre-populated with EMSI's devices to facilitate prescribing the TENS/NMES Devices. (*Id.* ¶ 309–10.) Each Letter of Medical Necessity also served as the prescription for the TENS/NMES Device, (*id.* ¶¶ 312), but "fail[ed] to adequately set forth a specific rationale to substantiate the necessity of the TENS/NMES Device" nor "indefinite lifetime prescriptions" and were not tailored to an actual treatment plan for each patient. (*Id.* ¶¶ 16, 316, 321 (internal quotation marks omitted).) Rather, each Letter of Medical Necessity contained a boilerplate paragraph that the prescribing provider purportedly attests to, stating that "In accordance with accepted medical standards, it is my opinion that the above named patient requires the device and attendant supplies for the above diagnosis. Dispense as written, no substitute permitted. If the device is purchased, I prescribe the device and supplies for indefinite use." (*Id.* ¶ 330.) There was no documentation to support the orders for the TENS/NMES Devices EMSI billed, including to demonstrate a successful trial of the device prior to provision of a home unit, measurable improvement with the use of the device, and that the device would be effective to treat the patient's chronic pain. (*Id.* ¶ 209.) For example, "EMSI purported to dispense TENS Devices to patients reporting chronic low back pain even though the device — and all replenishment supplies — were ineffective to treat the patients' pain and were no more effective than a placebo." (*Id.* ¶ 219.) Upon information and belief, a Territory Manager or other employee would complete the Letter of Medical Necessity form for each claimant rather than the physician who purportedly prescribed the device, (*id.* ¶¶ 317–18),

and the Territory Manager would also induce patients to agree to accept the TENS/NMES Device with promises that the device was covered by their insurance, (*id.* ¶ 319.)

## 2. Improper billing practices

Travelers alleges that EMSI improperly billed Travelers for unnecessary replenishments of TENS/NMES Device supplies and inflated prices by intentionally using improper billing codes, unbundling charges for TENS/NMES Device supplies, and charging for delivery. Below the Court recounts some examples of the improper billing practices that Travelers alleges in the Complaint but notes there are other alleged examples and supporting exhibits not discussed.

### A. Unnecessary replenishments

EMSI's scheme included automatic dispensation of replenishment supplies without regard to actual patient needs. (*Id.* ¶ 307.) The supplies billed by EMSI in connection with the TENS/NMES Devices routinely included electrodes, batteries, skin wipes, vitamin E lotion, lead wires, and topical Bio- Ice that were either wholly unnecessary in the first instance or provided more frequently than necessary or permitted under the applicable fee schedule. (*Id.* ¶¶ 240, 294, 298.) EMSI provided no documentation to Travelers that it regularly and consistently contacted patients to confirm that the items were needed and wanted before sending resupplies to the patient. (*Id.* ¶¶ 241, 300.) For example, EMSI routinely billed for unnecessary replacement batteries on a monthly basis without obtaining the required prior approval to exceed the twice per year limit under the Medicaid fee schedule. (*Id.* ¶ 258.) In addition, EMSI states in correspondence to Travelers that the frequency of electrode replacement "varies due to skin condition, climate, care and use of the product," (*id.* ¶ 259), but routinely dispensed between sixteen and twenty-four electrode pads at a time, without obtaining the required prior approval to exceed the two pair per month limit under the Medicaid fee schedule, (*id.* ¶ 260.) Travelers alleges that EMSI's billings for unnecessary replenishment supplies are corroborated by negative

13

consumer reviews from around the country "detail[ing] recurring deliveries of supplies on essentially a subscription basis that the consumers did not request or authorize." (*Id.* ¶¶ 304–06.)

### B.    Inflated pricing through improper billing codes

EMSI submitted claims for TENS/NMES Devices and replenishment supplies using improper billing codes that EMSI intentionally selected to inflate charges above the amounts authorized in the applicable fee schedules. (*Id.* ¶¶ 334, 337.)  Under New York's no-fault laws, "the maximum permissible charge for DME is calculated in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the Department of Financial Services formerly known as the Department of Insurance." (*Id.* ¶ 105 (quoting N.Y. Ins. Law § 5108; N.Y. Comp. Codes R. & Regs. tit. 11, § 68.1).)  Both the Medicaid DME schedule and the workers' compensation DME schedule list their corresponding Healthcare Common Procedure Coding System (HCPCS) Level II Codes. (*Id.* ¶¶ 115, 338.)  The use of HCPCS codes is mandatory for transactions involving healthcare information. (*Id.* ¶ 116.)  EMSI intentionally employed the improper billing code for specific TENS/NMES Device units. (*Id.* ¶ 337.)  For example, EMSI billed for the Flex MT, Flex IT, and IF-5000 Combo[7] using HCPCS Code E1399. (*Id.* ¶ 339.)  HCPCS Code E1399 is for "[d]urable medical equipment, miscellaneous" and is not appropriate for charging DME items that otherwise have a specific code. (*Id.* ¶¶ 340–41.)  Thus, HCPCS Code E1399 is inappropriate for the Flex IT and IF-5000 Combo because these units are appropriately reported

---

[7]  Travelers alleges that the Flex MT, Flex IT, and IF-5000 Combo Stimulator are specific types of TENS/NMES Device units. (Compl. ¶¶ 143–53.)  The Flex MT or Flex MT Plus is a NMES the FDA classifies as a "powered muscle stimulator." (*Id.* ¶¶ 147, 149.)  The Flex IT is a TENS the FDA classifies as a "transcutaneous electrical nerve stimulator." (*Id.* ¶¶ 143, 146.)  The IF-5000 may be used for both interferential current stimulation and electrical muscle stimulation and the FDA classifies it as "transcutaneous electrical nerve stimulator." (*Id.* ¶¶ 151, 153.)

using E0730, which is to be used for "[t]ranscutaneous electrical nerve stimulation (tens) device, four or more leads, for multiple nerve stimulation." (*Id.* ¶¶ 342–43.)  HCPCS Code E1399 is also inappropriate for use in billing for Flex MT because such devices are appropriately reported using E0745.  (*Id.* ¶ 344.)  HCPCS Code E0745 is described as "[n]euromuscular stim for shock."  (*Id.* ¶ 345.)

### C.    Unbundled charges for TENS/NMES supplies

Unbundling is a "billing tactic where a provider bills for components of a service separately when there is one code that describes the entire service."  (*Id.* ¶¶ 354–55.)  EMSI intentionally unbundled the charges for TENS supplies and resupplies to maximize the charges submitted to Travelers, (*id.* ¶¶ 366–67, 377), and the unbundled charges "grossly exceeded the permissible amounts under the applicable fee schedules," (*id.* ¶ 378.)

EMSI's TENS/NMES Devices manuals direct use of the "electrodes and leadwires that came with the unit" as well as the rechargeable battery pack and battery charging device and the proper billing codes for the TENS Devices (E0730) and NMES Devices (E0745) include the initial supplies associated with the unit.  (*Id.* ¶¶ 355–56, 358.)  When billing for the TENS/NMES Devices, however, EMSI improperly billed separately for included supplies, including electrodes, chargers, batteries, and lead wires on the same date of service.  (*Id.* ¶ 359.)  For example, EMSI billed for sixteen electrodes (A4556) and four batteries (A4630) separately from the Flex TENS unit purportedly provided to claimant L.B. (FSR0425) on June 16, 2021, even though the electrodes and batteries were included in the charge for the underlying TENS Device.  (*Id.* ¶ 360.)

Similarly, EMSI billed for TENS/NMES resupply items separately even though such supplies should be billed under one code (A4595), which allows for reporting of all the TENS resupply items.  (*Id.* ¶ 368.)  A TENS supply allowance under A4595 is an all-inclusive code and

includes items such as electrodes, skin preparation materials, and batteries.  (*Id.* ¶ 369.) "However, in numerous instances, EMSI submitted bills containing separate charges for electrodes, skin wipes, vitamin E lotion, and batteries." (*Id.* ¶ 370.)  In addition, certain resupply items, such as the batteries and vitamin E lotion required prior authorization, which was never sought, rendering the supplies non-reimbursable under New York's workers' compensation laws. (*Id.* ¶ 379.)

### D.   Improper delivery charges

EMSI "routinely tacked on" an improper $30.00 delivery charge for TENS/NMES Devices, supplies, and resupplies purportedly dispensed by EMSI and misrepresented these charges as compensable.  (*Id.* ¶¶ 385–87.)  EMSI billed the delivery charge using code A9901 without the requisite supporting proof of delivery, including identification of the specific TENS/NMES Device and supplies delivered along with the signature of the patient acknowledging receipt of the TENS/NMES Device and/or supplies.  (*Id.* ¶¶ 385–88.)  Code A9901 is to be used for "DME delivery, set up, and/or dispensing [a] service component of another HCPCS code." (*Id.* ¶ 388.)  In New York, delivery of DME cannot be separately paid and "according to [the Centers for Medicare and Medicaid Services] guidance, delivery costs for DME are considered to be part of a DME provider's costs of doing business and are not separately reimbursable absent rare and unusual circumstances." (*Id.* ¶¶ 389, 391.)  Under the workers' compensation DME Fee Schedule, code A9901 requires preauthorization, and because EMSI never sought prior authorization for its delivery charges under A9901, the delivery charges were not compensable.  (*Id.* ¶ 390.)  Moreover, EMSI never documented any unusual circumstances concerning shipping or mailing of TENS/NMES Devices and supplies to Travelers claimants.  (*Id.* ¶ 394.)  For example, no setup is required for the TENS/NMES Devices or related supplies and upon information and belief, EMSI provided manuals with

shipments of its TENS/NMES Devices to patients with directions on use.  (*Id.* ¶¶ 395–97.)

### 3. Licensing violation

At all relevant times, EMSI did not possess the New York City Department of Consumer and Worker Protection ("DCWP") license required to distribute TENS/NMES Devices in New York City and to bill insurers, including Travelers, for the dispensed DME.  (*Id.* ¶¶ 3–4, 130, 177, 184–86.)  EMSI was therefore ineligible to receive payment for the TENS/NMES Devices and replenishment supplies under New York No-Fault and workers' compensation benefits.  (*Id.* ¶¶ 21, 62, 186.)  EMSI induced Travelers to pay for unlicensed services in violation of New York law.  (*Id.* ¶¶ 180–81, 188.)

### 4. Exemplar Claim — Claimant A.T. (FRT2634)

Claimant A.T. was injured at work on or about December 29, 2020 when he slipped and fell onto his right lower back.  (*Id.* ¶¶ 401.)  Gaurav Jaswal, M.D. ("Dr. Jaswal") examined A.T. on December 31, 2020 for complaints of lower back pain on his right side, diagnosed him with acute right-sided low back pain with right-sided sciatica, and referred him to physical therapy. (*Id.* ¶¶ 401–03.)  On January 21, 2021, A.T. followed up with Dr. Jaswal and reported that his pain had improved with physical therapy and through oral and topical NSAIDs.  (*Id.* ¶ 404.) Despite A.T.'s pain improvement, Dr. Jaswal prescribed A.T. "a standard TENS unit . . . for his low back pain" and did not document that A.T. had undergone any trial of TENS therapy at the time of the prescription.  (*Id.* ¶¶ 405–06, 409.)  The Medical Treatment Guideline in effect at the time Dr. Jaswal prescribed the TENS unit to A.T. specifically stated that "[c]onsistent, measurable, functional improvement must be documented and a determination made of the likelihood of chronicity prior to the provision of a home unit."  (*Id.* ¶ 408 (alteration in original).) However, Dr. Jaswal did not document any determination of the likelihood that A.T.'s pain would be chronic.  (*Id.* ¶ 410.)  Dr. Jaswal purportedly signed an "EMSI Letter of Medical

Necessity" regarding a Flex TENS unit and Flex-Gar conductive garment for the back.  (*Id.* ¶ 412.)  Ashley Harvey who, upon information and belief is an EMSI Territory Manager serving central New York, handled the device referral for A.T.  (*Id.* ¶ 413.)  The Letter of Medical Necessity (1) misrepresented the necessity of the TENS unit for A.T. by indicating that A.T. had a history of "chronic pain" although only six weeks had passed since the date of A.T.'s injury, and Dr. Jawal had diagnosed A.T. with acute pain not chronic pain, (*id.* ¶¶ 414–15); (2) identified "other" history of "muscle spasm and atrophy" even though Dr. Jawal never documented either finding for A.T. as of February 12, 2021, (*id.* ¶ 416); and (3) prescribed the Flex TENS unit to A.T. for an excessive period encompassing A.T.'s "lifetime" even though Dr. Jaswal did not specify use of the TENS unit for such an indefinite period, (*id.* ¶ 417).

Dr. Jaswal did not prescribe specific supplies for A.T.'s use with the TENS unit. (*Id.* ¶ 419.)  Nevertheless, EMSI "purportedly provided" the Flex TENS unit to A.T. on February 18, 2021, along with sixteen electrodes and four batteries.  (*Id.* ¶ 420.)  EMSI charged Travelers $691.08 for the TENS unit and supplies dispensed to A.T., including $30 for delivery and $495.00 for the Flex TENS despite the Medicaid Fee Schedule in effect on February 18, 2021 setting the permissible charge for the unit at $76.25.[8]  (*Id.* ¶¶ 420–23.)  EMSI continued to bill Travelers for excessive resupplies purportedly sent to A.T. on a monthly basis from March 2021 to August 2021, with charges totaling $2,154.90 for the TENS resupplies despite the absence of

---

[8]  EMSI also unbundled the electrodes and batteries from the Flex TENS unit and improperly billed for these included items separately.  (Compl. ¶ 424.)  EMSI further submitted inflated charges for these items by billing for sixteen electrodes under A4556 even though the applicable Medicaid Fee Schedule limits the amount and frequency of replacement electrodes under A4556 to two pairs once per month at a rate of $6.13.  (*Id.* ¶ 425.)  In addition, EMSI billed Travelers for four batteries under A4630 even though applicable Medicaid Fee Schedule allows for a maximum of one unit of this code at a rate of $2.46.  (*Id.* ¶ 426.)  EMSI never sought authorization to bill for sixteen electrodes and four batteries.  (*Id.* ¶ 427.)

evidence that A.T. needed or wanted the supplies.  (*Id.* ¶¶ 428–29.)  EMSI mailed the bills for A.T.'s TENS unit and supplies and related documentation to Travelers.  (*Id.* ¶ 434.)

### iv.   Management and operation of the fraudulent scheme

None of the Individual Defendants are licensed healthcare providers and all "participated in the operation and management" of the fraudulent enterprise with the purpose of billing Travelers for false and fraudulent TENS/NMES Devices and replenishment supplies to receive payment EMSI was not entitled to under New York Law.  (*Id.* ¶¶ 37–38, 41–42, 45–46, 49–50, 53–54, 58–59, 171–72, 175–76, 520, 528.)  Garcia had sole control over EMSI's bank account and, upon information and belief, participated in the development and execution of EMSI's business and marketing strategy.  (*Id.* ¶¶ 157–59.)  Muley is EMSI's President.  (*Id.* ¶ 40.) Garcia personally performed one or more training attended by sales personnel and Muley stated that during at least one training, he, Garcia, and other members of the EMSI management team" discussed in "great detail" the "long term strategic game plan for EMSI."  (*Id.* ¶¶ 155–56.) Dacey-Zavalianos is EMSI's Executive Vice President of Operations.  (*Id.* ¶ 44.)  EMSI's 2022 NY Medicaid Provider Enrollment Application identified Dacey-Zavalianos as the primary contact to receive all checks and, according to EMSI's website, joined EMSI in May of 2007 and "is responsible for overseeing Operations which includes Billing, Patient Support Services, Customer Service, Medicare, and Accounts Receivables."  (*Id.* ¶¶ 162–63.)  Alfonso is EMSI's Executive Vice President of Finance.  (*Id.* ¶ 48.)  EMSI's 2022 NY Medicaid Provider Enrollment Application identified Alfonso as the primary contact to receive annual tax documents and according to EMSI's website, "is responsible for the development, interpretation, maintenance and implementation of Company financial policies and procedures" as well as "[f]inancial and business plan development and execution." (*Id.* ¶¶ 164–65 (alteration in original).)  EMSI's 2022 NY Medicaid Provider Enrollment Application for managed care

identified Muley, Dacey-Zavalianos, and Alfonso as EMSI's "agents or managing employees, and those with a control interest." (*Id.* ¶ 161.) Cielo is EMSI's Executive Vice President of Business Development. (*Id.* ¶ 52.) EMSI's 2022 NY Medicaid Provider Enrollment Application identified Cielo as the primary contact to receive all correspondence and according to EMSI's website, Cielo joined EMSI in 2009 as Vice President of Business Development and "oversees contracting, payor relations, contracted revenue cycle management, and state compliance." (*Id.* ¶¶ 166–67.)

Defendants were "well-aware of the indications for the TENS/NMES Devices" and "intentionally billed for TENS/NMES Devices and replenishment supplies for an indefinite duration that they knew were ineffective, unnecessary, and potentially dangerous for the claimants at issue in this Complaint." (*Id.* ¶¶ 236–37.) Travelers alleges that, through their management roles, the Individual Defendants (1) "own[], manag[e], and/or operat[e] EMSI," (2) "profit[] from the operation of EMSI," (3) "facilitat[e] unlawful and illegitimate prescriptions and orders between EMSI and prescribers," (4) "dispens[e] medically unnecessary TENS Devices and supplies to EMSI patients," and (5) "caus[e] EMSI to submit false and fraudulent New York No-Fault and workers' compensation claims to Travelers, render[ing] EMSI completely ineligible for both No-Fault and workers' compensation reimbursement under New York law." (*Id.* ¶¶ 507, 514.) Travelers further alleges that Defendants "intentionally prepared and mailed, (or caused to be prepared and mailed)," reimbursement documentation in connection with Travelers insurance claims in furtherance of this scheme to defraud, (*id.* ¶ 547), such as "claimants' prescription records and treatment records, assignment of benefits forms, letters of medical necessity, and/or invoices/bills from EMSI to Travelers (and/or counsel for claimants)," or acted with knowledge that the use of the mail for these purposes would follow in the ordinary course of business, (*id.* ¶¶ 505, 512, 552.) The Individual Defendants caused EMSI to falsely

certify that it was eligible to be reimbursed under New York's No-Fault and workers' compensation laws each time that EMSI mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Travelers.  (*Id.* ¶ 506; *see id.* ¶¶ 511, 518, 548–51).  When the Individual Defendants mailed or caused the submission of CMS-1500 forms and other claim-related documents to Travelers seeking No-Fault and workers' compensation reimbursement, they materially misrepresented EMSI's reimbursement eligibility under New York law to "induce Travelers to promptly pay charges related to TENS/NMES Devices and supplies purportedly provided to Travelers claimants who were caused to be customers of EMSI."  (*Id.* ¶¶ 508, 513, 519, 527, 553; *see also id.* ¶¶ 509, 516.)

Based on their participation in the operation and management of EMSI, the Individual Defendants each agreed to conduct the affairs of EMSI through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Travelers for the purpose of "obtain[ing] payments from Travelers on behalf of [EMSI]" and "agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions."  (*Id.* ¶¶ 566–68.)

### v.    Damages

In reliance on Defendants' false and fraudulent claim submissions, Travelers paid no-fault and workers' compensation benefits of more than $340,000.  (*Id.* ¶¶ 198, 545.)  EMSI and Garcia's paid "$20 million to resolve allegations that they violated the False Claims Act by billing federal healthcare programs for excessive and medically unnecessary supplies associated with [TENS] and related devices" and Travelers alleges that the settlement "corroborat[es]" the fraudulent billing scheme it alleges in this action.  (*Id.* ¶ 6 (first alteration in original) (quoting Press Release, E.D. Penn., EMSI and Garcia Agreement to Pay $20 Million to Resolve Allegations (Sept. 27, 2024)).)

### c.    Procedural background

Travelers alleges (1) that the Individual Defendants committed a substantive RICO violation under 18 U.S.C. § 1962(c) through the "EMSI Enterprise," (Compl. ¶¶ 546–63); (2) that the Individual Defendants engaged in a RICO conspiracy under 18 U.S.C. § 1962(d) through the EMSI Enterprise, (*id.* ¶¶ 564–70); (3) that EMSI and the Individual Defendants committed a substantive RICO violation under 18 U.S.C. § 1962(c) through the EMSI Association-in-Fact Enterprise, (*id.* ¶¶ 571–93); (4) that EMSI and the Individual Defendants engaged in a RICO conspiracy under 18 U.S.C. § 1962(d) through the EMSI Association-in-Fact Enterprise, (*id.* ¶¶ 594–604); (5) a common law fraud claim against Defendants, (*id.* ¶¶ 605–13); and (6) a claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, (*id.* ¶¶ 614–24).

Defendants have moved to dismiss all RICO claims against them as well as the common law fraud claim against the Individual Defendants only.[9]  (Defs.' Mem. 2–3, 8–17; Defs.' Reply 1, 9–10; *id.* at 6–9.)  They also seek dismissal of the Complaint in its entirety on the basis that Travelers' allegation that EMSI was "unlicensed," which they contend "permeates all counts," is "legally untenable, insufficiently alleged, and implausible." (Defs.' Reply 1–6; Defs.' Mem. 1–2, 4–7.)

## II.    Discussion

### a.    Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the Complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor."  *Sacerdote v. N.Y.*

---

[9]  As to Travelers' remaining claims for common law fraud against EMSI and declaratory judgment, Defendants note that while they "vehemently disagree with the allegations regarding the claims submitted by EMSI, EMSI's practices, and its compliance with the applicable billing requirements," "a motion to dismiss is not the time or place to attack inaccurate and unsupported factual allegations."  (Defs.' Reply 1.)

*Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d

Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020)

(quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A complaint must

plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007); *New Yorkers for Religious Liberty, Inc. v. New York*, 125

F.4th 319, 327 (2d Cir. 2024) (quoting *Twombly*, 550 U.S. at 570).  "A claim is plausible 'when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d

Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Roe v. St. John's*

*Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63); *Cavello Bay*

*Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at

678).  Although all allegations contained in the complaint are assumed to be true, this tenet is

"inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Roe*, 91 F.4th at 651 ("Although all

factual allegations contained in the complaint are assumed to be true, this rule does not extend

'to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

     **b.    DCWP licensure**

     Defendants argue Travelers' allegation that EMSI was ineligible to collect payment for

services rendered to Travelers under section 65-3.16(a)(12) of New York's no-fault law because

it "did not possess" a DCWP license is "implausible," "not supported," and no "basis for

invoking [section 65-3.16(a)(12)] to render EMSI ineligible for New York No-Fault benefits"

because (1) the licensing requirement applies only to "'dealers' whose business 'substantially

involves' selling to the disabled and who are not otherwise 'licensed or registered by any other

state or local law'" and Travelers has not alleged that "EMSI's business 'substantially involves'

selling products to the disabled," (Defs.' Mem. 4–5 (citations and emphasis omitted); Defs.'

Reply 2–3, 4–5); and (2) Travelers does not allege that EMSI or any of the Individual

Defendants "willfully failed to procure the City license as part of a supposed scheme to defraud,"

which under "New York precedent" is required "before the No-Fault forfeiture statute is applied"

and "[e]ven if [they had], . . . [the claim] would be implausible" as the Complaint lacks

allegations of "any connection whatsoever between the allegations of fraud and the lack of the

City license, and it defies credulity to suggest that EMSI would willfully avoid paying a $100 per

year licensing fee if in fact such a City license was required," (Defs.' Mem. 5–6; Defs.' Reply 2,

5).  Defendants argue that Travelers' allegations that EMSI is unlicensed are not "legally

cognizable" because (1) the "irrefutable facts" that EMSI is a licensed provider in the State of

Florida and a registered provider in the New York Medicaid Program along with a "reasonable

reading of the plain language of the rule" establish that EMSI is exempt from the licensing

requirement "as a matter of law," (Defs.' Mem. 5; Defs. Reply 5–6); (2) "while Travelers'

opposition argues that EMSI's exemption from the licensing requirement did not arise until its

New York Medicaid registration became effective in 2022," Travelers is "seek[ing] to disqualify

EMSI's payments *after* 2022 and through 2024," (Defs. Reply 6); and (3) "none of the claimed

billing errors" are alleged "to constitute a violation of any licensing law," (Defs.' Mem. 7).

Defendants contend that Travelers "conflates EMSI's No-Fault claims and its worker's

compensation claims" throughout the Complaint and in "seek[ing] a declaration that EMSI was

'completely ineligible' to receive both No-Fault and workers' compensation benefits."  (*Id.* at 6–

7, 6 n.2.)  Defendants argue that Travelers "essentially admit[s] that, to the extent EMSI is

certified under New York law . . . its business is outside the scope of the city license

requirement."  (*Id.* at 2–4.)

24

Travelers argues that EMSI was required to have a DCWP license "to collect payment on the No-Fault claims at issue" and that "[c]ontrary to EMSI's protestation, EMSI is a 'dealer' for the purposes of" New York's licensing rules because EMSI's entire business involves selling products for 'disabled' persons" as defined under New York law.  (Pls.' Opp'n 23–25.) Travelers contends that Defendants' interpretation "that EMSI is exempt from local DCWP licensing requirements because it is licensed in Florida and registered with New York's Medicaid program" is "wrong"  because (1) the "limited exceptions to DCWP licensure" provided for section 20-425(d) "do not include licenses issued under the laws of different states" and "only appl[y] to other state or local laws of New York," (*id.* at 25–26); (2) EMSI "cannot hide behind the Medicaid registration" as "EMSI obtained the registration in 2022, which means it operated in New York without a DCWP license or valid exception from 2017 until at least 2022" and "Medicaid registration is insufficient to satisfy" the DCWP licensing requirement, (*id.* at 25–26); (3) Defendants' arguments about EMSI's Florida license and Medicaid registration "demonstrate their awareness of the local DCWP licensing requirements, which only heightens the plausibility of Travelers' claims that the Defendants willfully failed to comply with licensing requirements," (*id.* at 25–26).  Travelers also contends that "Defendants' arguments about the materiality of EMSI's licensing violations" are "unavailing" because New York City regulations "merely provide[] that a provider is not eligible for No-Fault payments if they fail to meet any licensing requirements," "EMSI violated a local licensing requirement that was intended to protect the health and safety of New York City residents," and "Defendants' demonstrated history of misconduct permits the inference that EMSI's application for DCWP licensure would have been rejected."  (*Id.* at 27.)  Travelers also contends that Defendants mischaracterize their claims because "the distinction between No-Fault claims and Workers Compensation claims is only important for understanding the significance EMSI's operating in New York" with a DCWP

license as "EMSI's billing for unnecessary devices and supplies pursuant to false codes and excessive fees is not permitted under either the No-Fault or the Workers Compensation regulatory systems." (*Id.* at 22–23.)

Section 65-3.16(a)(12) of the implementing regulations for New York's no-fault law renders providers ineligible to receive reimbursement of no-fault benefits "if they fail[ ] to meet any applicable New York State or local licensing requirement . . . or meet any applicable licensing requirement necessary . . . in any other state." *Tri-Borough NY Med.*, 120 F.4th at 71 (alteration in original) (quoting N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16(a)(12)); *see Mayzenberg*, 121 F.4th at 410, 417 ("The Eligibility Regulation disqualifies a provider that 'fails to meet *any* applicable New York State or local licensing requirement' from receiving no-fault payments." (quoting N.Y. Comp. Codes, R. & Regs. tit. 11, § 65-3.16(a)(12) (emphasis added))); N.Y. Comp. Codes, R. & Regs. tit. 11, § 65-3.16(a)(12) ("A provider of health care services is not eligible for reimbursement under [§] 5102 (a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed."); *see also Jacques*, 2017 WL 9487191, at *2 ("To be eligible for reimbursement payments under the no-fault law, a provider of healthcare services must comply with applicable licensing requirements." (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16(a)(12))). "[T]he Eligibility Regulation does not define the term 'licensing requirement'" and "only authorizes non-payment for sufficiently severe violations." *Mayzenberg*, 121 F.4th at 410, 417. Therefore, in determining whether non-payment is warranted, "the focus should center on whether a corporate practice showed a 'willful and material failure to abide by licensing and incorporation statutes,' which may or may not satisfy the traditional elements of fraud" and "where a [professional services corporations] fails

26

to abide by such licensing and incorporation statutes" payments may only be withheld "where such violations are 'grave' ones rather than merely 'technical' ones." *Mayzenberg*, 121 F.4th at 417 (citing *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 405 (2019)); *Carothers*, 33 N.Y.3d at 405 ("A corporate practice that shows willful and material failure to abide by licensing and incorporation statutes may support a finding that the provider is not an eligible recipient of reimbursement under 11 NYCRR 65–3.16(a)(12) without meeting the traditional elements of common-law fraud." (quoting *State Farm Mut. Auto. Ins. Co. v Mallela,* 4 N.Y.3d, 313 321 (2005))).

Section 2-426 of chapter 2 of title 20 of the New York City Administrative Code makes it "unlawful for any dealer to engage in the selling, renting, fitting, repairing, or servicing of, or making adjustments to, products for the disabled without a license therefor" by the DCWP.[10] New York City, N.Y., Code § 20-426(a)–(b).  The statute defines a dealer as "any person," including "a firm, partnership, association, corporation or individual," "who engages in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, and who is not licensed or registered by any other state or local law." *Id.* § 20-425(c)–(d).  "Disabled" means "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques" and "Products for the Disabled" encompass "any instrument or device either represented as an aid for or designed specifically or substantially for the disabled," including but not limited to "braces, crutches, prosthetic devices, ostomy supplies and equipment, orthotic devices, self-help

---

[10]  The statute states that the license must be obtained from the Commissioner of the Department of Consumer Affairs.  The Department of Consumer Affairs is now the DCWP.  *See Morris v Trump*, No. 21-CV-4445, 2021 WL 2227797, at *2 (S.D.N.Y. June 1, 2021).

aids and wheelchairs" but excluding "prosthetic dental devices, or any product, instrument or device the manufacturing, retailing or distribution of which is licensed by any other state or local law." New York City, N.Y., Code § 20-425. The annual license fee is one hundred dollars. *Id.* §§ 20-425, 20-427.

Travelers' allegations do not establish that EMSI meets the definition of a dealer such that EMSI was required to secure a DCWP license to sell its TENS/NMES devices.[11] Travelers argues that "EMSI's entire business involves selling products for 'disabled' persons" as defined under New York City law, (Pls.' Opp'n 24–25), but does not point to any allegations that support this conclusory assertion. Travelers alleges the legal requirements for a DCWP license, (*see* Compl. ¶¶ 125–30), but does not offer any allegations to demonstrate that EMSI's business substantially involved providing products as "an aid for or designed specifically or substantially for the disabled" or any of the specific examples of disabled products listed in the statute. New York City, N.Y., Code § 20-425. Rather, Travelers pleads that EMSI's TENS/NMES Devices, putting aside the allegations of inefficacy, are designed for pain relief and muscle weakness, (Compl. ¶¶ 145–50), which does not mean that the devices must be prescribed to treat disabled

---

[11] Defendants request that the Court take judicial notice that "EMSI is certified under New York Law," (Defs.' Reply 2), and the following exhibits they submitted in support of their motion: (1) EMSI Home Medical Equipment Provider license issued by the Florida Agency for Health Care Administration with renewal letter, (EMSI Florida License, annexed to Leardi Decl. as Ex. A, Docket Entry No. 22-2); (2) screenshot of and link to website of the New York State Department of Health ("NYSDOH") showing that EMSI is enrolled as a medical equipment provider with the New York State Medicaid Program, (EMSI N.Y.S. Medicaid Program Enrollment, annexed to Leardi Decl. as Ex. B, Docket Entry No. 22-2); (3) letter from NYSDOH approving EMSI's enrollment in the New York State Medicaid Program's Medicaid Managed Care network, (NYSDOH Letter, annexed to Leardi Decl. as Ex. C, Docket Entry No. 22-2); and (4) screenshot of and link to Dealer in Products for the Disabled Webpage on the City of New York website with license application and showing that initial license fees are $200 or less for up to two years, (Dealer in Products for Disabled Webpage, annexed to Leardi Decl. as Ex. D, Docket Entry No. 22-2). Although the Court can take judicial notice of the documents, the Court declines to do so because the documents are not necessary to decide Defendants' motion.

persons as defined under New York law, *i.e.*, persons with "a physical or medical impairment resulting from anatomical or physiological conditions [that] prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  New York City, N.Y., Code § 20-425(c)–(d).

Accordingly, the Court finds that the allegations that Defendants violated DCWP licensure requirements are insufficiently pled and therefore cannot form the basis of any of Travelers' causes of action.  The Court is not persuaded by Defendants' argument that because "[e]ach of the six counts of the [C]omplaint incorporate or specifically rely upon the 'unlicensed' allegation as a basis for relief" and the "[C]omplaint relies on section 65-3.16(a)(12) as a basis to disqualify EMSI from all no-fault and workers compensation claims paid since 2017," dismissal of allegations concerning EMSI's alleged violation of DCWP licensure requirements warrants dismissal of the Complaint in its entirety.  (Defs.' Reply 6 (emphasis omitted); Defs.' Mem. 2, 7.)  Travelers' failure to plead that Defendants fall within the scope of DCWP licensure requirements is not alone grounds for dismissal of the Complaint or any cause of action in its entirety because Travelers alleges that Defendants' scheme was fraudulent on other independent grounds, including that they submitted claims for medically unnecessary devices and supplies and improperly and excessively billed Travelers.  Defendants do not challenge the plausibility or sufficiency of the allegations of the broader alleged scheme.

    **c.  RICO claims**

Defendants argue that Travelers has failed to plausibly allege or allege with the required specificity that "any of the Individual Defendants personally committed predicate acts for RICO," (Defs.' Mem. 2–3, 9–10, 13–16; Defs.' Reply 2, 7–9), and that "[u]pon dismissal of the Individual Defendants," EMSI should be dismissed because it would be "left as the sole defendant and thus both the RICO enterprise and the sole RICO defendant," and "[a] single

29

person or entity cannot be . . . both the RICO enterprise and the RICO defendant," (Defs.' Mem. 16–17; Defs.' Reply 9–10).

Travelers argues that "it is plausible that the Individual Defendants were aware of the scheme" to "generate and submit false claims" and "took intentional steps toward furthering or participating in the scheme given their management over the EMSI enterprise."  (Pls.' Opp'n 3, 30–35.)  Travelers contends that the "misconduct" of the Individual Defendants is "sufficiently described," (*id.* at 14–19), and Defendants' proffered extraneous materials "undercut[] the Defendants' other arguments about the Individual Defendants' participation in the EMSI enterprise," (*id.* at 25–26).

"RICO creates a private cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962' of RICO."  *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (alteration in original) (quoting 18 U.S.C. § 1964(c)); *see also Tri-Borough NY Med.*, 120 F.4th at 95 (similar); *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022) (similar); *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 21-847, 2022 WL 480475, at *2 (2d Cir. Feb. 17, 2022) (similar).  The statute "imposes liability on individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'"  *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (quoting 18 U.S.C. §§ 1962, 1964); *Tri-Borough NY Med.*, 120 F.4th at 95 ("RICO makes it unlawful, *inter alia*, 'for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt' or to conspire to do so." (alteration in original) (citing 18 U.S.C. § 1962(c)–(d))).

To establish a RICO claim, a plaintiff must plead "'(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a

result of the RICO violation.'" *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (quoting *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)); *see also Curtis v. Greenberg*, Nos. 22-252, 22-346, 2023 WL 6324324, at *1 (2d Cir. Sept. 29, 2023) (same); *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) ("To state a claim of a substantive RICO violation under [section] 1962(c), a plaintiff must allege, among other things, two or more predicate acts 'constituting a pattern' of 'racketeering activity.'" (quoting *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018))); *Williams*, 889 F.3d at 123–24 ("To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show '(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.'" (quoting *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983))). "The Supreme Court has interpreted [the] phrase ['pattern of racketeering activity'] to require both that the RICO predicates pose a threat of continuous criminal activity and that they be related to each other." *Reich*, 858 F.3d at 59 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). In addition, "a plaintiff must establish that the underlying § 1962 RICO violation was 'the proximate cause of his injury.'" *Empire Merchs.*, 902 F.3d at 140 (quoting *UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010)); *see also Laydon*, 55 F.4th at 100 ("To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of [section] 1962." (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013))); *Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001) ("[A] plaintiff must plead (1) the defendant's violation of [section] 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.").

31

Plaintiffs allege two enterprises that had the purpose of "obtaining reimbursement to which EMSI was not entitled under New York law for TENS/NMES Devices and replenishment supplies," (Compl. ¶137): (1) the "EMSI Enterprise," under which EMSI, the corporation, is the enterprise and the Individual Defendants "participated in the operations and management" of EMSI, (*id.* ¶¶ 55–58, 546–63); and (2) the "EMSI Association-in-Fact Enterprise" under which EMSI and the Individual Defendants were members and "participated in the operation and management of the EMSI [A]ssociation-in-[F]act enterprise," (*id.* ¶¶ 528, 571–93). Defendants do not challenge that Travelers has pleaded the existence of two cognizable enterprises — the EMSI Enterprise and the EMSI Association-in-Fact — and therefore, for the purposes of deciding Defendants' motion, the Court does not consider the sufficiency of Plaintiffs' enterprises as pleaded. Rather, Defendants argue in their "narrowly drawn" motion, (Defs.' Reply 1), that (1) Travelers has failed to plead that Individual Defendants committed two predicate acts necessary to sustain a substantive RICO claim, (2) because Travelers has failed to state a RICO claim against the Individual Defendants, their RICO claim against EMSI necessarily fails, and (3) Travelers has failed to state RICO conspiracy claims against all Defendants. (*Id.* at 1, 9–10; *id.* at 6–9; Defs.' Mem. 2–3, 8–17.) The Court addresses Defendants' three arguments below.

### i. Travelers has not sufficiently pleaded that the Individual Defendants participated in the alleged scheme to defraud Travelers

Defendants argue that Travelers has failed to plead that "the Individual Defendants personally committed predicate acts for RICO," (Defs.' Mem. 2–3), because (1) Travelers "merely identified the Individual Defendants from the EMSI website and the NY Medicaid Provider application and proceeded to recite conclusory allegations in the Complaint . . . in rote recitation of the elements of . . . [the] RICO predicate acts," (*id.* at 9–10, 13–14; Defs.' Reply 7–

9); (2) "[a]llegations specific to any of the particular Individual Defendants merely describe innocent conduct in the ordinary course of business," (Defs.' Mem. 10– 13); (3) Travelers fails to connect any of the Individual Defendants to the examples of fraudulent conduct alleged in the Complaint or "the nearly 500 pages of [e]xhibits," (*id.* at 10–13), and "the few allegations specific to the Individual Defendants amount to benign recitations of each defendant's job description," (Defs.' Reply 7); (4) the "allegations that advance the 'naked assertion' that the Individual Defendants actively participated in fraud that is the basis of claims are pure speculation devoid of the essential 'factual enhancement,'" (Defs. Mem. 14–16), and lack "any particularized allegations as to how any of them knowingly or intentionally participated in any fraudulent scheme," (Defs.' Reply 2, 7).

Travelers argues that it has "properly plead[ed]" the three elements of mail fraud.  (Pls.' Opp'n 30.)  As to the first element, Travelers argues that it has demonstrated the "existence of a scheme to defraud" because "[t]he Complaint describes the means and methods" Defendants used "to bill for devices and supplies that they knew were medically unnecessary," including (i) how Defendants "were driven to prey on Travelers as a No-Fault and Workers Comp insurer because they could exploit those programs by unbundling EMSI's bills for supplies" and (ii) how Defendants "executed this scheme using fraudulent bills, which misrepresented or concealed material facts about the billed-for services and EMSI's eligibility for payment."  (*Id.* at 30–31.)  Travelers contends that the allegations "describing the means and methods of the Defendants' scheme, including allegations that establish the Individual Defendants' roles in the operation and management of EMSI" are "amplified by proof that EMSI was engaged in similar misconduct during the same period."  (*Id.* at 14–19.)   For the second element, Travelers argues that it has established that Defendants "had the scienter (i.e., fraudulent intent) required for fraud" by alleging (i) Defendants' motive in that they "obtained over $340,000 from Travelers through

their alleged fraud" and "collected millions more from federal healthcare programs through their scheme," (ii) the opportunity Individual Defendants had to use "their management positions inside EMSI to devise and execute a scheme in which they caused EMSI to generate records and bills in support of fraudulent claims, and then used those fraudulent documents to demand payments from Travelers," and (iii) "Defendants were aware of EMSI's fraudulent billing, yet nevertheless chose to participate in the scheme."[12] (*Id.* at 31–32.) As to the third element, Travelers contends that it has established how Defendants "used the U.S. [m]ail to further their scheme by mailing fraudulent claims to Travelers" by (i) identifying Defendants' "specific mailings through a chart that details where and when EMSI mailed records and bills to Travelers," (*id.* at 33); and (ii) alleging that the "Individual Defendants committed hundreds of predicate acts (i.e., 379 fraudulent claims from EMSI, each of which contained at least one mailing) when EMSI (i.e., the enterprise that they associated with) was caused to mail documents to Travelers through the U.S. Mail," (*id.* at 33–34).

To sustain a civil RICO claim, a plaintiff must plausibly allege a pattern of racketeering activity, which consists of (1) at least two predicate acts, "the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity," that (2) "amount to or pose a threat of continued criminal activity." *Grace Int'l Assembly of God v. Festa*, 797 F. App'x

---

[12] Travelers argues that it has established the Individual Defendants' awareness of and participation in the scheme to defraud Travelers by alleging (1) "Garcia's role in the scheme as owner of EMSI and primary participant in similar efforts to defraud federal healthcare programs," (2) "the contours of the scheme, including how EMSI purposely marketed its services to beneficiaries of programs that could be exploited, how Garcia assembled a team of managers to implement the scheme, and how Muley, Dacey-Zavalianos, Alfonso, and Cielo were part of this management group," and (3) identifying "the specific role played by the managers, each of which contributed to the Defendants' scheme," including that "Cielo's management of EMSI's business development and payor relations throughout the relevant period placed her in position to participate in the operation and control of the enterprise" as "is true for Dacey-Zavalianos, who managed billing and customer service, and for Alfonso, who was in charge of executing EMSI's business strategy." (Pls.' Opp'n 32.)

603, 605 (2d Cir. 2019) (alteration in original) (first quoting 18 U.S.C. § 1961(5); and then quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)); *see also Butcher*, 975 F.3d at 241 ("To state a claim of a substantive RICO violation under [section] 1962(c), a plaintiff must allege, among other things, two or more predicate acts 'constituting a pattern' of 'racketeering activity.'" (quoting *Williams*, 889 F.3d at 124)).  "[A]llegations of frivolous, fraudulent, or baseless litigation activities — without more — cannot constitute a RICO predicate act."  *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018).

    Mail fraud is a RICO predicate act.  *See Bascuñán v. Elsaca*, 927 F.3d 108, 120–21 (2d Cir. 2019) (explaining mail fraud is a predicate act for civil RICO claims); 18 U.S.C. § 1961(1) (setting forth a list of predicate acts, including mail fraud).  "There are three 'essential elements' to mail or wire fraud: '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'"[13]  *Bascuñán*, 927 F.3d at 122 (emphasis omitted) (quoting *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017)); *see Gov. Emps. Ins. Co. v. Infinity Health Prods., Ltd.*, No. 10-CV-5611, 2012 WL 1427796, at *7 (E.D.N.Y. Apr. 6, 2012), *report and recommendation adopted*, 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012) ("Pleading mail fraud requires: (1) the existence of a scheme to defraud; (2) the use of United States mails . . . to further that scheme; and (3) evidence that defendants did so with a specific intent to defraud."); *see also Red Rock Sourcing LLC v. JGX LLC*, No. 21-CV-1054, 2024 WL 1243325, at *14 (S.D.N.Y. Mar. 22, 2024) (explaining that the first element, a scheme to defraud, requires proof of "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the

---

[13] "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *Bascuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019) (*United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017)).

misrepresentations" (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000))).

"[T]he mailed or wired communication need not itself be fraudulent," but "it must . . . be made in furtherance of the fraudulent scheme." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014); *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 125 (S.D.N.Y. 2023) (citation omitted) (same). Moreover, "mail fraud schemes do not require a defendant to know about the specific mailing" but require a showing that the defendant "acted with knowledge that the use of the mails will follow in the ordinary course of business, or that such use can reasonably be foreseen, even though not actually intended." *United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015) (quoting *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998)); *Red Rock Sourcing*, 2024 WL 1243325, at *15 (stating that under the mail and wire fraud statutes "a plaintiff need not allege 'that the defendants have personally used the mails or wires; it is sufficient that a defendant "causes" the use of the mails or wires'" (quoting *Sobel v. Fleck*, No. 03-CV-1041, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003), *report and recommendation adopted by* 2004 WL 48877 (S.D.N.Y. Jan. 8. 2004))); *Allstate Ins. Co. v. New Cent. Pharm. Inc.*, No. 19-CV-5702, 2021 WL 7830141, at *8 (E.D.N.Y. Aug. 13, 2021) ("To properly allege the 'use of interstate mails,' the plaintiff need not allege that each defendant sent a piece of mail; rather, 'it need only be shown that [each defendant] acted with knowledge that the use of the mails will follow in the ordinary course of business, or that such use can reasonably be foreseen, even though not actually intended.'" (alteration in original) (quoting *Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187, 2015 WL 5774459, at *12 (E.D.N.Y. Sept. 30, 2015))).

Because allegations of mail fraud are governed by Rule 9(b) of the Federal Rules of Civil Procedure, they must be pled with particularity. *See Babb v. Capitalsource, Inc.*, 588 F. App'x 66, 68 (2d Cir. 2015) (discussing pleading requirements under RICO for fraudulent predicate

acts); *Curtis v. L. Offs. of David M. Bushman, Esq.*, 443 F. App'x 582, 584 (2d Cir. 2011) (same); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (same); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (same).  As the Second Circuit has explained, "Rule 9(b) serves several purposes.  '[I]t is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect a defendant against the institution of a strike suit.'" *Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 544 (2d Cir. 2024) (alteration in original) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  "It also discourages plaintiffs from using the litigation process to discover hypothetical wrongdoing." *Id.* (citing *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)).  "'Bare-bones allegations' therefore do not suffice." *McNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023) (quoting *Lundy*, 711 F.3d at 119).

To meet the heightened pleading standard of Rule 9(b), "[a]llegations of predicate mail and wire fraud acts 'should state the contents of the communications, who was involved, [and] where and when they took place, and [should] explain why they were fraudulent.'" *Spool*, 520 F.3d at 185 (alterations in original) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)); *Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *1 (2d Cir. Apr. 4, 2023) (quoting *Mills*, 12 F.3d at 1176); *see also Purchase Real Est. Grp.*, No. 05-CV-10859, 2010 WL 3377504, at *8 (S.D.N.Y. Aug. 24, 2010) ("Under Rule 9(b), allegations of fraud in the RICO context must be made with particularity and must 'specify the statements [plaintiffs] claim[] were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" (alterations in original) (quoting *Moore*, 189 F.3d at 172–73)).  "[W]here multiple defendants are accused of mail or wire fraud,

plaintiffs must plead with particularity as to each defendant . . . ."  *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443–44 (S.D.N.Y. 2004) (quoting *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2001 WL 293683, at *4 (S.D.N.Y. Mar. 27, 2001)); *see also DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) ("The requirements of section 1962(c) must be established as to each individual defendant."); *Mondelus v. August W. Dev., LLC*, No. 19-CV-4832, 2022 WL 182363, at *7 (E.D.N.Y. Jan. 20, 2022) ("[W]here . . . multiple defendants are accused of mail and wire fraud, the plaintiff must particularize and prove each defendant's participation in the fraud as well as each defendant's involvement in the two necessary predicate acts."  (quoting *GWG MCA Cap., Inc. v. Nulook Cap., LLC*, No. 17-CV-1724, 2020 WL 10508196, at *8 (E.D.N.Y. June 28, 2020))).  Plaintiffs need not allege that each defendant itself made a misrepresentation, but rather must allege sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud.  *See Paul Hobbs Imps. Inc. v. Verity Wines LLC*, No. 21-CV-10597, 2023 WL 374120, at *4 (S.D.N.Y. Jan. 24, 2023) ("[A] complaint adequately alleges each defendant's commission of mail or wire fraud as long as it alleges sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud." (citations, brackets, and internal quotation marks omitted)); *see also Red Rock Sourcing*, 2024 WL 1243325, at *15 ("Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge" and "sufficient factual basis for fraudulent intent may consist of allegations as to who 'possessed . . . knowledge' of the fraud, 'when and how they obtained [that] knowledge,' or even why they 'should have known' of the fraud." (alterations in original) (quoting *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987))).

Travelers alleges with particularity the existence of a scheme to defraud; it specifies the statements that are fraudulent (misrepresentations and omissions regarding EMSI's eligibility for

and entitlement to reimbursement of benefits under New York's No-Fault and workers'

compensation programs), who made the statements (EMSI), where the statements were made (in

claims and supporting documentation mailed to Travelers), when the statements were made

(2014 through the present[14]), and how and why the statements are fraudulent (the reimbursement

claims were for TENS/NMES Devices and supplies that were unnecessary, medically worthless,

billed pursuant to a pre-determined treatment protocol, and improperly coded and billed).

Defendants do not challenge the sufficiency or plausibility of the allegations of the broader

scheme to defraud Travelers.  However, Travelers fails to establish the Individual Defendants'

knowing and intentional participation in the scheme.  Travelers alleges that the Individual

Defendants directly participated in, or caused others to engage in, billing and "falsely charging"

Travelers for TENS/NMES Devices, dispensing TENS/NMES Devices and supplies in violation

of applicable regulatory requirements, and "falsely claim[ing] eligibility for No-Fault and

workers' compensation reimbursement each and every time that EMSI sought No-Fault

reimbursement from Travelers," (Compl. ¶ 521), *see supra* Section I.b.iv, but the sole allegations

particularized to each Individual Defendant are general allegations of their titles and

responsibilities at EMSI that do not plausibly link any of the alleged fraudulent conduct to the

Individual Defendants.  *U.S. Fire Ins*, 303 F. Supp. 2d at 443–44 ("[W]here multiple defendants

are accused of mail or wire fraud, plaintiffs must plead with particularity as to each defendant

. . . ." (citation omitted)); *see Sanchez v. ASA College, Inc.*, No. 14-CV-5006, 2015 WL 3540836,

at *6–7 (S.D.N.Y. June 5, 2015) (explaining that "a plaintiff may not rely solely upon the

---

[14]  The Court notes that although Travelers argues in its opposition that its "allegations easily satisfy Rule 9(b) by identifying the time of the alleged misrepresentations," which it defines as "2017 to the present," (Pls.' Opp'n 28–29), it includes allegations in its Complaint that predate 2017, (*see* Compl. ¶¶ 317, 488, 490).  Defendants do not challenge any claims as time-barred and the Court therefore does not render any opinion on the appropriate limitations period.

defendants' 'positions of control' in an enterprise and may not link individual defendants to fraudulent activities 'by stating only that [d]efendants were officers and shareholders' of the organization'" to "inform each defendant of the nature of his alleged participation in the fraud" (alteration in original) (citations omitted)); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Surgalign Spine Techs., Inc.*, No. 22-CV-9870, 2024 WL 477031, at *4 (S.D.N.Y. Feb. 7, 2024) (finding allegations that defendants marketed and sold products for use in spinal surgeries and retained a sales representative that billed for unused products was not impermissible group pleading because, "notwithstanding the fact that the complaint referred to certain actions by defendants 'collectively,'" the plaintiffs alleged that the moving defendant retained the sales representative and that the sales representative in turn submitted fraudulent invoices to induce payment for the moving defendant's products, which established the moving defendant's "similar, but ultimately independent, role[]" and provided "fair notice of the nature of [its] participation in the fraud" (internal quotation marks and citation omitted)).

Travelers alleges that Muley was EMSI's president and participated in at least one sales training, (Compl. ¶¶ 40, 156, 161), but provides no description of his role nor any factual basis to plausibly find that he directed any aspect of the alleged scheme or was even aware of the scheme. *Cf. Aghaeepour v. N. Leasing Sys., Inc.*, No. 14-CV-5449, 2015 WL 7758894, at *6 (S.D.N.Y. Dec. 1, 2015) (concluding allegations of a fraudulent scheme that "stem[med] from the origination of leases" sufficiently pleaded the participation of the corporate defendant's vice president of operations because in addition to providing the defendant's job title, the complaint "demonstrate[d] [his] participation in the scheme" including that he "[was] responsible for day–to–day operations and lease originations"), *order corrected on other grounds on denial of reconsideration*, 2016 WL 828130 (S.D.N.Y. Feb. 25, 2016). Travelers provides slightly more detail on Alfonso's responsibilities as EMSI's Executive Vice President of Finance, including

that he was the primary contact to receive annual tax documents and "responsible for the development, interpretation, maintenance and implementation of [EMSI's] financial policies and procedures" as well as "[f]inancial and business plan development and execution," (Compl. ¶¶ 164–65 (second alteration in original)), but, like the allegations against Muley, these facts are too generic to plausibly link Alfonso to the scheme to defraud Travelers.  Travelers argues that Alfonso's responsibility for "managing the development and implementation of EMSI's financial and business plans . . . included the billing fraud scheme described in the Complaint," (Pls.' Opp'n 18), but points to no allegations to support that Alfonso developed the billing code scheme.  Similarly, Travelers alleges that Cielo is Executive Vice President of Business Development, primary contact for all correspondence, and "oversees contracting, payor relations, contracted revenue cycle management, and state compliance," (Compl. ¶¶ 52, 166–67), and argues her being in charge of EMSI's payor relations "is relevant since Travelers is a payor," (Pls.' Opp'n 19), and along with her duties managing business development, "placed her in position to participate in the operation and control of the enterprise," (*id.* at 32).  There are no allegations, however, that Cielo directly engaged with Travelers nor any allegations to reasonably infer that Cielo had any role in the alleged scheme.  *Lynn v. McCormick*, No. 17-CV-1183, 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18, 2017) (concluding that the plaintiffs failed to plead a plausible RICO claim against the CEO of a bank that was alleged to be part of an enterprise that forced the plaintiffs into loans and subsequent defaults because there were no allegations that the CEO "committed, or had anything to do with, any of the allegedly fraudulent acts").

Travelers alleges that Dacey-Zavalianos was responsible for overseeing Operations including Billing, Patient Support Services, Customer Service, Medicare, and Accounts Receivables, (*id.* ¶¶ 162–63), but does not describe her responsibilities nor demonstrate that she

41

had any role in preparing or reviewing the fraudulent claims, dispensing TENS/NMES devices, or directing the Territory Managers and Area Managers who marketed the devices to doctors and patients and improperly completed the Letters of Medical Necessity. Travelers argues that because Dacey-Zavalianos was "in charge of customer support, . . . she was aware of the numerous complaints lodged against EMSI concerning unwanted supplies," (Pls.' Opp'n 17), and alleges examples of customer complaints, including a complaint to the New York Office of the Inspector General that a physical therapist prescribed a TENS Device to a friend of the complainant in exchange for dinner and drinks from an EMSI employee, (Compl. ¶¶ 11–12), complaints filed with the Consumer Sentinel Network regarding EMSI mailing unnecessary and unwanted DME, (*id.* ¶¶ 15), and negative customer reviews posted on an unnamed website concerning "recurring deliveries of supplies" on "a subscription basis that the consumers did not request or authorize EMSI to make," (*id.* ¶¶ 304–06). Drawing the inference that Dacey-Zavaliaos was aware of the alleged consumer complaints merely because she was in charge of customer support does not link Dacey-Zavaliaos to the alleged scheme to defraud Travelers because it is not alleged that any of the complaints are from individuals insured by Travelers or affected by the alleged scheme to defraud Travelers. *Cf. Angermeir v. Cohen*, 14 F. Supp. 3d 134, 147–48 (S.D.N.Y. 2014) (finding that the plaintiffs stated RICO claims against an officer and a "controlling person" of a company that forged equipment small business equipment leases and "bullied" out-of-state plaintiffs into paying the leases through "bogus lawsuits" because the plaintiffs "specifically allege[d] the role each [i]ndividual [d]efendant played in the scheme" including that the vice president of operations "verified complaints filed" in the bogus lawsuits and held responsibility for "several aspects" of the "day-to-day operations, lease originations, and sales" and the legal administrative manager "verified and notarized complaints" and mailed the summons and complaint to a named plaintiff).

Travelers' allegations concerning Garcia are a closer call, but they nevertheless fall short of alleging Garcia's participation in the scheme to defraud Travelers. Travelers' allegations that Garcia was founder, chairman, and owner of EMSI, had sole control over EMSI's bank account, participated in developing and executing EMSI's business and marketing strategy, convened EMSI's management team, and is listed as the authorized official on EMSI National Provider ID and the National Provider ID is listed on every fraudulent claim, (Compl. ¶¶ 35–36, 38, 155–60, 262, 264, 495), amount to generic allegations of routine business responsibilities from which it would be speculative to conclude that he directed the Travelers' scheme or had any direct role in or knowledge of the scheme. The allegation that Mulry overhead Garcia speak about the EMSI strategic plan, (*id.* ¶ 156), similarly does not provide the necessary linkage to the alleged scheme to defraud Travelers because there are no facts concerning what Garcia said. *See Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 266 (E.D.N.Y. 2011) (holding that the plaintiffs sufficiently pleaded the role of two individual defendants in a mail fraud scheme involving the fraudulent incorporation of medical clinics and the submission of fraudulent bills for medical services by alleging "among other things" that the individual defendants owned and controlled one of the medical clinics, one defendant was "a non-licensed layperson" who illegally owned and controlled the medical clinic through management and/or consulting agreements with his management company, and both defendants "controlled [the medical clinic] and used it to employ physicians and other licensed healthcare professionals, to control their practices, and charge for their services," and "through their ownership and control of [the medical clinic], they illegally siphoned-off revenues of $1,243,256.00 . . . through billing submitted to the [p]laintiffs for healthcare services").

Travelers' allegation that Garcia and EMSI entered into a $20 million settlement with the federal government to settle False Claims Act allegations concerning "excessive and medically

unnecessary" billing of TENS supplies and related devices to federal healthcare program "from at least 2018 through 2019," (Press Release; Compl. ¶ 6–7), is not a proper substitute for specific allegations linking Garcia to the alleged scheme to defraud Travelers.  The fact that Garcia and EMSI paid claims to settle *allegations* of misconduct is immaterial and a settlement does not constitute an admission of guilt or a finding of liability.  *See Greenlight Cap., Inc. v. Fishback*, No. 24-CV-4832, 2024 WL 5168623, at *7 (S.D.N.Y. Dec. 19, 2024) ("Allegations in a complaint 'that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Federal Rule of Civil Procedure 12(f).'" (citation omitted)).  As expressly stated in a disclaimer at the end of the Press Release excerpted in the Complaint, "[t]he claims asserted by the United States are allegations only" and "[t]here has been no determination of liability." (Press Release.)  Moreover, allegations that Garcia was engaged in fraudulent billing of federal healthcare programs from approximately 2018 through 2019 does not alone lead to an inference that Garcia directed a scheme to defraud Travelers for sales to its insured in one of many states where EMSI did business from 2014 through the present nor that he should have known about the alleged scheme.[15]  *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-CV-7536, 2021 WL 1199035, at *12 (S.D.N.Y. Mar. 30, 2021) (disregarding the plaintiffs allegations concerning unproven claims in an Israeli lawsuit against the individual defendant because "the prevailing view . . . is to disregard allegations that incorporate unproven allegations

---

[15]  Travelers argues that "the Defendants acted with knowledge of the Department of Justice's investigation and settlement described in the Complaint, which means their actions were intentional."  (Pls.' Opp'n 3 n.2.)  Assuming that Travelers' argument is referring to the federal investigation of the False Claims Act allegations, Travelers does not allege any facts to support that all Defendants knew about the False Claims Act investigation and even if it had, this argument would be unavailing because such allegations alone would still not link the Individual Defendants to the scheme to defraud Travelers.

from complaints filed in other lawsuits" and even if the allegations from the Israeli case were true "they still fail[ed] to recount any of the details of a supposedly illegal transaction" in the instant case), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), and 54 F.4th 82 (2d Cir. 2022).

In the absence of any specific facts concerning the Individual Defendants beyond their titles and general descriptions of their corporate responsibilities, Travelers in effect alleges, or requests that the Court infer, that because the Individual Defendants held management positions at EMSI during the relevant period, they directly participated in or facilitated the fraudulent billing of Travelers and therefore may be held individually liable for the alleged scheme to defraud Travelers. The Court cannot reasonably draw this inference because Travelers' allegations demonstrate that the alleged scheme constituted a minority of EMSI's business. Travelers alleges that New York is but one state in EMSI's "nationwide market," (*id.* ¶¶ 70–71), and that 35% of EMSI's business is derived from the New York market, (*id.* ¶¶ 73, 504). It does not allege that EMSI's New York business consisted solely of devices sold to patients that Travelers insured nor does the Complaint establish that all or the majority of EMSI's business is derived from the illegitimate or fraudulent activities involved in the scheme to defraud Travelers. Thus, even construing the Complaint liberally, the most the Court can infer is that up to 35% of EMSI's business was derived from the alleged scheme to defraud Travelers. In view of Rule 9(b)'s purposes "to safeguard a defendant's reputation from 'improvident charges of wrongdoing,'" "to protect a defendant against the institution of a strike suit," and "discourage[] plaintiffs from using the litigation process to discover hypothetical wrongdoing," *Miller*, 110 F.4th at 544, the Court declines to infer solely on the basis of the Individual Defendants' management positions at EMSI that they participated in or directed the scheme to defraud Travelers. *See Lynn*, 2017 WL 6507112, at *6 (concluding that the plaintiffs failed to plead a

plausible RICO claim against the CEO of a bank that was alleged to be part of an enterprise that forced the plaintiffs into loans and subsequent defaults because there were no allegations that the CEO "committed, or had anything to do with, any of the allegedly fraudulent acts"); *Sanchez*, 2015 WL 3540836, at *6–7 (explaining that "a plaintiff may not rely solely upon the defendants' 'positions of control' in an enterprise and may not link individual defendants to fraudulent activities 'by stating only that [d]efendants were officers and shareholders' of the organization'" to "inform each defendant of the nature of his alleged participation in the fraud" (alteration in original) (citations omitted)); *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 528 (S.D.N.Y. 1997) (concluding the plaintiffs allegations that two individual defendants "knowingly managed, operated, maintained and conducted the illegal fraudulent activities" of an insurer's overseas scheme involving the sale of illegal life insurance policies that violated the laws of various European nations satisfied Rule 9(b) because the plaintiffs had detailed "a large, decades-long" RICO scheme, including the "precise" role several other defendants played, and the "scheme [was] so large that the inference unavoidably [arose] that the individual [d]efendants, all of whom were [the insurer's] personnel, were aware of or participated in it"); *see also City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665, 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) (rejecting the plaintiffs argument that the individual defendants should have been aware of certain alleged "corrupt . . . events . . . because of their supervisory positions" as "generalized allegations founded solely on an individuals' corporate position are not sufficient to demonstrate scienter"); *cf. Allstate Ins. Co. v. CPM Med Supply Inc.*, No. 23-CV-5864, 2024 WL 3949968, at *7 (E.D.N.Y. Aug. 27, 2024) (finding that the plaintiff insurer sufficiently alleged the individual defendant's engagement in a RICO scheme to defraud the insurer into paying claims for fraudulently prescribed post-surgical rehabilitation DME devices issued by the corporate defendant, a medical supplier, where the insurer alleged that the

individual defendant was "the principal, officer, and/or director of [the DME supplier], operating, managing and controlling its activities" and that he formed the DME supplier "to engage in a scheme whereby [he] paid kickbacks to [the] [clinics] in exchange for prescriptions of DME"); *Cap. 7 Funding v. Wingfield Cap. Corp.*, No. 17-CV-2374, 2020 WL 2836757, at *10, *14 (E.D.N.Y. May 29, 2020) (finding allegations of the individual defendants' roles and general responsibilities in the alleged RICO enterprise coupled with allegations that they furthered the alleged predicate acts of wire fraud "by, among other things, 'concealing [the owner's] activities, and by falsifying records to conceal the scheme from [the plaintiff investor]'" satisfied Rule 9(b) where the plaintiffs established that the enterprise from its inception was solely a vehicle to defraud and siphon monies from the plaintiff); *Aghaeepour*, 2015 WL 7758894, at *6 (concluding that "while the [c]omplaint contain[ed] a number of allegations against all [the d]efendants in general, the [c]omplaint's other allegations specific to each [d]efendant" including their job titles and "how their individual responsibilities demonstrate[d] their participation in the scheme" were sufficient to accomplish the goals of Rule 9(b)).

Because Travelers has failed to plausibly allege the Individual Defendants' participation in the alleged scheme to defraud it, the Court dismisses the substantive RICO claims predicated on the EMSI Enterprise and EMSI Association-in-Fact against the Individual Defendants.

### ii. Travelers' substantive RICO claim against EMSI fails as a matter of law

Defendants contend that "[u]pon dismissal of the Individual Defendants," the Court should also dismiss the claims against EMIS because it would be "left as the sole defendant and thus both the RICO enterprise and the sole RICO defendant," and "[a] "single person or entity cannot be the both the RICO enterprise and the RICO defendant." (Defs.' Mem. 16–17; Defs.' Reply 9–10).

Travelers argues that "when taken as true, [its] allegations are sufficient to show that all of the Defendants are liable for fraud." (Pls.' Opp'n 38.)

"The RICO statute defines 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting 18 U.S.C. § 1961(4)); *Curtis*, 2023 WL 6324324, at *1 (same). A RICO enterprise can consist of "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also O'Neill v. NYU Langone Hosps.*, No. 23-CV-4679, 2024 WL 4216501, at *8 (E.D.N.Y. Sept. 17, 2024) (same); *Yien-Koo King v. Wang*, No. 14-CV-7694, 2020 WL 6875403, at *18 (S.D.N.Y. Nov. 23, 2020) (similar). The Supreme Court has "instructed that, in accordance with the law's purposes, the RICO statute is to be 'liberally construed,' giving a broad and flexible reach to the term 'association-in-fact'" and has "rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO enterprises." *D'Addario*, 901 F.3d at 100 (quoting *Boyle v. United States*, 556 U.S. 944, 945 (2009)); *see United States v. Kelly*, 128 F.4th 387, 409 (2d Cir. 2025) (quoting *D'Addario*, 901 F.3d at 100), *cert. denied*, No. 24-1172, 2025 WL 1727414 (U.S. June 23, 2025).

An association-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625 (2d Cir. 2020) (quoting *Boyle*, 556 U.S. at 945); *Kelly*, 128 F.4th at 410 (same). "Such an enterprise 'must have at least three structural

48

features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id.* (quoting *Boyle*, 556 U.S. at 946); *Kelly*, 128 F.4th at 410 (same); *see also Khan Funds Mgt. Am., Inc. v. Nations Techs. Inc.*, No. 22-CV-5055, 2025 WL 1003964, at *17 (S.D.N.Y. Mar. 31, 2025); *Kelco Constr., Inc. v. Spray in Place Sols., LLC*, No. 18-CV-5925, 2019 WL 4467916, at *7 (E.D.N.Y. Sept. 18, 2019) (same); *Aerowest GmbH v. Freitag*, No. 15-CV-2894, 2016 WL 3636619, at *3 (E.D.N.Y. June 28, 2016) ("A RICO 'association in fact' enterprise requires at least the pleading of an organized entity, and not . . . pleading only that a group existed to commit fraud.  It requires that the enterprise have a common purpose, and functions as a continuing unit, and that each [d]efendant has some part in directing the affairs of the enterprise.").

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be both the RICO person and the enterprise." *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205–06 (2d Cir. 2017) (emphasis omitted) (first quoting 18 U.S.C. § 1961(3),(4); and then citing *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999)); *Lynn v. McCormick*, 760 F. App'x 51, 53 (2d Cir. 2019) (quoting *U1it4less*, 871 F.3d at 205–06); *Cruz*, 720 F.3d at 120 ("As we have long recognized, the plain language and purpose of the [RICO] statute contemplate that a *person* violates the statute by conducting an *enterprise* through a pattern of criminality[]" and "[i]t thus follows that a corporate person cannot violate the statute by corrupting itself." (emphases in original) (quoting *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir.1985))); *see also First Cap. Asset Mgt.*, 385 F.3d at 173 ("The [RICO] enterprise must be separate from the pattern of racketeering activity, and distinct from

49

the person conducting the affairs of the enterprise." (citations omitted)).

Because Plaintiffs have failed to state a RICO claim against the Individual Defendants, the substantive RICO claim against EMSI fails because EMSI cannot be both the enterprise and the RICO person.  Travelers alleges that EMSI and the Individual Defendants were members of the EMSI Association-in-Fact, the purpose of the association-in-fact was to "submit false and fraudulent bills for DME," and the Individual Defendants executed the alleged scheme through their management roles at EMSI.  (Compl. ¶¶ 168, 571–76, 581–82.)  Thus, Plaintiffs' association-in-fact enterprise comprises EMSI and the Individual Defendants associating with one another to conduct EMSI's ordinary business of selling TENS/NMES devices.  (Compl. ¶¶ 571–76.)  Without the Individual Defendants, EMSI is left as the sole member of Plaintiffs' alleged association-in-fact enterprise and would be one and the same as the alleged enterprise. *U1it4less*, 871 F.3d at 205–06 ("A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be both the RICO person and the enterprise." (citations omitted)); *see Bennett*, 770 F.2d at 315 (affirming dismissal of complaint that alleged the corporate defendant was "simultaneously the 'enterprise' and the 'person' who conduct[ed] the affairs of the enterprise through a pattern of racketeering activity"); *cf. DarkPulse, Inc. v. EMA Fin., LLC*, No. 22-CV-45, 2023 WL 2307386, at *4 (S.D.N.Y. Mar. 1, 2023) (dismissing substantive RICO claim against corporate defendant because the corporate defendant was also the alleged enterprise while maintaining the RICO claim against the other alleged members of the enterprise, including the corporate defendant's managing member and investment manager).

Therefore, the Court dismisses the substantive RICO claim against EMSI.[16]

---

[16] The Court notes that even if Travelers had stated a substantive RICO claim against the Individual Defendants, the EMSI Association-in-Fact Enterprise would still fail to satisfy the distinctness requirement.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)

### iii. Travelers' RICO conspiracy claims fail

Defendants argue that the RICO conspiracy claims must be dismissed because Travelers

has failed to "plausibly allege that any of the Individual Defendants personally committed

predicate acts for RICO or committed common law fraud" and cannot state a RICO claim against

---

("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."). Travelers has alleged that EMSI, a corporation, associated with its officers to defraud Travelers through their management of EMSI's business of selling TENS/NMES devices. Stated differently, Travelers' EMSI Association-in-Fact is "a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant" or "of a corporate defendant 'corrupting itself,'" *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 206 (2d Cir. 2017) (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)), which is the very enterprise model that the Second Circuit has determined fails to meet the distinctness requirement. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (holding that defendant corporation and its chief operating officer and corporate counsel could not form an enterprise because the complaint merely alleged that the officer and counsel carried out "the regular affairs of [the corporation], such as day-to-day financial operations, including the implementation and supervision of deceptive trading practices" as "[t]he requirement of distinctness cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees"); *Anglin Automotive LLC v. EBF Holdings, LLC*, No. 23-CV-1404, 2024 WL 1118892, at *8 (S.D.N.Y. Mar. 14, 2024) (finding the plaintiffs failed to allege an enterprise because "each 'enterprise' consist[ed] merely of a corporate defendant and its corresponding John and Jane Doe owners, employees, and investors" and nothing suggested that the individual defendants in setting up "usurious loan agreements as bona fide merchant cash advance agreements to collect unlawful debt" acted beyond 'the regular affairs of the corporation'" (quoting *Riverwoods*, 30 F.3d at 344)); *Lynn v. McCormick*, No. 17-CV-1183, 2017 WL 6507112, at *6 (S.D.N.Y. Dec. 18, 2017) (concluding that the plaintiffs failed to state a RICO claim against the corporate defendant because their alleged association-was "comprised of [the corporate defendant] and its employees and agents conducting [the corporate defendant's] corporate business of collecting on its judgments against [the plaintiffs]"), *aff'd*, 760 Fed. Appx. 51 (2d Cir. 2019); *Palatkevich v. Choupak*, No. 12-CV-1681, 2014 WL 1509236, at *15 (S.D.N.Y. Jan. 24, 2014) (dismissing substantive RICO claim against the corporate defendants because the plaintiff failed to allege that the corporate defendants were distinct from the RICO enterprise and the "three natural person [d]efendants who [were] the additional members of the enterprise [were] owners/employees/agents of the six companies"); *C.M. Exec. Gallery Corp. v. Rols Cap. Co.*, 901 F. Supp. 630, 640–41 (S.D.N.Y. 1995) (dismissing RICO claims for lack of distinctness and noting that "an alleged association-in-fact does not have an existence apart from the [corporation] merely because the alleged racketeering activities are not legitimate [corporate] activities").

EMSI alone.  (Defs.' Mem. 2–3, 17; Defs.' Reply 10.)

Travelers argues that it has stated a claim for RICO conspiracy by pleading (1) "specific allegations of wrongdoing against the Defendants in conducting the affairs of the EMSI enterprise," (2) "the Defendants' material misrepresentations and omissions about the compensability of EMSI's claims," and (3) "that the Defendants agreed to engage in RICO-prohibited conduct."  (Pls.' Opp'n 35–36.)

Under 18 U.S.C. § 1962(d), a person violates the statute if they "conspire to violate any of the" RICO provisions of the statute.  "To establish the existence of a RICO conspiracy, a plaintiff must prove 'the existence of an agreement to violate RICO's substantive provisions.'"  *Cofacrèdit*, 187 F.3d at 244 (internal quotation marks omitted) (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)); *see also Jordan v. Tilzer*, No. 21-1938, 2022 WL 16544335, at *2 (2d Cir. Oct. 31, 2022) (same); *One World, LLC v. Onoufriadis*, No. 21-374, 2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (quoting *Williams*, 889 F.3d at 124) (same); *Morin v. Trupin*, 835 F. Supp. 126, 135 (S.D.N.Y. 1993) (stating that to establish a RICO civil conspiracy claim, "[t]he complaint . . . must specifically allege . . . an agreement" to commit predicate acts.").  Furthermore, a plaintiff must demonstrate that a defendant "understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses."  *Morin*, 835 F. Supp. at 136 (quoting *Morin v. Trupin*, 747 F. Supp. 1051, 1067 (S.D.N.Y. 1990)); *see also Infinity Health Prods.*, 2012 WL 1427796, at *7 (same).  This requirement may be satisfied by showing that a defendant "possessed knowledge of only the general contours of the conspiracy."  *Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.*, No. 10-CV-4341, 2011 WL 5507426, at *10 (E.D.N.Y. Nov. 9, 2011) (quoting *United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011)).

When a plaintiff relies on the same factual predicate to plead both a substantive RICO violation and conspiracy claim, if the plaintiff fails to adequately plead a substantive RICO

claim, the plaintiff cannot adequately plead a conspiracy claim. *See Curtis*, 2023 WL 6324324, at *2 (explaining that a 'RICO conspiracy claims fail when the 'alleged conspiracy involved an agreement to commit the same substantive RICO violations the [c]ourt has deemed insufficiently pled'" (brackets omitted) (quoting *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018))); *Zamora*, 834 F. App'x at 626 ("Plaintiffs' failure to state a claim for a substantive RICO violation is fatal to their RICO conspiracy claim under § 1962(d), given that [p]laintiffs rely on the same factual predicate to plead both the substantive RICO violation and the conspiracy claim[.]"); *Lynn*, 760 F. App'x at 54 ("[Plaintiffs'] failure to plead a substantive RICO claim under 18 U.S.C. § 1962(c) necessarily defeats their conspiracy claim under 18 U.S.C. § 1962(d)."). To plead a RICO conspiracy, "a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions." *Williams*, 889 F.3d at 124; *Hubbuch v. Cap. One, N.A.*, No. 25-CV-406, 2025 WL 1983218, at *7 (S.D.N.Y. June 11, 2025) (same), *report and recommendation adopted*, No. 25-CV-406, 2025 WL 1934472 (S.D.N.Y. July 15, 2025); *Nygård v. Bacon*, No. 19-CV-1559, 2021 WL 3721347, at *3 (S.D.N.Y. Aug. 20, 2021) ("If a complaint fails to state a substantive RICO claim, it also does not state a claim for RICO conspiracy.").

As discussed in Sections II.c.i–ii *supra*, Travelers has not adequately alleged a substantive RICO claim against any Defendant. Travelers bases its conspiracy claims on (1) Individual Defendants alleged agreement "to conduct the affairs of [EMSI] through a pattern of racketeering activity, including numerous acts of mail fraud . . . . , and through the preparation and/or submission of fraudulent insurance claim documents, including CMS-1500 forms, to Travelers" for the purpose of "obtain[ing] payments from Travelers" even though EMSI "was not eligible to collect . . . No-Fault and workers' compensation payments," (Compl. ¶¶ 566–67); and (2) Individual Defendants agreement with EMSI to "conduct the affairs of the EMSI

Association-in-Fact Enterprise by means of a pattern of racketeering activity, namely using the U.S. [m]ail to send fraudulent invoices and other claim-related documents to Travelers in connection with No-Fault and workers compensation claims," (*Id.* ¶ 600). Thus, Travelers' "alleged conspirac[ies] involved an agreement to commit the same substantive RICO violations [the Court has] deemed insufficiently pled," *Williams*, 889 F.3d at 126, and it does not assert allegations or events separate from those underlying the substantive RICO claims for the RICO conspiracy claim.

Travelers quotes *State Farm Mutual Automobile Insurance Co. v. CPT Medical Services, P.C.*, 375 F. Supp. 2d 141 (E.D.N.Y. 2005), to argue that "dismissal of the RICO conspiracy claims is not warranted because a 'plaintiff is not required to plead a cognizable, substantive RICO claim against defendants in order to allege a claim for RICO conspiracy.'" (Pls.' Opp'n (quoting *CPT Med. Servs.*, 375 F. Supp. 2d at 150–51).) However, Travelers' reliance is misplaced. In *CPT Medical Services*, an insurer asserted RICO violations and common law claims against two physicians and other defendants for their billing of unnecessary diagnostic tests, including at least eighty-three tests the physicians ordered. 375 F. Supp. 2d at 147–50. The insurer brought only a RICO conspiracy claim against the physicians, alleging that they "wil[l]fully combined, conspired and agreed to . . . conduct and/or participate, directly or indirectly, in the conduct of the [enterprise's] affairs" and "knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by facilitating the submission to [the insurer] and other insurance companies of fraudulent bills for [tests] that were not medically necessary and were of no diagnostic value." *Id.* at 151. The physicians moved to dismiss, arguing in relevant part that the RICO conspiracy claim "must be dismissed as a matter of law" because the insurer had not alleged "any substantive violation of [section] 1962(c) by [the physicians]." *Id.* at 150. The court dismissed this argument because, as Travelers notes, a

"plaintiff is not required to plead a cognizable, substantive RICO claim against defendants in order to allege a claim for RICO conspiracy"; rather, a plaintiff need only allege that plaintiffs agreed to commit at least two predicate acts. *Id.* at 150–51. However, the court went on to explicitly distinguish cases like Travelers' action here, explaining that "cases which dismiss a RICO conspiracy claim because the courts find substantive RICO claims against the same defendants to be meritless" were "inapposite" because the insurer in *CPT Medical Services* had not asserted any substantive RICO claims against the physicians and the court therefore was "not making a determination . . . that those defendants against whom a conspiracy cause of action is pleaded, have (or have not) committed a substantive RICO violation." *Id.* at 151–52. Like the cases the court distinguished in *CPT Medical Services*, Travelers pleads both substantive and conspiracy RICO claims against Defendants and the Court has determined that the substantive claims are "meritless." *Id.* at 151–52. Moreover, Travelers relied on the "same factual predicate to plead both the substantive RICO violation and the conspiracy claim," *Zamora*, 834 F. App'x at 626, and thus has failed to offer any basis for the Court to find that it has pleaded a RICO conspiracy claim independent of the substantive RICO violations that were inadequately pleaded.

Accordingly, the Court dismisses the RICO conspiracy claims against all Defendants. *See, e.g.*, *Curtis*, 2023 WL 6324324, at *2 (dismissing the plaintiffs' conspiracy claim where they had not stated a substantive RICO claim); *First Cap. Asset Mgmt.*, 385 F.3d at 182 (same); *Chester Park View, LLC v. Schlesinger*, No. 23-CV-5432, 2024 WL 2785140, at *12 (S.D.N.Y. May 29, 2024) (same); *Anglin Auto. LLC v. EBF Holdings, LLC*, No. 23-CV-1404, 2024 WL 1118892, at *9 (S.D.N.Y. Mar. 14, 2024) (same); *Paul Hobbs Imps.*, 2023 WL 374120, at *13 (same).

### d.  Common law fraud claim

Defendants argue that the common law fraud claim against Individual Defendants must be dismissed because "[o]nce conclusory allegations are excluded from the Complaint, the

remainder as concerns the Individual Defendants does not plausibly allege that any of [them] personally committed . . . common law fraud."  (Defs.' Mem. 2–3; Defs.' Reply 6–9.)

Travelers argues that its allegations state all necessary elements of fraud.  As to the first element, a material misrepresentation or omission of fact, Travelers contends that it has alleged that (i) Defendants "misrepresented and omitted material facts that the devices were ordered because of a predetermined protocol," (ii) "the [Letters of Medical Necessity] were actually completed by EMSI managers instead of the treating providers," (iii) EMSI's claims "omitted the material fact that the device orders were not indicated in the records of the treating provider," and (iv) EMSI's bills "misrepresented the nature of the devices to inflate charges."  (Pls.' Opp'n 37.)  Travelers argues it has alleged the second element, "knowledge of falsity and an intent to induce reliance," by pleading (i) "evidence of EMSI's similar schemes to defraud other insurers, coupled with the allegations establishing each Defendant's involvement in operating and managing the EMSI enterprise during the scheme" that "makes it plausible that the Defendants knew the claims submitted to Travelers were false," and (ii) "Defendants caused EMSI to submit claims seeking reimbursement," (*id.* at 37).  Travelers also argues that its allegations "raise the strong inference that the Defendants possessed fraudulent intent" because it alleges motive through allegations that "Defendants obtained over $340,000 from Travelers through their alleged fraud; they also collected millions more from federal healthcare programs through their scheme" and opportunity through the allegation that the Individual Defendants "used their management positions inside EMSI to devise and execute a scheme in which they caused EMSI to generate records and bills in support of fraudulent claims, and then used those fraudulent documents to demand payments from Travelers."  (*Id.* at 31–32.)  As to the third element, justifiable reliance, Travelers contends the allegations establish that it "was unable to discover the Defendants' misconduct given the strict time limit afforded insurers to challenge claims" and that "EMSI

refused to comply with Travelers' lawful verification requests, which prevented discovery of the misconduct." (*Id.* at 38.) Travelers argues it has alleged damages because "the Complaint and accompanying exhibits establish that the Defendants' fraudulent actions caused Travelers to suffer damages exceeding $340,000." (*Id.*)

"Under New York law, [t]he essential elements of a cause of action for fraud are representation of a material existing fact, falsity, scienter, deception, and injury." *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 641 (2d Cir. 2012) (alteration in original) (internal quotation marks, footnote, and emphasis omitted) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)); *Cargo Logs. Int., LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 226 (E.D.N.Y. 2024) ("Under New York law, the essential elements of a fraud claim include representation of a material existing fact, falsity, scienter, deception, and injury." (internal quotation marks omitted) (quoting *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001))); *see also Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018) (stating the elements of a fraudulent misrepresentation claim). Specifically, "[t]o state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Housey v. Proctor & Gamble Co.*, No. 22-CV-888, 2022 WL 17844403, at *1 n.1 (2d Cir. Dec. 22, 2022) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015)); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (same); *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009) ("The second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation." (citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995))).

"[I]n conjunction with the facial plausibility standard of Rule 12(b)(6)," pleadings for common law fraud claims "must satisfy the heightened pleading standard set forth in Rule 9(b)" of the Federal Rules of Civil Procedure. *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 171 (2d Cir. 2015); *Turk v. Rubbermaid Inc.*, No. 21-CV-270, 2022 WL 836894, at *4 (S.D.N.Y. Mar. 21, 2022) ("[F]raud claims — including common law fraud claims — are subject to the heightened pleading standard set forth in Rule 9(b)."). "Rule 9(b) requires that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25–26 (2d Cir. 2016) (alteration in original) (quoting Fed. R. Civ. P. 9(b)).

"[T]he particularity pleading requirements of [Rule 9(b)] . . . 'require[ ] that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Fin. Guar. Ins.*, 783 F.3d at 402–03 (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "Put another way, Rule 9(b) 'requires that a plaintiff set forth the who, what, when, where[,] and how of the alleged fraud.'" *U.S. ex rel. Henig v. Amazon.com, Inc.*, No. 19-CV-5673, 2025 WL 27736, at *6 (S.D.N.Y. Jan. 3, 2025) (quoting *U.S. ex rel. Kester Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014)); *Kearney v. Bayerische Motoren Wekre Aktiengesellschaft*, No. 17-CV-13544, 2018 WL 4144683, at *10 (D.N.J. Aug. 29, 2018) (quoting *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009)). "Although Rule 9(b) allows for '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally,' Fed. R. Civ. P. 9(b), a plaintiff must still allege facts 'that give rise to a strong inference of fraudulent intent.'" *Red Apple 86 Fleet Place Dev., LLC v. State Farm Fire & Cas. Co.*, No. 23-1312, 2024 WL

4764060, at *3 (2d Cir. Nov. 13, 2024) (alterations in original) (quoting *Loreley Fin.*, 797 F.3d at

171).  "[A] 'strong inference of fraudulent intent' . . . 'may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging

facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"

*Fed. Deposit Ins.*, 2023 WL 7130553, at *2 (quoting *United States v. Strock*, 982 F.3d 51, 66 (2d

Cir. 2020)); *see also Honeyman v. Hoyt* (*In re Carter-Wallace, Inc., Sec. Litig.*), 220 F.3d 36, 39

(2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994)) (same).

 Travelers bases its common law fraud claim against the Individual Defendants on the

same fraudulent billing scheme that formed the basis of its RICO claims.[17]  As discussed under

Section II.c.i, Travelers alleges the specific statements it contends are fraudulent, who made

them, where and when the statements were made, and how and why the statements are

fraudulent, but the allegations fail to establish that the Individual Defendants participated in the

scheme and therefore are insufficient to state a fraud claim.  *Lima LS PLC v. PHL Variable Ins.*

*Co.*, No. 12-CV-1122, 2013 WL 3327038, at *14 (D. Conn. July 1, 2013) (dismissing common

law fraud claim against the individual defendants because "[c]onsistent with the discussion

relevant to the RICO claim, [the p]laintiff ha[d] not pleaded fraud with particularity with regard

to the conduct by the [i]ndividual [d]efendants" as the "complaint lack[ed] specific allegations as

to actual acts specific to each of the [i]ndividual [d]efendants" and appeared to "rely upon the

corporate positions of the [i]ndividual [d]efendants").

 Accordingly, the Court dismisses Travelers' common law fraud claim against the

Individual Defendants.

---

[17]  As discussed in note 9 *supra*, Defendants have not moved to dismiss the common law
fraud claim against EMSI.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion and dismisses the RICO claims against Defendants and the common law fraud claim against the Individual Defendants only.  Although the Court finds that the licensure allegations are insufficiently pleaded and therefore cannot sustain any cause of action, the Court denies Defendants' motion to dismiss the Complaint on the basis of the insufficient licensure allegations.  The Court grants Travelers leave to file an amended complaint as to the dismissed claims and licensure allegations.[18]  Any amended complaint must be filed within thirty days from the filing of this Memorandum and Order.

Dated:  September 13, 2025
       Brooklyn, New York

                                  SO ORDERED:

                                          /s/MKB
                                  MARGO K. BRODIE
                                  United States District Judge

---

[18]  Although neither party addressed leave to amend the Complaint in the event of dismissal, leave to amend should be "freely give[n] . . . when justice so requires."  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (quoting Fed. R. Civ. P. 15(a)(2)); *see also Norman v. Experian Info. Sols., Inc.*, No. 23-CV-9245, 2024 WL 3890103, at *1 (S.D.N.Y. Aug. 20, 2024) ("In this Circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" (alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))).  Leave to amend may be denied for good reason, including "instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  *Ladas*, 824 F.3d at 28 (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)).  In addition, "it is within the sound discretion of the district court to grant or deny leave to amend . . . ."  *Broidy Cap. Mgmt. v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019).  Because leave to amend should be freely given under Rule 15 of the Federal Rules of Civil Procedure, the Court grants Travelers leave to amend the Complaint.